# 23-7038

*To Be Argued By:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

NATHANIEL CHASTAIN, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

DAVID I. MILLER
DANIEL P. FILOR
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200

ALEXANDRA A.E. SHAPIRO
JASON A. DRISCOLL
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
  17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION .............................................................................1

JURISDICTIONAL STATEMENT.....................................................3

ISSUES PRESENTED ........................................................................4

STATEMENT OF THE CASE .............................................................5

    A.   The Charges And *Carpenter* Theory.......................................5

    B.   Trial Evidence .........................................................................6

        1. OpenSea's Business ...................................................6

        2. Chastain's Employment .............................................7

        3. Featured NFT Section ................................................7

        4. Chastain's NFT Purchases And Resignation .............9

        5. OpenSea Lacked Clear Confidentiality Policies ...........10

        6. Atallah And Finzer's Equivocal Testimony.................13

        7. New Confidentiality Policies Implemented
           After Chastain Resigned ..............................................14

        8. Atallah's And Finzer's Own Use Of
           OpenSea Information .....................................................15

    C.   Relevant Rulings And Jury Notes ........................................16

        1. Motion To Dismiss And Daubert Rulings ....................16

        2. Jury Instructions.........................................................16

        3. Rule 29 Motion ..........................................................17

i

        4.  Jury Deadlock And Supplemental Instruction ................................. 17

   D.  Sentencing ............................................................................. 18

STANDARDS OF REVIEW .............................................................. 18

SUMMARY OF ARGUMENT ........................................................... 19

ARGUMENT ..................................................................................... 21

I.     CHASTAIN IS ENTITLED TO ACQUITTAL BECAUSE
      FEATURED NFT INFORMATION IS NOT
      "PROPERTY" UNDER § 1343 ................................................... 21

   A.  The Evidence Was Insufficient Because Featured
      NFT Information Is Not Traditional Property
      With Commercial Value To Its Owner ................................ 22

      1.  Under *Carpenter*, Only Confidential Business
         Information With Commercial Value To A
         Business Is Its "Property" Under § 1343 ....................... 22

      2.  *Carpenter* Only Applies To Confidential Business Information
         Protected At Common Law, Consistent With Supreme Court
         Decisions Limiting "Property" To Its
         Common-law Meaning .................................................... 25

      3.  This Court Recently Rejected A Broader Interpretation
         Of *Carpenter*, And Its Earlier Decisions Do Not
         Support The Government's Theory .................................. 27

      4.  The Featured NFT Information Was Not
         OpenSea's "Property" .................................................... 30

   B.  The Evidence Was Insufficient Even If Commercial
      Value Is Not Required ....................................................... 32

      1.  OpenSea Had No Relevant "Written Company
         Policies" ......................................................................... 32

2.  OpenSea Took No Other Affirmative Steps To Protect The Information ................................... 35

3.  Chastain Used An Open Process Involving Other Employees And The Public To Decide What To Feature ...................... 36

4.  The Information Had No Commercial Value ................. 37

C.  The Government Failed To Prove Intend To Defraud .......................... 38

II.  FLAWED JURY INSTRUCTIONS REQUIRE A NEW TRIAL ................................... 38

A.  The District Court Erroneously Instructed The Jury That Proof Of Commercial Value Was Not Required ................................... 38

B.  The District Court's Response To Jury Note Three Misstated The Law And Unfairly Prejudiced Chastain ................................... 40

1.  Background ................................... 40

2.  The Supplemental Instruction Was Wrong, Misleading, And Unfair ................................... 43

3.  The Error Was Not Harmless ........................... 48

C.  The Jury Instructions Misstated The Law Of Fraud ........................... 49

D.  Omitting The Materiality Element Was Plain Error ........................... 53

III.  THE ERRONEOUS EXCLUSION OF CRITICAL DEFENSE EVIDENCE REQUIRES A NEW TRIAL ................................... 54

A.  The District Court Erroneously Excluded Evidence That Chastain's Peers Did Not Consider Or Treat The Information As Confidential ........................... 54

1.  The Evidence Was Relevant ........................... 54

      2. The Evidence Was Not Improper Lay Opinion ...............................56

B. The District Court Erroneously Excluded A Redline Showing That OpenSea Made No Material Changes To The Clerky Template ........................................................57

      1. Background ............................................................57

      2. The Evidence Was Relevant .....................................59

      3. Rule 403 Did Not Warrant Exclusion ...........................60

C. The District Court Erroneously Excluded Evidence That OpenSea's CEO Did Not View Similar Information As OpenSea's "Property" .................................61

      1. Background ............................................................61

      2. The Evidence Was Relevant .....................................62

      3. Rule 403 Did Not Warrant Exclusion ...........................63

D. The Evidentiary Errors Prejudiced Chastain ........................64

IV. THE CUMULATIVE EFFECT OF THESE ERRORS PREJUDICED CHASTAIN ...........................................................66

CONCLUSION ...................................................................66

iv

## TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Bank of China, New York Branch v. NBM LLC*,
   359 F.3d 171 (2d Cir. 2004) ............................................................45

*Board of Trade of City of Chicago v. Christie Grain & Stock Co.*,
   198 U.S. 236 (1905) .......................................................................24

*Cameron v. City of New York*,
   598 F.3d 50 (2d Cir. 2010) .............................................................57

*Carpenter v. United States*,
   484 U.S. 19 (1987) ...................................................................passim

*Chapman v. California*,
   386 U.S. 18 (1967) .........................................................................48

*Ciminelli v. United States*,
   598 U.S. 306 (2023) .................................................................passim

*Cleveland v. United States*,
   531 U.S. 12 (2000) ............................................................21, 25, 46

*Gregory v. United States*,
   253 F.2d 104 (5th Cir. 1958) .........................................................50

*In re Trib. Co. Fraudulent Conv. Litig.*,
   10 F.4th 147 (2d Cir. 2021) ...........................................................44

*Int'l News Serv. v. Associated Press*,
   248 U.S. 215 (1918) .................................................................22, 23

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) .......................................................21, 46, 51

*Koon v. United States*,
   518 U.S. 81 (1996) .........................................................................19

*Mazer v. Stein*,
   347 U.S. 201 (1954) .......................................................................26

*McDonnell v. United States*,
579 U.S. 550 (2016) .................................................................53

*McNally v. United States*,
483 U.S. 350 (1987) ............................................................31, 38

*Neder v. United States*,
527 U.S. 1 (1999). ............................................................25, 53

*Palmer v. De Witt*,
47 N.Y. 532 (1872)...................................................................26

*Pearson v. Dodd*,
410 F.2d 701 (D.C. Cir. 1969) ...............................................26

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ............................................................24, 45

*Sekhar v. United States*,
570 U.S. 729 (2013) .................................................................31

*Skilling v. United States*,
561 U.S. 358 (2010) .................................................................50

*Stewart v. Wilmington Tr. SP Servs., Inc.*,
112 A.3d 271 (Del. Ch. 2015) ...............................................44

*Taft v. Smith, Gray & Co.*,
134 N.Y.S. 1011 (App. Term 1912)........................................26

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) ...................................................66

*United States v. Biaggi*,
909 F.2d 662 (2d Cir. 1990) ...................................................65

*United States v. Blaszczak*,
56 F.4th 230 (2d Cir. 2022)........................................19, 27, 31

*United States v. Blum*,
62 F.3d 63 (2d Cir. 1995) ..................................................61, 64

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005) ...................................................................18

*United States v. Chapman,*
   209 F. App'x 253 (4th Cir. 2006).........................................................57

*United States v. Coplan,*
   703 F.3d 46 (2d Cir. 2012) ...................................................................34

*United States v. Czubinski,*
   106 F.3d 1069 (1st Cir. 1997) ..............................................................36

*United States v. Dove,*
   916 F.2d 41 (2d Cir. 1990) .............................................................46, 47

*United States v. Figueroa,*
   548 F.3d 222 (2d Cir. 2008) .................................................................59

*United States v. Gatto,*
   986 F.3d 104 (2d Cir. 2021) .................................................................44

*United States v. Gramins,*
   939 F.3d 429 (2d Cir. 2019) .................................................................54

*United States v. Grinage,*
   390 F.3d 746 (2d Cir. 2004) .................................................................65

*United States v. Grossman,*
   843 F.2d 78 (2d Cir. 1988) ...........................................................passim

*United States v. Hager,*
   879 F.3d 550 (5th Cir. 2018) ...............................................................36

*United States v. Hoskins,*
   44 F.4th 140 (2d Cir. 2022) ..................................................................45

*United States v. Kopstein,*
   759 F.3d 168 (2d Cir. 2014) .........................................................passim

*United States v. Litvak,*
   808 F.3d 160 (2d Cir. 2015) .................................................19, 55, 64

*United States v. Mahaffy*,
693 F.3d 113 (2d Cir. 2012) .................................................................passim

*United States v. Nouri*,
711 F.3d 129 (2d Cir. 2013) ...................................................................53

*United States v. Novod*,
923 F.2d 970 (2d Cir. 1991) ...................................................................28

*United States v. O'Hagan*,
521 U.S. 642 (1997) ...........................................................................51, 52

*United States v. Parse*,
789 F.3d 83 (2d Cir. 2015) ...........................................................20, 21, 38

*United States v. Porat*,
76 F.4th 213 (3d Cir. 2023) ...................................................................50

*United States v. Quattrone*,
441 F.3d 153 (2d Cir. 2006) .............................................................61, 64

*United States v. Quintieri*,
306 F.3d 1217 (2d Cir. 2002). ...............................................................48

*United States v. Quinto*,
582 F.2d 224 (2d Cir. 1978) .............................................................59, 62

*United States v. Scully*,
877 F.3d 464 (2d Cir. 2017) ...................................................................60

*United States v. Siegel*,
717 F.2d 9 (2d Cir. 1983) .......................................................................64

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017) ...................................................................39

*United States v. Stewart*,
907 F.3d 677 (2d Cir. 2018) .........................................................59, 60, 65

*United States v. Weaver*,
860 F.3d 90 (2d Cir. 2017) .....................................................................52

viii

*United States v. White*,
   692 F.3d 235 (2d Cir. 2012). ..............................................60, 61, 63, 64

*United States v. Winans*,
   612 F. Supp. 827 (S.D.N.Y. 1985) ......................................................34

*Zappulla v. New York*,
   391 F.3d 462 (2d Cir. 2004) ................................................................65

## Statutes and Rules

5 U.S.C. § 552 ........................................................................................24

18 U.S.C. § 1343 ...............................................................................passim

18 U.S.C. § 1956 ......................................................................................5

18 U.S.C. § 3231 ......................................................................................3

28 U.S.C. § 1291 ......................................................................................3

Fed. R. Evid. 401 ...................................................................................63

Fed. R. Evid. 403 ...................................................................................61

Fed. R. Evid. 701 .............................................................................56, 57

## Treatises and Publications

3 Fletcher, *Cyclopedia of the Law of Corporations* § 857.10 .................23

3 W. Fletcher, Cyclopedia of Law of Private Corporations
   § 857.1, p. 260 (rev. ed. 1986) ..........................................................22

John C. Coffee Jr., *Hush: The Criminal Status of Confidential Information after
   McNally and Carpenter and the Enduring Problem of Overcriminalization*,
   26 Am. Crim. L. Rev. 121 (1988) .......................................................26

Wayne R. LaFave, 3 Subst. Crim. L. §19.6(c) (3d ed.)..........................25

Wayne R. LaFave, 3 Subst. Crim. L. §19.7(e) (3d ed.)..........................25

**Other Authorities**

Fed. Crim. Jury Instr. 7th Cir. 1341 & 1343[2] (2023) ............................................51

Mod. Crim. Jury Instr. 3rd Cir. 6.18.1341-1 (2023) ...............................................50

Model Crim. Jury Instr. 8th Cir. 6.18.1341 (2021) .................................................51

Model Crim. Jury Instr. 8th Cir. 6.18.1343 (2021) .................................................51

Model Crim. Jury Instr. 9th Cir. 15.32 (2023) .......................................................51

Model Crim. Jury Instr. 9th Cir. 15.35 (2023) .......................................................51

Pattern Crim. Jury Instr. 1st Cir. 4.12 (1998) ........................................................50

Pattern Crim. Jury Instr. 1st Cir. 4.13 (1998) ........................................................50

Pattern Crim. Jury Instr. 5th Cir. 2.56 (2019) ........................................................51

Pattern Crim. Jury Instr. 5th Cir. 2.57 (2019) ........................................................51

Pattern Crim. Jury Instr. 6th Cir. 10.01 (2023) ......................................................51

Pattern Crim. Jury Instr. 6th Cir. 10.02 (2023) ......................................................51

Pattern Crim. Jury Instr. 10th Cir. 2.56 (2023) ......................................................51

Pattern Crim. Jury Instr. 10th Cir. 2.57 (2023) ......................................................51

Pattern Crim. Jury Instr. 11th Cir. OI O50.1 (2020) ..............................................51

Pattern Crim. Jury Instr. 11th Cir. OI O51 (2020) .................................................51

## INTRODUCTION

This appeal raises important questions about the scope of federal wire fraud, which only prohibits fraud schemes to obtain things that had "long been recognized as property when the wire fraud statute was enacted." *Ciminelli v. United States*, 598 U.S. 306, 314 (2023). The issues here relate to when *information* qualifies as "property" under the statute: Is an employee's idea about what image to display on a company's website its "property," even if the idea has no commercial value to the employer? Is *all* "confidential business information" protected "property"?

The answer to both questions is no. The employee's idea is not "property" if it lacks commercial value to the employer, because only information traditionally recognized as property qualifies. For the same reason, confidentiality is not sufficient, by itself, to establish that information is "property."

Appellant Nathaniel Chastain's convictions must therefore be reversed.

Chastain worked at OpenSea, an online marketplace for buying and selling digital assets known as non-fungible tokens (NFTs). OpenSea makes money by taking a commission on transactions conducted on its website. Chastain came up with the idea to display a different NFT on OpenSea's homepage every few days. The prices of these NFTs typically rose after they were featured. Chastain occasionally purchased NFTs before featuring them and sold them for a profit. He

was prosecuted for wire fraud (and laundering the proceeds). The government claimed his ideas about which NFTs to feature were OpenSea's "confidential business information"—and therefore its property under *Carpenter v. United States*, 484 U.S. 19 (1987). The government argued that he "misappropriated" this "property" by trading ahead of the featuring.

The district court found this "an odd case, where the victim doesn't feel victimized," and doubted charges would have been filed had it not involved a "sexy, new arena, NFTs." Indeed, OpenSea earned its usual fee on all the transactions and lost no money. The information in *Carpenter*—the content of forthcoming articles in the Wall Street Journal—was its "stock in trade," the product it sold. By contrast, Chastain's ideas about which NFT to feature (even if confidential) had no commercial value to OpenSea. Deeming such information "property" would stretch the fraud statutes far beyond the narrow limits repeatedly drawn by the Supreme Court. Businesses maintain all sorts of "information" they consider "confidential"—WiFi passwords, personnel records, even the code to the office restroom—but obviously, not all this information is "property."

Here, the government did not even prove that OpenSea treated the information as confidential. OpenSea took no affirmative steps to keep the information secret or train employees on which uses were permitted or prohibited.

It was unclear whether company policy even barred Chastain's transactions. This is yet another reason the evidence was insufficient to sustain the conviction.

The district court also eviscerated Chastain's defense through a series of rulings that, individually and collectively, deprived Chastain of a fair trial. The court instructed the jury that proof of commercial value was not required to prove the property element. Then it gutted Chastain's fallback defense—that OpenSea didn't consider the information confidential—in multiple ways. It precluded evidence supporting that defense. Later, when a note suggested the jury doubted the information was confidential, the court gave a supplemental instruction that misstated the law, answered questions the jury had not asked, and invited conviction on a theory the precluded defense evidence would have refuted. The trial was also tainted by erroneous instructions defining fraud based on long-outdated, vague "notions of fundamental honesty and fair play" and omitted the materiality element.

For these reasons, Chastain's conviction must be reversed.

## <u>JURISDICTIONAL STATEMENT</u>

The district court had jurisdiction under 18 U.S.C. § 3231. The judgment of conviction was entered on August 23, 2023. (SPA-32). Chastain timely filed a notice of appeal on September 1, 2023. (A-639). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.  Whether the evidence was insufficient on both counts because information must be commercially valuable to a business to constitute its "property" under 18 U.S.C. § 1343.

2.  Whether the evidence was insufficient on both counts because the government did not prove the information constituted OpenSea's "confidential business information."

3.  Whether Chastain was deprived of a fair trial because the jury instructions (a) erroneously stated information could be "property" even if it lacked commercial value to OpenSea; (b) effectively directed a guilty verdict in response to a note suggesting the jury doubted the information was confidential; (c) permitted the jury to find a fraud scheme based on vague "notions of fundamental honesty and fair play in the general and business life of society"; and (d) omitted the materiality element.

4.  Whether Chastain was deprived of a fair trial by the erroneous exclusion of three types of evidence that individually and collectively supported defense arguments that the information was not confidential.

5.  Whether the errors cumulatively deprived Chastain of a fair trial.

## STATEMENT OF THE CASE

Chastain appeals a judgment of conviction entered by the United States District Court for the Southern District of New York (Furman, J.), following a seven-day jury trial. The relevant rulings are unreported.

### A. The Charges And *Carpenter* Theory

The indictment charged wire fraud, 18 U.S.C. § 1343, and money laundering, 18 U.S.C. § 1956(a)(1)(B)(i). Wire fraud was the predicate crime for the money laundering count. (A-27; A-418). Accordingly, if the wire fraud count is reversed or vacated, the money laundering charge cannot stand.

The indictment alleged that Chastain's ideas about which NFTs to feature on OpenSea's website were the company's "confidential business information" and thus its "property" under § 1343. The prosecution's theory was that purchasing NFTs before they were featured was fraudulent under *Carpenter v. United States*, 484 U.S. 19 (1987).[1]

In *Carpenter*, a Wall Street Journal employee orchestrated a securities-trading scheme using the pre-publication contents of a market-moving Journal column. The Supreme Court held that this pre-publication information was the Journal's "property." The Court reasoned that it was the Journal's "stock in trade,"

_____

[1] Unless otherwise noted, citations omit quotation marks, footnotes, emphasis, and alterations in the original source.

and that such information had "long been recognized as property." *Id.* at 26. Accordingly, the scheme constituted misappropriation of "money or goods" and thus "embezzlement." *Id.* at 27. Because the employee misappropriated the information "for his own use, all the while pretending to perform his duty of safeguarding it," he committed deception and thus fraud. *Id.* at 28.

Chastain challenged the government's fraud theory in a motion to dismiss and throughout the proceedings below. He argued that the NFT information was not "property" under the statute or *Carpenter* as a matter of law because it had no commercial value to OpenSea. He also argued that it was not property under *Carpenter* because OpenSea did not take steps to protect its confidentiality.

**B. Trial Evidence**

*1. OpenSea's Business*

OpenSea was founded in December 2017 by Devin Finzer and Alex Atallah. (A-174-75). OpenSea is an online "peer-to-peer" marketplace for buying, selling, and discovering NFTs. (A-175-77). An NFT is a digital asset stored on a public blockchain, often representing a digital object such as digital artwork. (A-167-68, A-173). OpenSea does not buy, sell, or own the NFTs traded on the platform; only the "users themselves" do so. (A-177). The company collects a 2.5% fee on "every successful transaction." (A-178, A-304). That is its "primary source of revenue." (A-305).

6

OpenSea promoted NFT projects and artists on its website and through social media. (A-181-82, A-207). The company chose not to earn revenue from these promotions, and charging for promotional activity would not have "been substantial to [OpenSea's] business." (A-183-84; *see also* A-170-71, A270-271). Rather, promotions were meant to provide "fresh content" and help grow the NFT market. (A-181-83, A-269-71).

### 2. *Chastain's Employment*

OpenSea hired Chastain, then 30 years old, on January 28, 2021, as Head of Product, reporting directly to Finzer. (A-186-89, A-540). OpenSea granted him stock options. (A-189-90). He was considered a member of its leadership team (along with Finzer, Atallah, Head of Design Jessica Phan, and VP of Business Development Ryan Foutty). (A-185-86, A-522). His job was to set product direction, formulate changes to OpenSea's website, and interact with OpenSea's user community about product features. (A-186, A-260-61).

### 3. *Featured NFT Section*

A few months into his employment, Chastain added a "featured NFT" section to OpenSea's website. (A-303-04, A-174). This section would feature a new artist every few days using an image of their art. (A-171-72). The idea was to make the homepage "more dynamic," educate the public about NFTs, and promote independent artists. (A-206-07, A-229, A-284-85). Chastain oversaw the section,

7

selecting a new NFT to feature once or twice a week.  (A-208-09, A-213, A-219, A-366, A-341).

OpenSea did not earn revenue from the section.  (A-228).  OpenSea's co-founders testified that charging a fee "wouldn't have been substantial for the business" and "was not aligned with [OpenSea's] main goals as a company."  (A-228-29).  Finzer also admitted it made no difference to OpenSea's business which NFT Chastain selected to feature.  (A-305).  Instead, like with any other NFT transaction, "OpenSea just made its standard 2.5 percent fee."  (A-229, A-304-05).

Although Chastain didn't publicly announce which NFTs he planned to feature on OpenSea's website (A-220-21, A-287, A-341-42), his selection process was neither proprietary nor secretive.  Many people—including employees and third parties—recommended and discussed possible NFTs to feature.  (A-337).  A Slack channel open to all employees allowed anyone to propose feature ideas.  (A-209-11, A-213-17, A-286-87, A-337, A-543-72).  Chastain put a link in that channel to a "current favorites gallery" where employees could view potential features.  (A-543, A-354).  OpenSea also solicited recommendations from the public on its website and on Twitter.  (A-211-12, A-217-18, A-222-27, A-589-92).  As Atallah testified, OpenSea was "open to ideas from everybody."  (A-218-19).

### 4. *Chastain's NFT Purchases And Resignation*

On several occasions in mid-2021 Chastain purchased NFTs before featuring them on OpenSea's website. He readily admitted this in a text message. (A-585-88, A-364-66). The NFTs increased in value after they were featured, and Chastain earned profits in a cryptocurrency called ether (or ETH) that, in total, were worth roughly $50,000—and potentially less—at that time. (A-165, A-267).

There was evidence suggesting Chastain may have believed his conduct was unethical or a "conflict of interest." (A-502-08, A-358-63). For instance, he once suggested that another employee's request to feature his own art on the website might be "unethical" or "could be a problem." (A-231). But there was no evidence he believed his transactions were criminal or fraudulent, or that he intended to harm OpenSea. Indeed, Chastain publicly disclosed his featured NFT transactions on August 2, 2021—over a month before the company took any action. (A-593). At that time, a Twitter user commented: "Looks like Nate from OS had the jump on everyone else 👀". Another commented, "I might start tracking his wallet." (*Id.*). Chastain replied, "I just wanted to secure one of these before they all disappeared tbh." (*Id.*). Thus, it was clear to members of the public—and OpenSea employees had they seen this public exchange—that Chastain had purchased an NFT ahead of featuring the artist. Yet OpenSea took no action in response. (A-314-15).

9

On September 14, 2021, a Twitter user accused Chastain of frontrunning featured NFTs. (A-594). When initially shown the tweet, Chastain shook his head and said it was "mistaken." (A-343-45, A-235-36). The next day, Atallah, Finzer, and Gina Moon asked Chastain to resign. (A-236-37, A-288-90). Chastain apologized and stated he "loved working with [OpenSea]." (A-237).

Finzer testified that asking for Chastain's resignation was a "hard decision," and texted Chastain on September 16, 2021 that doing so was "[u]ndoubtedly the most difficult call we had to make." (A-318, A-603). Finzer remained "[r]eally proud of the amazing work [Chastain] did at OpenSea," and "really want[ed] to stay close friends and keep syncing up." (A-603, A-317-18). Finzer even tried to help Chastain land a new job by introducing him to the co-founder of Coinbase, who was an OpenSea investor. (A-604, A-323-25). In the weeks following his resignation, Chastain stayed close with both OpenSea co-founders—meeting with Atallah at a bar and attending Finzer's birthday party. (A-238, A-325).

## 5. *OpenSea Lacked Clear Confidentiality Policies*

The government relied heavily on a document entitled "Confidential Information and Invention Assignment Agreement" ("CIIAA"), which Chastain signed on January 28, 2021, and Finzer countersigned. (A-524-33, A-197-98, A-203). That agreement was the only confidentiality policy in effect during Chastain's employment. (A-204, A-249).

Finzer and Atallah testified that using a confidentiality policy seemed like a "common sense," "standard practice." (A-193, A-279). The agreement was a template from a service called Clerky. (A-278-79, A-281-82, A-193-94, A-246). Although Atallah claimed he "believe[d]" OpenSea modified the Clerky form "to customize the template" (A-246), Finzer contradicted this account, testifying that OpenSea did not modify Clerky's template (A-300). As discussed in Point III.B, the district court precluded Chastain from introducing a redline that would have shown Atallah was incorrect.

Atallah effectively conceded he hadn't read the CIIAA. He initially stated, "I believe I read it, but I'm not positive, I—I can't recall for certain," but subsequently admitted, "I don't recall taking a deep read." (A-246-47).

The CIIAA instructs employees "to hold in strictest confidence, and not to use, except for the benefit of the Company…any Confidential Information …until such Confidential Information becomes publicly and widely known…." (A-524). "Confidential Information" is defined as "information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties." (*Id.*). The agreement provides examples of "Confidential Information," including, *inter alia*, "product or service ideas or plans," "marketing plans," and "other business information." (A-524-25, A-282-83, A-334-35). Some are plainly irrelevant to

11

OpenSea—"laboratory notebooks," "biological materials," and "mask works." (A-525). Atallah and Finzer admitted these were not relevant to OpenSea's business and that the CIIAA did not mention NFTs. (A-248-49, A-258-59, A-300-02). Instead, it "was basically boilerplate language" lifted from the Clerky template. (A-249).

Atallah and Finzer admitted OpenSea failed to educate employees about any confidentiality obligations. Neither recalled any conversations with Chastain about the CIIAA; they did not train employees concerning the use of confidential information or distribute any training materials; and there were no evaluations, assessments, or recertifications about confidentiality. (A-204, A-249-51, A-302-03, A-346, A-349-50). Nor did OpenSea have a general counsel, head of HR, or compliance function for most of Chastain's tenure. (A-297-99, A-349-50). Instead, because OpenSea was then a small company, Atallah relied on his "good sense of what all the employees were doing," and "felt like…[OpenSea] hire[d] people [it] really trusted." (A-205).

In contrast to when Chastain worked at OpenSea, "[t]oday, new employees go through an on-boarding process, where they learn about the corporate values; and values are part of [OpenSea's] internal documentation." (A-276-77, A-299). The company also has compliance professionals. (A-350). But "[w]hen

[OpenSea] [was] a smaller company, [it] didn't have formal on-boarding training."
(A-277, A-299).

      *6. Atallah And Finzer's Equivocal Testimony*

      On the dispositive issue—whether OpenSea considered featured NFT information confidential—Atallah and Finzer were equivocal. Atallah testified, "I believe so," and "I considered it to be confidential information." (A-221). When asked whether employees were "allowed to use OpenSea's confidential information to buy and sell NFTs," he answered, "[n]ot to my knowledge," and that he "believe[d]" the CIIAA prohibited this. (A-230, A-242).

      Asked on direct, "What was the connection, if any, between Mr. Chastain's actions in buying featured NFTs before they were featured and then selling them after and the confidentiality agreement that we just looked at?" Finzer testified: "The connection would be that the knowledge of which NFTs were used or were going to be featured on the home page was information that was privy and specific to the company that was being used to perform those actions." (A-290). On cross-examination, Finzer admitted that prior to these events he "hadn't thought explicitly about whether [Chastain's NFT selection] was confidential information." (A-305).

      On several occasions, Chastain publicly commented on new product features and upcoming business plans, without objection by others at OpenSea. (A-260-61,

A-306-14, A-595-600). Atallah was personally tagged on one such tweet (A-598, A-311) and could not recall ever instructing Chastain not to publicize OpenSea's product plans (A-261). Finzer did not think these tweets violated the CIIAA, but was "not sure." (A-332-33).

### 7. *New Confidentiality Policies Implemented After Chastain Resigned*

The day Chastain resigned, OpenSea publicly announced "additional policies that specifically outlined what employees could do with regards to buying and selling NFTs…featured on the home page" (A-291) to "strengthen [its] existing controls" (A-582). The policies (1) specified that "OpenSea team members may not buy or sell from collections or creators while we are featuring or promoting them (e.g. on our home page)" and (2) prohibited employees "from using confidential information to purchase or sell any NFTs, whether available on the OpenSea platform or not." (A-583). The announcement did not suggest Chastain's conduct violated any previous policy but said his "behavior [did] not represent our values as a team" and violated OpenSea's "strong obligation" to the NFT community. (A-582-83).

Finzer testified these new, "more specific" (A-294) policies were needed "to clarify and add to the policies" (A-322). He maintained, however, that employees' use of "confidential information" was already covered by the CIIAA. (A-322, A-293-94). Atallah claimed that only the first rule was truly new, while the second

14

was covered by the CIIAA. (A-240-42). However, when confronted with a Zoom invite to OpenSea employees characterizing the rules as "our new team policy," Atallah admitted the invite described a "new policy." (A-253-54, A-601). Viau agreed OpenSea adopted "new policies" in the wake of Chastain's resignation. (A-349).

OpenSea later promulgated a more detailed "information use policy" that more comprehensively defined employee obligations and best practices for considering and handling featured NFT information. (A-576-81). The policy included rules Atallah conceded "weren't yet in place when Chastain worked at OpenSea" (A-243-44), including language about NFT trading (A-255-59). The new policy explicitly defined Confidential Information to include: "OpenSea's plans to feature or promote an NFT…on the OpenSea home page…." (A-577-78).

### 8. Atallah's And Finzer's Own Use Of OpenSea Information

On cross examination, Atallah testified to personally engaging in NFT trading activity that violated the terms of OpenSea's new information use policy. He admitted that on May 1, 2022, he minted an NFT while it was still being featured on OpenSea's Twitter account. (A-263-65, A-256, A-391-92).

Chastain attempted to cross examine Finzer regarding his own apparently similar conduct during Chastain's tenure. However, as discussed in Point III.C, the court erroneously precluded this line of questioning. (A-328-31).

15

### C. Relevant Rulings And Jury Notes[2]

#### 1. Motion To Dismiss And Daubert Rulings

Chastain moved to dismiss the indictment. (Dkts. 17-19). He argued, *inter alia*, that the indictment failed to adequately allege that the featured NFT information constituted OpenSea's "property," because only information with inherent economic value constitutes "property" under the fraud statutes. The court denied the motion without finally resolving this legal issue. (SPA-1-6).

Chastain renewed his argument in briefing on motions to preclude expert testimony about the use and value—or lack thereof—of the featured NFT information. (Dkts. 57-59, 61-63). In deciding whether the proffered opinions were relevant, the court rejected Chastain's argument that, "to qualify as property, confidential business information must have some 'inherent economic value' to its owner." (SPA-9).

#### 2. Jury Instructions

With respect to the "property" element of wire fraud, the court instructed that the jury "may…consider whether the information had economic value to the employer, but the government is not required to prove that the information had such value." (A-413). Chastain objected, proposing an instruction stating that

---

[2] Point III describes background relevant to evidentiary rulings challenged on appeal.

information is "property" "only if it is…confidential business information…[that] has inherent value to the purported victim." (A-40, A-74, A-386-87).

Chastain also objected to the scheme to defraud instruction, which invited the jury to "find the existence of a scheme to defraud if…the defendant conducted himself in a manner that departed from traditional notions of fundamental honesty and fair play in the general and business life of society." (A-385, A-133, A-411).

Although Chastain requested an instruction on materiality (A-38-39, A-70-71), the court gave the jury no instruction on this element.

### 3. Rule 29 Motion

Chastain moved for a judgment of acquittal after the government rested. The court denied his motion shortly before the defense rested. (A-347-48, A-367-72). After the verdict, the Court endorsed Chastain's request to renew his motion and deemed it fully preserved. (A-625).

### 4. Jury Deadlock And Supplemental Instruction

After several hours of deliberations, the jury indicated it was deadlocked. (A-440). The court instructed jurors to keep deliberating. (A-446-47). Towards the end of that day, the jury sent a note suggesting it had concluded that Finzer did not regard the featured NFT information as confidential, and asking whether, if Chastain considered it confidential, that would be sufficient to establish the "property" element. (A-448). Instead of simply answering "no," the court

17

instructed the jury that it could consider the "conduct and testimony" of Finzer and how other "employees at OpenSea treated the information within the scope of their employment," and that, "[w]hat weight, if any, you give any such evidence is…for you to decide." (A-485-86). Chastain objected to this supplemental instruction (A-450-84, A-142-45), which was followed by three other notes and then a guilty verdict on both counts.

### D. Sentencing

The district court sentenced Chastain principally to three months' imprisonment. (A-631-38). Reflecting on Finzer's trial testimony and OpenSea's failure to seek restitution, the court described this as "an odd case, where the victim doesn't feel victimized." (A-629-30). The judge twice questioned whether the charges were warranted: "I genuinely wonder, but for the fact that this raised in a slight sexy, new arena, NFTs, whether it would have been charged." (A-627-28, A-634-35).

Chastain is serving his sentence.

## STANDARDS OF REVIEW

Questions of statutory interpretation, *Ciminelli v. United States*, 598 U.S. 306, 312-16 (2023), sufficiency of the evidence, *United States v. Cassese*, 428 F.3d 92, 97 (2d Cir. 2005), and jury instructions, *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014), are reviewed *de novo*. Evidentiary rulings are reviewed

for abuse of discretion. *United States v. Litvak*, 808 F.3d 160, 179–80 (2d Cir. 2015). An "error of law" is "by definition" an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996).

## SUMMARY OF ARGUMENT

I. Chastain is entitled to a judgment of acquittal because he did not commit wire fraud.

*First*, confidential information is not a business's "property" under § 1343 unless it has commercial value to the business. That limitation is required by *Carpenter* and many other Supreme Court decisions confining "property" to interests "that had 'long been recognized as property' when the wire fraud statute was enacted." *Ciminelli*, 598 U.S. at 314 (quoting *Carpenter*, 484 U.S. at 26). This Court confirmed the commercial value requirement in *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022). Since the government failed to prove OpenSea's feature NFT information had any commercial value, the evidence was insufficient on "property."

*Second*, even if "confidential business information" lacking commercial value could constitute "property," the evidence was insufficient, because OpenSea failed to take affirmative steps to protect the confidentiality of the information.

*Third*, under either interpretation of "property," the proof was insufficient on intent to defraud, because there was no evidence Chastain "contemplated or

19

intended some harm to [OpenSea's] property rights." *United States v. Parse*, 789 F.3d 83, 121 (2d Cir. 2015).

      II.    At a minimum, Chastain is entitled to a new trial because the jury instructions erroneously lowered the government's burden of proof in four ways. *First*, the jury was permitted to convict even if the information lacked commercial value to OpenSea. *Second,* when a note suggested the jury doubted the information was confidential, the court gave a legally incorrect supplemental instruction that unfairly directed the jury to convict. *Third*, the jury was invited to find a scheme to defraud based on vague concepts of "fundamental honesty and fair play"—permitting conviction for non-criminal conduct. *Fourth*, the court plainly erred by omitting an essential element—materiality.

      III.    The district court also erroneously excluded evidence central to Chastain's defense. This highly relevant evidence would have demonstrated that: other employees did not believe OpenSea's confidentiality policy covered Chastain's transactions; the CIIAA was never customized to cover OpenSea's specific needs or the information at issue; and OpenSea's co-founders did not believe company policy barred Chastain's transactions. The district court minimized the probative value of this evidence, violating Rules 401 and 403 of the Federal Rules of Evidence, and eviscerating Chastain's defense.

IV.    The cumulative effect of the instructional and evidentiary errors deprived Chastain of a fair trial.

## ARGUMENT

## I.    CHASTAIN IS ENTITLED TO ACQUITTAL BECAUSE FEATURED NFT INFORMATION IS NOT "PROPERTY" UNDER § 1343

The sole prosecution theory was that Chastain defrauded OpenSea by using its information for personal benefit.  Thus, to sustain a wire fraud conviction, the government had to prove that the purported "object" of his scheme—the information at issue—was OpenSea's "property."  *See Cleveland v. United States*, 531 U.S. 12, 26 (2000); *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020).[3] Likewise, to establish the separate intent element, the government had to prove Chastain intended to "harm" OpenSea's "property rights."  *Parse*, 789 F.3d at 121. It failed to prove either element.

---

[3] The wire fraud statute prohibits using interstate wires for "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  Although phrased in the disjunctive, the statute only criminalizes schemes to "obtain[] money or property."  *Ciminelli*, 598 U.S. at 312.

**A. The Evidence Was Insufficient Because Featured NFT Information Is Not Traditional Property With Commercial Value To Its Owner**

*1. Under* Carpenter, *Only Confidential Business Information With Commercial Value To A Business Is Its "Property" Under § 1343*

Not all confidential information is property. To constitute "property" under *Carpenter*, confidential information must have commercial value to its owner. The government's contrary theory is a distortion of the Supreme Court's holding.

*Carpenter* held that a newspaper's pre-publication contents were its property because of their commercial nature and value to the business: "'Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy.'" 484 U.S. at 26 (quoting 3 W. Fletcher, Cyclopedia of Law of Private Corporations § 857.1, p. 260 (rev. ed. 1986)). Specifically, the "Journal had a property right in keeping confidential and making exclusive use, prior to publication," of its column, because "'[n]ews matter…is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as for any other merchandise.'" *Carpenter*, 484 U.S. at 26 (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236 (1918)).

22

The Supreme Court's reliance on *International News Service* shows that it was focused on whether the information was "traditional" property with commercial value. In *International News Service*, the Court explained that "news articles" were "literary property at the common law," 248 U.S. at 234, protectible because they are the news organization's "stock in trade," developed through its economic investments, and then "sold to those who will pay money for it," *id.* at 236. The Court thus described the property interest as a "right of a pecuniary nature." *Id.* Notably, *International News Service* affirmed an injunction restraining the misappropriation of Associated Press's "news," but only "*until its commercial value as news…ha[d] passed away*." *Id*. at 245. This further confirms that business information must have commercial value to qualify as property.

*Carpenter*'s citation of Fletcher's treatise for the proposition that "[c]onfidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property," *id*. at 26, reinforces the point. Fletcher is clear that commercial value determines whether secret business information qualifies as property. He describes as key factors whether the information "provides a demonstrable competitive advantage" and "was gained at expense to the employer." 3 Fletcher, *Cyclopedia of the Law of Corporations* § 857.10.

*Carpenter* also analogized the Journal's information to other commercially valuable business information. *Carpenter* cited trade secrets caselaw: *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984), which held that trade secrets are "property" under the Takings Clause; a FOIA exemption protecting "trade secrets and commercial or financial information," 5 U.S.C. § 552(b)(4); and *Board of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905), which protected a "collection of [price] quotations" since "[i]t stands like a trade secret," *id.* at 250. *See Carpenter*, 484 U.S. at 26-27.

In sum, the Court concluded the Journal's pre-publication contents were its "property" based on authorities holding that news matter is property, and analogies to other information with commercial value. The government and the district court seized on the fact that *Carpenter* noted in passing that "[c]onfidential business information has long been recognized as property." 484 U.S. at 26. But that comment was immediately followed by the detailed discussion of the authorities discussed above—trade secrets law, the Fletcher treatise, and *International News Service*. That context demonstrates that the Supreme Court was not endorsing the idea that *any* information a business keeps confidential is its "property."

24

2. Carpenter *Only Applies To Confidential Business Information Protected At Common Law, Consistent With Supreme Court Decisions Limiting "Property" To Its Common-law Meaning*

At "the time of the mail fraud statute's original enactment in 1872, and later when Congress enacted the wire fraud and bank fraud statutes, actionable 'fraud' had a well-settled meaning at common law." *Neder v. United States*, 527 U.S. 1, 22 (1999). The fraud statutes are interpreted consistent with that common-law meaning, such that the statutory term "property" covers only "interest[s] that 'ha[ve] long been recognized as property,'" and "traditional concepts of property." *Cleveland*, 531 U.S. at 23-24 (quoting *Carpenter*, 484 U.S. at 26); *accord Ciminelli*, 598 U.S. at 314.

*Carpenter*'s commercial value requirement also flows from the obligation to interpret "property" in accord with its common-law meaning. At common law, fraud and similar causes of action did not generally apply to intangibles like information. The few exceptions involved information with commercial value to its owner.

For instance, false pretenses—a common law ancestor of the federal fraud statutes—was generally limited to tangible property. *See* Wayne R. LaFave, 3 Subst. Crim. L. §19.7(e) (3d ed.). Likewise, common law embezzlement was limited to "tangible personal property," *id.* §19.6(c), and "intangibles could not be stolen or embezzled," John C. Coffee Jr., *Hush: The Criminal Status of*

25

*Confidential Information after McNally and Carpenter and the Enduring Problem of Overcriminalization*, 26 Am. Crim. L. Rev. 121, 134 (1988). One of the few exceptions to this rule was information like that in *Carpenter*—the contents of unpublished writings. *See*, *e.g.*, *Mazer v. Stein*, 347 U.S. 201, 214-15 (1954); *Palmer v. De Witt*, 47 N.Y. 532, 538 (1872); *Taft v. Smith, Gray & Co*., 134 N.Y.S. 1011, 1013 (App. Term 1912) ("literary property" includes "an unpublished manuscript" and "the incorporeal right to the exclusive use of its contents").

Moreover, at common law, torts like conversion or embezzlement only covered information gathered or developed through the labor or investment of the owner, for the purpose of commercial sale. As the D.C. Circuit explained in rejecting a conversion action based on theft of information in a politician's files, "[t]he general rule has been that ideas or information are not subject to legal protection." *Pearson v. Dodd*, 410 F.2d 701, 707 (D.C. Cir. 1969). The exceptions are limited to situations where, for example, "information is gathered and arranged at some cost and sold as a commodity on the market" or "formulated with labor and inventive genius." *Id.* at 707. Protected intangibles are thus limited to "literary property," "scientific invention," "information held in any way for sale," or "instruments of…commercial competition." *Id.* at 708.

Thus, limiting wire fraud to information with commercial value to its owner is consistent with the common-law definition of property.

*3. This Court Recently Rejected A Broader Interpretation Of* Carpenter*, And Its Earlier Decisions Do Not Support The Government's Theory*

This Court has never read *Carpenter* to hold that all of a business's confidential information is its "property." Indeed, its most recent precedent rejects this expansive interpretation of *Carpenter* and shows that information must have economic value to the owner to constitute "property." In *United States v. Blaszczak*, this Court emphasized the importance of the commercial value of confidential information in reversing wire fraud and related property-offense convictions. 56 F.4th 230, 243-44 (2d Cir. 2022). The Court held that "confidential information" was not the "property" of a regulatory agency, because an agency "is not a commercial entity" and "does not sell, or offer for sale, a service or a product," such that "premature[] disclos[ure]…has no direct impact on the government's fisc." *Id.* The Court expressly contrasted the agency's confidential information with the "property of a commercial entity such as the publisher victim in *Carpenter*," which was its "'stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and *to be distributed and sold to those who would pay money for it*'"—emphasizing the *Carpenter* information was *sold* to the victim's customers. *Id.* (quoting *Carpenter*, 484 U.S. at 26, emphasis in *Blaszczak*).

*Blaszczak* thus identified the essential characteristic necessary to prove an entity has a "traditional property interest," *Ciminelli*, 598 U.S. at 309, in

confidential information—the information must have commercial value to that entity. *See also United States v. Novod*, 923 F.2d 970, 974 (2d Cir.) ("*McNally* and *Carpenter* taken together establish that 'property' under the statutes encompasses things, however intangible, that are *currently of value to their owners*." (emphasis added)), *on reh'g,* 927 F.2d 726 (2d Cir. 1991). The district court here read *Blaszczak* narrowly (*see* SPA-14), but *Blaszczak* did not limit its holding to regulatory information or suggest a private business's information is property if it is confidential. If the dispositive issue had been whether the alleged victim was governmental or private, the Court would not have needed to *emphasize* that the *Carpenter* information was "stock in trade" sold to customers. Indeed, in *Blaszczak* the government itself conceded that "confidential business information" only qualifies as property when the information has "inherent market value" to its owner. U.S. Supplemental Brief at 7, *United States v. Blaszczak*, No. 18-2811 (2d Cir. June 4, 2021), ECF No. 497.

Nor is the district court's view supported by this Court's earlier decisions. The only Circuit precedent affirming a conviction for misappropriation of information, *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), involved commercially valuable information. There, an associate misappropriated his law firm's confidential client information by trading ahead of a public announcement that caused the client's stock price to rise. The court held that the client

28

information was the firm's property because "maintaining the confidentiality of the information was of commercial value" to the firm. *Id.* at 86.

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012), which the district court also cited, likewise involved information with obvious commercial value to the victim. In *Mahaffy*, brokers disclosed client orders—transmitted over devices known as "squawk boxes"—to a third party, who "placed trades in the squawked securities before the brokerage firms executed the squawked customer orders." *Id.* at 120. The court reversed the convictions because the government had failed to disclose exculpatory evidence about whether the information was *confidential*. It did not resolve when confidential business information constitutes *property*.

The part of the opinion the district court cited (SPA-12) was dicta. *Mahaffy* was merely "provid[ing] guidance" in case of a retrial. *Id.* at 134. And that guidance concerned how to assess whether information is *confidential*, not how to determine whether information that *is* confidential is a business's property. The district court had refused to give a jury instruction requiring the government to prove that the information in question was a trade secret. The defendant's proposal "did not accurately reflect the law in every respect," because "[i]nformation may qualify *as confidential* under *Carpenter* even if it does not constitute a trade secret." *Id.* at 135 (emphasis added). That, of course, is true. For instance, the pre-publication contents of a newspaper are not trade secrets, but if they are

29

confidential, they are still its property. *Mahaffy* also says that factors "borrowed from case law discussing trade secrets"—such as "the value of the information to the business and the business's investment in developing the information"—"do not necessarily bear *on the confidentiality* of the squawked information." *Id.* (emphasis added). Again, that is true, but it only speaks to whether information is *confidential*, not how to determine whether information that is confidential is *property*.

### 4. The Featured NFT Information Was Not OpenSea's "Property"

The information about which NFTs Chastain planned to feature on OpenSea's website is plainly not its "property" under the legal principles discussed above. It had no commercial value to OpenSea and was not protected property at common law. The news matter in *Carpenter* was protected literary property and had obvious commercial value, because the Journal was in the business of selling that information to its customers. By contrast, OpenSea did not commercialize the information at issue. As multiple government witnesses testified, OpenSea never sought to profit in any way from the information, which had no economic value to OpenSea—it "wouldn't have been substantial for the business" (A-228-29) and made no financial difference to OpenSea (A-305). The company's business model was to earn revenue from commissions on NFT transactions conducted on its website, not to monetize Chastain's ideas about which NFTs to feature.

Nor did Chastain's use of the information have any negative "direct impact on [OpenSea's] fisc." *Blaszczak*, 56 F.4th at 244. The only impact on its fisc was positive. OpenSea *made money* from Chastain's trading, because it earned commissions when he used its platform to buy and sell the featured NFTs.

And unlike the law firm in *Grossman*, OpenSea was not in the business of charging clients to "maintain[] the confidentiality of the information." *Id.* at 86. In *Grossman*, prematurely disclosing the information would have caused immediate *commercial* harm to the law firm, which would "lose its clients." *Id.* By contrast, keeping the NFT selection secret before the feature went live provided no "value" to OpenSea. That public disclosure of Chastain's transactions may have damaged "trust" within the NFT community (A-230-231, A-290-91), is irrelevant. Wire fraud is restricted to "traditional property notions," and the only intangible right Congress "revived" after *McNally v. United States*, 483 U.S. 350 (1987), was the intangible right of "honest services." *Ciminelli*, 598 U.S. at 314-15. Trust and reputation, while undoubtedly important, are exactly the sort of intangibles excluded from the scope of the fraud statutes, because "the term 'property' plainly does not reach everything that a person may hold dear." *Sekhar v. United States*, 570 U.S. 729, 740 (2013) (Alito, J., concurring).

### B. The Evidence Was Insufficient Even If Commercial Value Is Not Required

Even if all confidential business information were property, the information at issue here was not considered or treated as confidential. "*Carpenter* requires proof that the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information." *Mahaffy*, 693 F.3d at 135 n.14. "If employers 'consider' information to be confidential but do not really take *affirmative steps* to treat it as such and maintain exclusivity, *Carpenter* is not satisfied." *Id.* (emphasis added). OpenSea took no such steps. None of the factors *Mahaffy* identified for assessing whether information was confidential—"written company policies, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business, and the ways in which other employees may access and use the information," *id.*—support the government's case.

#### 1. OpenSea Had No Relevant "Written Company Policies"

Prior to Chastain's resignation, OpenSea took no "affirmative steps" to protect the secrecy of information about which NFTs he planned to feature on its website. Nor did it take any affirmative steps to maintain exclusive use of this information. In fact, OpenSea implemented no policies governing the information. The government claimed the CIIAA was such a policy, but it was a Clerky

32

template that didn't mention featured NFT information and wasn't customized to OpenSea's business in any respect. The co-founders made no modifications to the "boilerplate" (A-249) language and the document said nothing about NFTs, or OpenSea's business. OpenSea used the CIIAA because doing so was "standard practice" (A-279, A-193) and "seemed like common sense" (A-193-94), not with *any* specific information in mind.

Both co-founders' testimony raised reasonable doubt about whether OpenSea considered the information confidential. Finzer admitted that before this case, he "hadn't thought explicitly about whether [the feature NFT selection] was confidential information." (A-305). He was unable to articulate what "Confidential Information" the CIIAA even covered. For example, when asked whether Chastain's public tweets describing upcoming product plans contained confidential information, it was "hard for [Finzer] to say" because he was "not sure." (A-332-33).

Atallah could not recall having read the CIIAA, much less "affirmatively" adopting it as a policy to protect the information at issue. To the extent he suggested the information was confidential, his testimony was equivocal and speculative. He testified "I believe" it was confidential, and "I considered it to be confidential information" (A-221)—in stark contrast to the testimony in *Mahaffy* that the conduct was "as black and white [a] violation of the [firm's] written

policy…as I can imagine." 693 F.3d at 124. This "equivocal testimony" is insufficient to support a finding of guilt and demonstrates that "a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012).

Whereas OpenSea used an unmodified generic template that one of its founders didn't even read, cases affirming misappropriation convictions involve specific, clear company policies tailored to protect the purloined information. For example, the policy in *Carpenter* "specifically forbid[] the purchase or sale of securities on the basis of articles an employee knows will appear in the newspaper; it also state[d] that employees should not disclose the paper's future contents to anyone outside the company." *United States v. Winans*, 612 F. Supp. 827, 830 (S.D.N.Y. 1985). That "employee manual" thus "removed any doubts" that the employer "intended" the information at issue "be kept confidential" and "was its property." *Carpenter*, 484 U.S. at 28. Likewise, the policy in *Mahaffy* expressly protected the "confidentiality of client order information." 693 F.3d at 122, 124. And in *Grossman*, the law firm "periodically circulated…a general memorandum on its confidentiality policy…stat[ing] that attorneys receiving information from clients could not use that information for trading and could not give it to anyone else for any purpose." 843 F.2d at 80.

34

By contrast, here it was not until Chastain's resignation that OpenSea—for the first time—took "affirmative steps" to protect the NFT feature information by adopting NFT trading policies "to clarify and add to" existing "policies." (A-322). These would have expressly prohibited Chastain's conduct, but OpenSea described them as "new" when implemented, and Atallah testified they "weren't yet in place when Chastain worked at OpenSea." (A-601, A-254, A-349, A-243-44). The new policies thus confirm that, at the relevant time, OpenSea had no "written company policies" protecting the confidentiality or its exclusive use of the relevant information.

### 2. OpenSea Took No Other Affirmative Steps To Protect The Information

Atallah and Finzer both admitted OpenSea did nothing to train employees about confidentiality. Nor did OpenSea otherwise enforce the purported policy. Instead, Atallah monitored employees based on his "good sense of what all the employees were doing," and "trust." (A-205).

In other words, OpenSea relied on its employees' judgment in lieu of any "affirmative steps." *Mahaffy*, 693 F.3d at 135 n.15. That is patently insufficient. In *Mahaffy*, for instance, it was not necessarily dispositive "that the firms did not train brokers on proper use of squawks or squawk boxes," because "[v]arious witnesses testified that, in order to pass the Series 7 exam, an individual would have known of the dangers of frontrunning and an accompanying need to keep

35

block order information confidential." *Id.* at 122, 124. *Cf. Grossman*, 843 F.2d at 80 (periodic circulation of confidentiality policy); *United States v. Hager*, 879 F.3d 550, 552 (5th Cir. 2018) ("[T]he importance of keeping the information confidential [was] 'discussed frequently.'").

Nor did OpenSea employ any other practices that would have clarified whether the information was confidential. It didn't use anything like the "code name" "on drafts of documents" in *Grossman*, nor did it "establish[]…a 'need-to-know' basis" policy. 843 F.2d at 80; *see also United States v. Czubinski*, 106 F.3d 1069, 1071 (1st Cir. 1997) (restricting access using "passwords and access codes"). OpenSea did not even intervene to protect the confidentiality of the featured NFT information even when given the opportunity. When Chastain publicly disclosed his trading in featured NFTs on Twitter on August 2, 2021, OpenSea did nothing.

3. *Chastain Used An Open Process Involving Other Employees And The Public To Decide What To Feature*

The "entire OpenSea team" could view, discuss, and recommend possible NFTs to be featured. (A-337). Chastain collaborated with other employees about which NFT to highlight on the website, and selected NFTs that employees had recommended. (A-354-57). In other words, the information was not guarded at OpenSea.

Members of the public also nominated NFTs to be featured. This was by design, because OpenSea was "open to ideas from everybody" and solicited the

public's recommendations. (A-217-19). For instance, Viau introduced a third-party colleague to Chastain so he could receive "input from outside sources." (A-574, A-337-39). The evidence thus demonstrated that the process of recommending which NFTs to featured was not secretive nor confidential, but open and public.

### 4. *The Information Had No Commercial Value*

Finally, even if commercial value is not *required* to show that information is property, it is still an important factor in weighing whether it constitutes "confidential business information." (*See* A-413 (instructing jury that "whether the information had economic value to the employer" is relevant to whether it constituted "confidential business information")). And as discussed, here the information had no commercial value. *See supra* Point I.A.4.

\* \* \*

There is no evidence from which a reasonable jury could find that OpenSea took the "affirmative steps" required to establish that information about which NFTs Chastain would feature on its website was "confidential business information" protected as the company's "property" under § 1343. Accordingly, even if the information's lack of commercial value to OpenSea were not dispositive, there is insufficient evidence to prove the "property" element.

## C.     The Government Failed To Prove Intend To Defraud

The Supreme Court has repeatedly held that a scheme to defraud entails "wronging one in his property rights" by "deprivation of something of value." *McNally*, 483 U.S. at 358.  In other words, the government must prove "that the defendant contemplated or intended some harm to the property rights of the victim."  *Parse*, 789 F.3d at 121.  The only conceivable harm Chastain's conduct could have caused OpenSea was to vague notions of injury to trust and reputation, not any property interest.  Thus, by failing to prove that Chastain engaged in a scheme to obtain OpenSea's "property," the government also failed to prove the element of intent to defraud.

## II.     FLAWED JURY INSTRUCTIONS REQUIRE A NEW TRIAL

The district court gutted Chastain's defense with erroneous jury instructions that lowered the government's burden of proof on the key elements of § 1343: whether Chastain engaged in a scheme to defraud, whether the object of that scheme was property within the meaning of the statute, and materiality.

### A. The District Court Erroneously Instructed The Jury That Proof Of Commercial Value Was Not Required

Chastain requested a jury instruction that "property" must have commercial value:

> Under the wire fraud statute, information is "property" only if it is, among other things, confidential business information (which must be treated as such) and has inherent value to the purported victim.

38

> Confidential business information may be "property," if the information was the business's "stock in trade," to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those would pay money for it—in other words, information that is of inherent value to the victim. Accordingly, even if you find that the defendant engaged in a "scheme," if the object of the scheme was not to obtain a thing of inherent value to the alleged victim, it is your duty to find the defendant not guilty.

(A-40, A-74).

Instead, over his objection (A-386-87), the district court instructed the jury that it "may…consider whether the information had economic value to the employer, but the government is not required to prove that the information had such value." (A-413).

As explained in Point I.A, this misstates the law, and the government cannot show that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017). Thus, even if outright acquittal is not required, Chastain is entitled to a new trial with a legally accurate property instruction.

**B. The District Court's Response To Jury Note Three Misstated The Law And Unfairly Prejudiced Chastain**

*1. Background*

a. The district court permitted the government to introduce OpenSea's founders' opinions about company policy but precluded Chastain from introducing other employees' testimony on that subject.

The government moved in limine to "limit" Chastain's "questioning of OpenSea employees about whether they found the company's rules to be clear," and to prevent him from "introduc[ing] evidence" of other employees' opinions on OpenSea's confidentiality policies. (Dkt. 70 at 1, 12-14). Chastain countered that evidence showing "employees believed the generic [CIIAA] was unclear, vague, incomplete, and inapplicable" to his transactions was relevant and critical to his defense. (Dkt. 87 at 1). He proffered that other OpenSea employees confirmed "there were no clear rules of the road (or no rules at all) addressing whether the selection of NFT featured artists was required to be kept confidential." (*Id.* at 16-17). The proffered evidence included a message to Chastain from OpenSea's Head of Design, Jessica Phan, stating "[OpenSea] didn't have policies around these things yet," (A-605)—which, as the government conceded, "was a reference to OpenSea not having policies relating to…purchasing featured works at the time." (Dkt. 70 at 13).

The court allowed the government to ask Finzer and Atallah "what they intended the confidentiality agreement to cover and whether the [NFT]

information…was confidential." (SPA-30-31). Yet it precluded Chastain "from questioning other OpenSea employees, including Jessica Phan, about their opinions" on the same subject. (SPA-30).

Chastain then filed a motion seeking equal treatment. He requested that any restrictions on employee opinion testimony about OpenSea's policies be applied to the government's questioning of Finzer and Atallah. (A-61-62). The government countered that the views of "defendant's peer employees"—including Phan—were "irrelevant," because OpenSea's co-founders had established the company policy. (A-130). The court agreed and reaffirmed that Chastain could not introduce evidence from Phan or others who would have corroborated that OpenSea had no policies to protect the information's secrecy or bar the transactions. (A-159-63). The court later confirmed this supposed distinction between the co-founders and other employees mid-trial when excluding a Viau tweet suggesting OpenSea employees could use company information for personal benefit. (A-382-83; *see* A-623).[4] Thus, Chastain did not call them as witnesses. (A-280, A-477-78).

b. Jury notes.

At 9:12 a.m. on the first full day of deliberations, the jury requested Finzer and Atallah's testimony. (A-439). At 2:19 p.m., the jury sent a note stating: "We

---

[4] As explained in Point III.A, the district court was wrong, because the other employees' views were relevant and admissible.

are unable at this time to reach a unanimous verdict." (A-440). The court responded, "keep at it." (A-446-47). At 4:55 p.m., the jury submitted a third note asking:

> Re: Count One, Element One [the property requirement]
> If the defendant viewed the information as confidential,
> but Devin Finzer, the other signatory to the
> Confidentiality Agreement did not, is that enough to
> consider it confidential?

(A-448).

Chastain contended the answer should be a simple "no." (A-457).

The court requested written submissions, proposed three alternative supplemental instructions, and heard further argument the following morning. (A-460, A-462-63; Dkts. 123-25). Chastain reiterated his objections (A-466-71, A142-45), but the court overruled them, brought the jury back, repeated its original "confidential business information" instruction, and added:

> As these instructions suggest, the focus of the inquiry
> with respect to whether the information at issue was
> "confidential business information" is on the company,
> namely, OpenSea. Of course, a company can act only
> through its officers, employees, and corporate materials,
> such as policies and agreements. Thus, in evaluating how
> OpenSea considered and treated the information at issue,
> you may consider the conduct and testimony of Mr.
> Finzer, as an officer of the company, as well as any other
> evidence that relates to the issue, including how
> employees at OpenSea treated the information within the
> scope of their employment and any other evidence
> relevant to the factors referenced above. What weight, if

        any, you give any such evidence is, of course, for you to
        decide.

(A-485-86).

During the arguments about the jury's note, Judge Furman said he "d[id]n't

feel great about this whole thing," that the note had "confounded" him, presenting

"a number of very thorny issues" with which he "wish[ed] [he] had more time to

grapple." (A-462-63, A-481, A-483). He noted, the "pretrial litigation regarding

the questions that could be asked of Ms. Phan…certainly loom[ed] large." (A-

463). He also admitted that when rendering his in limine ruling, he did not have "a

particularly vivid understanding of just how small the company was…and where

Ms. Phan was…in the pecking order." (A-465).

Almost immediately after the supplemental instruction, the jury requested

employee Ryan Foutty's brief testimony (A-487)—presumably because Foutty had

described a conversation in which Chastain had apologized for his transactions (A-

272-73). Then it requested the definition of "trade secret," which the court

declined to define, instead referring the jury back to its "confidential business

information" charge. (A-487-500, A-151, A-157).

At 4:10 p.m., the jury rendered its verdict. (A-501).

*2. The Supplemental Instruction Was Wrong, Misleading, And Unfair*

The supplemental instruction was legally incorrect and "sufficiently

incomplete and misleading" to require a retrial. *Kopstein*, 759 F.3d at 172. It

erroneously invited the jury to consider the opinions of employees other than

Finzer to determine whether the information was confidential and incorrectly

suggested Chastain's subjective views could trump the jury's apparent conclusion

that Finzer did not view the information as confidential.

*First*, the instruction contradicted fundamental principles of agency and

fiduciary duty law. "A corporation can only act through its directors and officers."

*In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 160 (2d Cir. 2021); *see also*

*Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 302-03 (Del. Ch.) ("A

basic tenet of corporate law, derived from principles of agency law, is that the

knowledge and actions of the corporation's officers and directors, acting within the

scope of their authority, are imputed to the corporation itself."), *aff'd,* 126 A.3d

1115 (Del. 2015). Not every agent's "knowledge, [] intentions, [] statements, and

[] actions…are considered to be those of the [corporation]." *United States v.*

*Gatto*, 986 F.3d 104, 127 (2d Cir. 2021), *abrogated on other grounds by Ciminelli,*

*supra*. Only the knowledge and actions of agents "acting within the scope of

th[eir] authority…without any [improper] purpose" are imputed to the corporation.

*Id.* The jury asked whether it could find the information confidential even if Finzer

did not, if Chastain thought the information was confidential. The answer was

clearly no, because it was undisputed that Finzer had authority to act on OpenSea's

behalf, whereas, as the allegedly disloyal agent, Chastain's "actions and knowledge

44

are not imputed" to OpenSea. *Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 179 (2d Cir. 2004). The district court apparently recognized this legal principle: "The conduct here is alleged to be ultra vires, not the scope of his employment." (A-467-68). But the court disregarded it, instead telling the jury it was up to them "to decide" what "weight" to give any employee's opinions on the subject. (A-486).

Moreover, Chastain was "subject to [OpenSea's] control" and could not define the scope of the relationship. *United States v. Hoskins*, 44 F.4th 140, 149 (2d Cir. 2022). Chastain reported "directly to" Finzer and nobody else. (A-278, A-295, A-188-89). In short, Finzer's views were dispositive. But the court erroneously invited the jury to consider and elevate Chastain's own views—and those of other employees—over Finzer's.

*Second*, *Carpenter* requires proof that "*employers* 'consider' [the] information to be confidential," as reflected by their own "affirmative steps" to maintain confidentiality. *Mahaffy*, 693 F.3d at 135 n.14 (emphasis added); *see also Ruckelshaus*, 467 U.S. at 1002 ("property right [in trade secret] is defined by the extent to which the owner of the secret protects his interest from disclosure to others") (cited in *Carpenter*, 484 U.S. at 26).

Whether a *defendant* considers information confidential is not relevant to—much less dispositive of—the "property" question. What constitutes "property" is

45

an objective question. A defendant's views are not relevant to whether a video poker license, *Cleveland*, 531 U.S. at 20-24, or decisions to close traffic lanes on a bridge, *Kelly*, 140 S. Ct. 1571-74, constitute property. Nor are they dispositive of whether a business considered its information secret. Thus, *Mahaffy* focused on testimony from high-level "firm representatives." 693 F.3d at 124, 128 ("manager of middle markets…at Smith Barney," "senior vice president of Lehman," and Merrill's "head of U.S. trading"); *id.* at 127 ("senior personnel"); *id.* at 130 ("senior members"); *id.* at 133 ("senior employees and management").

*Third*, the instruction was fundamentally unfair, because it strayed far beyond the jury's question and suggested an answer that supported the government. This violated the district court's obligation to "exercise special care to see that inaccuracy or imbalance in supplemental instructions do not poison an otherwise healthy trial." *Kopstein*, 759 F.3d at 172-73 (reversing conviction); *United States v. Dove*, 916 F.2d 41, 45 (2d Cir. 1990) (similar).

The jury's question was simple: if OpenSea's CEO did not consider the information confidential, but Chastain did, is that enough to find that the company considered it confidential? The answer to this question was clearly "no." Chastain could not bind the company. His views were relevant only to his scienter. Even if he believed the information was confidential, or regretted his conduct, that has no bearing on whether the information was OpenSea's "property." By contrast,

Finzer was the one setting policy, as the district court recognized in its in limine rulings.

Moreover, the district court barred Chastain from introducing evidence about "how *other* employees interpreted or understood the rules." (SPA-31). At the time, it said such evidence would be "irrelevant and improper opinion testimony" (*id.*)—yet when the jury seemed poised to find that the CEO didn't consider the information confidential, the district court reversed course, telling the jury that it should consider "how employees at OpenSea treated the information," (A-486). Given the jury's question, this unfairly suggested it should disregard Finzer's equivocal testimony and find that Chastain's views were "enough" to convict. (A-448). The instruction thus directed the jury away from a conclusion it apparently was contemplating—that it should acquit because Finzer's testimony was insufficient to meet the government's burden to establish that the information was confidential. The court's answer was unbalanced because it "only point[ed] towards how guilt is proved." *Dove*, 916 F.2d at 46.

The instruction was also unfair because, to the extent it asked the jury to consider "how [other] employees at OpenSea treated the information," it departed from law of the case. "[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless 'cogent' and 'compelling' reasons militate otherwise." *United States v. Quintieri*,

47

306 F.3d 1217, 1225 (2d Cir. 2002). The district court recognized the departure (A-474-75, A-463), but cited no compelling reasons. Instead, it was hesitant and lacked confidence in its ruling: "I don't feel great about this whole thing. I think there are a number of very thorny issues here that I wish I had more time to grapple with." (A-483).

The court's last-minute about face severely prejudiced Chastain. The jury was laser-focused on the confidentiality policy, and the supplemental instruction suddenly invited the jury to consider *other* employees' views without the benefit of Chastain's evidence.

### 3. *The Error Was Not Harmless*

When an erroneous supplemental instruction concerns a defendant's primary defense at trial, it is "almost certainly not harmless." *Kopstein*, 759 F.3d at 173. Indeed, "a confusing jury instruction on the defendant's sole defense will constitute plain error." *Id.* at 180 n.6. Here, of course, the objection was preserved, so the government must meet the far more demanding *Chapman* standard, which requires the government to demonstrate "beyond a reasonable doubt that the error complained of did not contribute to the verdict." *Chapman v. California*, 386 U.S. 18, 24 (1967). It cannot possibly do so.

As the government told the jury, the "defense ha[d] spent most of the trial focused on whether OpenSea's plan for these features was really its confidential

48

business information." (A-388). The court also acknowledged that the note concerned "one of the key issues in th[e] case." (A-453, A-479, A-484).

The supplemental instruction clearly had "a potent influence" on the jury and proved "decisive." *Kopstein*, 759 F.3d at 172-73. The jury was deadlocked before the supplemental instruction, and its question reflected doubts that Finzer considered the information confidential. Yet shortly after the supplemental instruction, the jury apparently followed the court's erroneous suggestion to consider the views of other OpenSea "employees"—including Chastain's own views. We know that because, immediately after hearing the supplemental instruction, the jury requested Foutty's testimony, which highlighted Chastain's comments about his conduct. Likely deeming this evidence "enough" (A-448), the jury convicted later that day, without the benefit of the defense evidence that other employees confirmed that company policy didn't clearly protect the information or bar Chastain's transactions.

## C. The Jury Instructions Misstated The Law Of Fraud

Over Chastain's objection (A-385, A-133), the jury instructions defined fraud far too broadly, inviting conviction for conduct that is not fraudulent. The court instructed the jury: "You may find the existence of a scheme to defraud if you find that the conduct of the defendant was deceptive *or* if you find that the defendant conducted himself in a manner that *departed from traditional notions of*

49

*fundamental honesty and fair play in the general and business life of society.*" (A-411) (emphasis added).

The italicized language has roots in pre-*McNally* honest-services caselaw abrogated in *McNally*. Apparently derived from *Gregory v. United States*, 253 F.2d 104 (5th Cir. 1958), this outdated "fundamental honesty and fair play" formulation has long since been relegated to the dustbin by modern Supreme Court decisions, from *McNally* to *Ciminelli*. "[I]n the decades since [*McNally*], the Court has made clear that the fraud statutes do not enact Article III judges' sense 'of moral uprightness, of fundamental honesty, fair play and right dealing.'" *United States v. Porat*, 76 F.4th 213, 224 (3d Cir. 2023) (Krause, *C.J.*, concurring) (quoting *Skilling v. United States*, 561 U.S. 358, 418 (2010) (Scalia, J., concurring))). As Justice Scalia explained in *Skilling*, such "astoundingly broad" language reflects a judicial "grandiloquence" prohibited by Supreme Court fraud jurisprudence. 561 U.S. at 418.

This Court has not previously considered such language in a jury instruction—undoubtedly because it is so obviously wrong and outdated that district courts in this Circuit do not use it. Other circuits have rejected the instruction as legally incorrect, as it appears nowhere in their pattern instructions for mail or wire fraud. Pattern Crim. Jury Instr. 1st Cir. 4.12, 4.13 (1998); Mod. Crim. Jury Instr. 3rd Cir. 6.18.1341-1 (2023); Pattern Crim. Jury Instr. 5th Cir.

2.56, 2.57 (2019); Pattern Crim. Jury Instr. 6th Cir. 10.01, 10.02 (2023); Fed.

Crim. Jury Instr. 7th Cir. 1341 & 1343[2] (2023); Model Crim. Jury Instr. 8th Cir.

6.18.1341, 6.18.1343 (2021); Model Crim. Jury Instr. 9th Cir. 15.32, 15.35 (2023);

Pattern Crim. Jury Instr. 10th Cir. 2.56, 2.57 (2023); Pattern Crim. Jury Instr. 11th

Cir. OI O50.1, O51 (2020).

To prove a scheme to defraud, modern jurisprudence requires more than a

mere departure from "fundamental honesty and fair play in the general and

business life of society"—a nebulous standard.  Fraud requires "deception, not

merely the breach of a fiduciary duty," which a jury might otherwise easily

confuse with concepts like dishonesty or unfairness. *United States v. O'Hagan*,

521 U.S. 642, 654 (1997).

The district court's instructions as a whole did not cure the problem.  If fraud

is defined as any deviation from "fundamental honesty and fair play," a separate

instruction requiring proof that the defendant knew the scheme's fraudulent

character does not cure the problem—it just means the jury has to find the

defendant knows he is doing something generally unethical.  It does nothing to

ensure that the defendant is convicted only for *fraudulent*—as opposed to

immoral—conduct.  *See Kelly*, 140 S. Ct. at 1574 (fraud statutes are not a general

license for "the Federal Government…to enforce (its view of) integrity").  That

distinction was especially critical in this case:  Chastain was remorseful, and the

evidence suggested he was aware of a conflict of interest; the jury could easily have relied on that evidence, under the erroneous instruction, to find a scheme to defraud even though his conduct, while perhaps morally questionable, was not *fraudulent*.

Worse, the charge stated that "the Government need not show that the defendant made a misrepresentation" (A-411), and didn't mention omissions, even though either a false statement or an omission in the face of a duty to disclose is a prerequisite for fraud. Indeed, the only reason misappropriation or embezzlement, which are theft crimes, can constitute fraud is that "[t]he undisclosed misappropriation of [property], in violation of a fiduciary duty, the Court said in *Carpenter*, constitutes fraud akin to embezzlement." *O'Hagan*, 521 U.S. at 654; *id.* at 656 ("the fiduciary's fraud is consummated, not when the fiduciary gains the confidential information, but when, *without disclosure to his principal*, he uses the information" in a transaction (emphasis added)); *Carpenter*, 484 U.S. at 27-28 (misappropriation can constitute fraud because defendant stole company property "all the while pretending to perform his duty of safeguarding it").

The fraud instruction also erroneously omitted any reference to materiality— a separate element necessary to "assure that the defendant's conduct was calculated to deceive." *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017). Instead, the charge stated—tautologically—that fraud includes the "fraudulent appropriation of

property by a person to whom such property has been entrusted." (A-412). Lacking any additional guidance on what "fraudulent" might mean, the jury was left to rely on vague notions of "fundamental honesty and fair play." Because it is "possible" that Chastain was convicted "for conduct that is not unlawful," the government cannot carry its burden of establishing that the errors in the fraud instruction "were harmless beyond a reasonable doubt." *McDonnell v. United States*, 579 U.S. 550, 579–80 (2016).

### D. Omitting The Materiality Element Was Plain Error

Chastain requested an instruction on materiality. (A-38-39, A-70-71). He did not specifically raise the issue in the charge conference, but omitting the materiality element from the jury charge was clear and obvious error. "[M]ateriality of falsehood is an element of the…fraud statutes." *Neder*, 527 U.S. at 25. Thus, to sustain Chastain's conviction, it must be "clear beyond a reasonable doubt that a rational jury would have found [Chastain] guilty absent [the] error." *United States v. Nouri*, 711 F.3d 129, 140 (2d Cir. 2013) (asking "(a) whether there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty").

There was insufficient evidence to prove OpenSea considered and treated the featured NFT information as confidential. *See supra* Point I.B. And even if

the proof somehow barely cleared the sufficiency hurdle, it is not clear beyond a reasonable doubt—given the erroneous instructions—that a rational jury would have found that Chastain's undisclosed use of the information was a material misrepresentation or omission. Omitting a materiality instruction thus constituted plain error.

## III. THE ERRONEOUS EXCLUSION OF CRITICAL DEFENSE EVIDENCE REQUIRES A NEW TRIAL

### A. The District Court Erroneously Excluded Evidence That Chastain's Peers Did Not Consider Or Treat The Information As Confidential

As explained, the district court precluded Chastain from questioning other OpenSea employees about how they "interpreted or understood [OpenSea's] rules," (SPA-31), including a text message stating "[OpenSea] didn't have policies" relating to purchasing featured NFTs. (A-605). The district court erroneously excluded this evidence as "irrelevant and improper opinion testimony." (SPA-31).

#### 1. *The Evidence Was Relevant*

Federal Rule of Evidence 401's relevance standard "is a low threshold, easily satisfied." *United States v. Gramins*, 939 F.3d 429, 450 (2d Cir. 2019). The proffered evidence easily meets that low bar.

*First*, it tends to rebut the government's argument that Chastain knew or must have known his actions were deceptive or reflected an intent to defraud.

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015), is instructive. There, the defendant sought to introduce "good faith" evidence about his supervisors' approval of "*other employees'*" similar negotiation tactics. *Id.* at 188. The district court excluded it as irrelevant. *Id.* at 188-89. This Court reversed because the evidence, even though not highly probative, was nonetheless relevant "as to his intent to defraud, *i.e.*, that he held an honest belief that his conduct was not improper or unlawful." *Id.* at 190. "[S]ince [good faith] may be only inferentially proven, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh its relevance." *Id.*

*Second*, OpenSea was a small company, and Chastain's peers signed the same confidentiality agreement. If other OpenSea employees did not believe OpenSea's confidentiality policy covered the at-issue information, that was relevant to whether OpenSea was taking the requisite "affirmative steps" to keep the information confidential. Such beliefs tend to show that—even if the officers or directors actually authorized to set policy testified that the policy applied here— any purported policy was not being enforced, which is probative as to the "affirmative steps" inquiry.

Accordingly, it was legal error for the district court to conclude the proffered evidence was not probative of OpenSea's "efforts" or "of Chastain's intent." (Dkt. 70 at 12; SPA-30-31 (citing Gov't Mem. 12-14)).

### 2. The Evidence Was Not Improper Lay Opinion

The district court committed an additional legal error when it ruled that this evidence constituted "improper opinion testimony." The evidence was admissible, because it was "(a) rationally based on the witness's perception; (b) helpful to…determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge…." Fed. R. Evid. 701.

The first requirement was satisfied by the proffered witnesses' "first-hand knowledge or observation" of OpenSea's confidentiality policy and workplace. *Id.* advisory committee notes. For instance, Jessica Phan was a "senior leader[] of the company" (A-160, A-522) and all OpenSea employees signed the CIIAA when hired (A-245, A-278).

The second requirement was likewise met. The evidence was clearly "helpful" to the jury's assessment of the intent and scheme to defraud elements, as it would help the jury understand how OpenSea employees viewed their confidentiality obligations, which reflected whether the company was enforcing a policy that applied to Chastain's conduct.

Nor was the proffered evidence based on scientific, technical, or other specialized knowledge. It "result[ed] from a process of reasoning familiar in everyday life"—reading and signing the CIIAA and working at OpenSea—not "a process of reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 advisory committee notes. Indeed, an employee's "personal understanding of the obligations imposed by a contract to which his company was a party" is "a typical and proper subject for lay witness testimony." *United States v. Chapman*, 209 F. App'x 253, 267 (4th Cir. 2006).

Chastain did not offer opinions on the legal meaning of the CIIAA. The proposed testimony concerned whether other employees *believed* the rules were clear and whether they *believed* the rules covered the at-issue information. (SPA-30 (deciding "Government's Motion to Preclude Questioning of OpenSea Employees Regarding Their Beliefs About the Company's Rules"). Where, as here, "a witness's own *belief*…is relevant…, testimony about [the witness's] own subjective belief may be admissible." *Cameron v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010). The evidence was thus admissible under Rule 701.

### B. The District Court Erroneously Excluded A Redline Showing That OpenSea Made No Material Changes To The Clerky Template

*1. Background*

During cross examination, Atallah testified that the CIIAA was created based on "information that we provide Clerky about our company" (A-193-94),

and that he "believe[d] [OpenSea] made modifications on Clerky's website to customize the template" (A-246). This conflicted with Finzer's testimony that the template was not modified. Chastain sought to introduce a redline comparison between the CIIAA and the Clerky template—which shows OpenSea made no substantive modifications to the template—to refute Atallah's testimony. (A-374-76, A-606-21).

The government moved to preclude the redline, claiming it was irrelevant and "likely to confuse the jury." (A-139-41). Chastain countered that it was relevant in two ways. First, "[i]t goes to the state of mind of OpenSea and its founders, under the *Mahaffy* factors, and what steps they took to keep confidential information confidential"—"how much OpenSea cared about that document, and [] how it was protecting its supposed confidential information." (A-375). Second, it "goes to impeachment of Mr. Atallah," who falsely "suggested there were modifications." (*Id.*).

The court excluded the evidence. It said the document "has minimal, if any relevance," "to the extent it has relevance, it's already been elicited through the witnesses," and "introducing the redline can only cause confusion and undue prejudice." (A-376).

## 2. *The Evidence Was Relevant*

The redline contradicted Atallah's testimony and was thus relevant, for "credibility is always an issue of consequence," and evidence "which aids in the jury's determination of a witness's credibility and veracity is always relevant." *United States v. Quinto*, 582 F.2d 224, 233 (2d Cir. 1978). For this reason, "[t]he jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Figueroa*, 548 F.3d 222, 228 (2d Cir. 2008). Whether Atallah was lying, or just misremembering, Chastain was entitled to challenge his credibility using the redline. *See United States v. Stewart*, 907 F.3d 677, 688 (2d Cir. 2018).

The redline also was relevant because it demonstrated that OpenSea's co-founders took no steps—if any—to define employees' confidentiality obligations. "If employers 'consider' information to be confidential but do not really take affirmative steps to treat it as such and maintain exclusivity, *Carpenter* is not satisfied." *Mahaffy*, 693 F.3d at 135 n.14. "[W]ritten company policies" and "measures the employer has taken to guard the information's secrecy" are relevant considerations. *Id.* Accordingly, the specificity with which an employer crafts a written confidentiality policy is relevant, and the court was clearly wrong to minimize the redline's probative value and exclude it.

### 3. Rule 403 Did Not Warrant Exclusion

The district court's justification under Rule 403—that the evidence would be cumulative and "cause confusion and undue prejudice" (A-376)—was untrue.

For starters, the court's finding of minimal relevance "cast[s] doubt as to the balancing made" under Rule 403, because "the court effectively assigned [the redline] little or no probative value, thereby shifting the Rule 403 balancing test considerably in the Government's favor." *United States v. White*, 692 F.3d 235, 247 (2d Cir. 2012). That was legally erroneous, because the redline carried more than minimal relevance and concerned the dispositive issue at trial.

The redline was the only direct evidence available to impeach Atallah's testimony. Although Atallah conceded the CIIAA was boilerplate, during cross examination he told a new, false story—that OpenSea customized the template. This conflicted with Finzer's account, and it was error to deem the redline cumulative, because it would have broken a tie between two government witnesses' competing accounts. *See Stewart*, 907 F.3d at 688 (impeachment not cumulative because it was more probative than other "stray bits of evidence touching upon similar subject matter"); *United States v. Scully*, 877 F.3d 464, 475 (2d Cir. 2017).

Nor was the redline unfairly prejudicial or confusing. Unfair prejudice means an undue tendency to suggest decision on an improper basis or "a

tendency…to prove some adverse fact not properly in issue." *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006). Admitting the redline carried no such risks, and the court below did not identify any. Nor was there any risk of confusion. Why would the jury misapprehend the meaning and significance of a redline, which is easily explainable and not inherently complicated?

The risks cited by the court—even had they existed—would not have "substantially outweighed" the redline's probative value. Fed. R. Evid. 403; *see also United States v. Blum*, 62 F.3d 63, 68 (2d Cir. 1995). "Rule 403 favors admissibility," *White*, 692 F.3d at 247, and the court erroneously invoked it to exclude this key defense evidence.

### C. The District Court Erroneously Excluded Evidence That OpenSea's CEO Did Not View Similar Information As OpenSea's "Property"

#### 1. Background

Chastain attempted to cross-examine Finzer about his own apparent use of non-public business plans to purchase cryptocurrency for personal gain. The conduct concerned OpenSea's early 2021 integration of a new blockchain—Polygon—into the company's platform. (A-327-28). Polygon had its own cryptocurrency token called MATIC. (A-328). Chastain proffered that Finzer purchased MATIC tokens prior to approving the integration and profited greatly from a rise in the tokens' value after OpenSea's public announcement. (A-329-30).

The government objected on relevance grounds. (A-330). Chastain argued that, as OpenSea's founder, Finzer "appl[ied] the rules and set[] the standards" regarding confidentiality, and this evidence demonstrated whether Finzer intended certain types of information to be confidential and used only for a business purpose, or not. (A-329-30). It also could be used to impeach. (A-330). The court sustained the objection, stating: "This is totally different information. OpenSea is not on trial. Mr. Finzer is not on trial. I think this is unfair and prejudicial in the sense it will just smear him and make him look bad and doesn't speak to the issues in this case." (A-331).

### 2. *The Evidence Was Relevant*

The evidence bore on Finzer's credibility—which is "always relevant." *Quinto*, 582 F.2d at 233. It was also probative of the meaning and scope of the CIIAA and whether Chastain violated company policy. The CIIAA defines "Confidential Information" broadly as "information and physical material not generally known or available outside the Company," including "product or service ideas or plans," "marketing plans," and "other business information." (A-524-25, A-334-35). The government argued that the CIIAA prohibited "people using information for their own personal gain, not for the company's benefit," citing Finzer's testimony that "the rule means employees shouldn't use or disclose any

confidential information for personal benefit. The information is for the company, not for the employees." (A-390, A-282; *see also* A-202).

Chastain's proffered line of questioning would have directly rebutted this argument. It would have revealed that Finzer personally traded on knowledge that—under the government's interpretation of the CIIAA—would have constituted confidential information. Thus, it was probative of whether Finzer believed certain categories of information—including the NFT information—were protected by the CIIAA, and whether Finzer acted to preserve OpenSea's "exclusive right" to such information. *Mahaffy*, 693 F.3d at 135 n.14. These facts were clearly "of consequence in determining the action." Fed. R. Evid. 401.

### 3. Rule 403 Did Not Warrant Exclusion

The Rule 403 ruling was similarly flawed. First, the balancing was "tainted," *White*, 692 F.3d at 247, by the court's erroneous conclusion that the evidence "doesn't speak to the issues in this case." Second, the court erroneously excluded the evidence merely because it would "smear [Finzer] and make him look bad." (A-331). The point was not to make Finzer look bad, but to show that the CEO—who was responsible for setting company policy—didn't believe company policy precluded officers or employees from using similar company information for personal benefit.

Regardless, Rule 403 does not permit the court to exclude evidence simply because it is embarrassing to a witness. Evidence does not create "unfair prejudice" just because it is "damaging to [a party's] case." *United States v. Siegel*, 717 F.2d 9, 17 (2d Cir. 1983). The evidence only would have made Finzer "look bad" by undermining his testimony on the dispositive issue at trial. Indeed, all impeachment evidence makes a witness "look bad." But it was the probative weight of the evidence—"the rationale [justifying] its admission," *Quattrone*, 441 F.3d at 186—that would have discredited Finzer, not any unfair prejudice. Thus, Rule 403 was not a permissible basis for exclusion, particularly given the "wide latitude" that criminal defendants must be given when cross-examining government witnesses. *White*, 692 F.3d at 251.

### D. The Evidentiary Errors Prejudiced Chastain

The proffered employee testimony, redline, and Finzer MATIC trading incident were each probative of the "issue central to [Chastain's] case." *Litvak*, 808 F.3d at 184. The government thus cannot establish that these errors—individually or collectively—did not "substantially influence the jury." *Id.*; *see also Blum*, 62 F.3d at 69 (reversing where excluded evidence "went to the core of the prosecution's case").

The government's evidence was far from overwhelming. The jury's notes demonstrate how close the case was. After requesting the co-founders' testimony

and subsequent "brief deliberations, the jurors sent a note that they were hung," *United States v. Grinage*, 390 F.3d 746, 752 (2d Cir. 2004). This "cuts strongly against" a finding the evidence "would have made no difference to the jury." *Stewart*, 907 F.3d at 689.

The jury ultimately deliberated for two full days after hearing less than four days of testimony and reached a verdict only after a supplemental instruction inviting the jury to consider how other "employees" besides the co-founders "treated the information." (A-486). The jury then submitted additional notes. "The length and deliberative conduct by the jury...suggests that a conviction was not assured…." *Zappulla v. New York*, 391 F.3d 462, 471 (2d Cir. 2004).

Moreover, the supplemental instruction pointed the jury to the exact type of evidence the court prevented Chastain from introducing—evidence of OpenSea employees' understanding of the confidentiality policy that would have corroborated Chastain's arguments on both the property and intent elements, and evidence of Finzer's own "conduct" (A-486) showing he didn't treat similar information as company-confidential. The evidence was thus "highly significant to a fair presentation of [Chastain's] defense." *United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990). A new trial is warranted.

## IV.  THE CUMULATIVE EFFECT OF THESE ERRORS PREJUDICED CHASTAIN

Each of the trial errors, standing alone, requires vacatur.  Cumulatively, they

invited the jury to convict for innocent conduct, and unfairly tilted the scales in

favor of the government.  "[E]ven if they are harmless when considered singly,"

their cumulative effect "amount[s] to a violation of due process requiring reversal

of [the] conviction[s]."  *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir.

2008).

## <u>CONCLUSION</u>

The judgment should be reversed, and the case remanded with instructions

to enter a judgment of acquittal.  Alternatively, the Court should vacate and

remand for a new trial.

Dated:   New York, New York
         January 16, 2024

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Jason Anthony Driscoll
SHAPIRO ARATO BACH LLP
1140 Ave of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

David I. Miller
Daniel P. Filor
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, New York 10017
(212) 801-9200

*Attorneys for Defendant-Appellant
Nathaniel Chastain*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.  The undersigned counsel of record for Defendant-Appellant Nathaniel Chastain certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 13,989 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word 2023.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2023 in 14-point font of Times New Roman.

Dated:   January 16, 2024

/s/Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

SPECIAL APPENDIX

## TABLE OF CONTENTS

PAGE

Memorandum Opinion and Order Denying Motion to Dismiss
 Indictment, entered October 21, 2022 (Dkt. 39) .................. SPA-1

Opinion and Order Deciding Motions to Preclude Expert Testimony,
 entered April 17, 2023 (Dkt. 88)................................. SPA-7

Memorandum Opinion and Order Deciding Motions *in Limine*,
 entered April 18, 2023 (Dkt. 90)................................ SPA-28

Judgment, entered August 23, 2023 (Dkt. 154)...................... SPA-32

**Significant Rules of Law**

18 U.S.C.A. § 1341 ............................................... SPA-39

18 U.S.C.A. § 1343 ............................................... SPA-39

Fed. R. Evid. 401 ............................................... SPA-39

Fed. R. Evid. 403 ............................................... SPA-40

Fed. R. Evid. 701 ............................................... SPA-40

# SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                         :
UNITED STATES OF AMERICA,                                :
                                                         :
                                                         :        22-CR-305 (JMF)
                    -v-                                  :
                                                         :        MEMORANDUM OPINION
NATHANIEL CHASTAIN,                                      :        AND ORDER
                                                         :
                         Defendant.                      :
                                                         :
------------------------------------------------------------------- X

JESSE M. FURMAN, United States District Judge:

 Defendant Nathaniel Chastain is charged with wire fraud and money laundering relating

to his purchase and sale of Non-Fungible Tokens or "NFTs" on OpenSea, an online NFT

marketplace.  ECF No. 1 ("Indictment"), ¶¶ 1, 3.  According to the Indictment, Chastain was a

product manager for OpenSea and, in that role, had responsibility for selecting certain NFTs to

be featured on OpenSea's homepage.  *Id.* ¶¶ 4, 8.  In general, the Government alleges, when an

NFT is featured on OpenSea's homepage, the values of that NFT and NFTs made by the same

creator increase.  *Id.* ¶¶ 7-8.  The Government further alleges that, between approximately June

and September 2021, Chastain purchased dozens of NFTs shortly before they (or other NFTs

made by the same creator) were featured on OpenSea's homepage and, shortly after they were

featured, sold them for profit.  *Id.* ¶¶ 10, 12, 13.  In making these purchases and sales, the

Government alleges, Chastain "misappropriated OpenSea's confidential business information,"

namely knowledge of which NFTs were going to be featured when on OpenSea's homepage and,

in so doing, committed wire fraud in violation of 18 U.S.C. § 1343.  Indictment ¶ 13.  The

Government further alleges that, to conceal his involvement in buying and selling the featured

NFTs, Chastain transferred funds through anonymous Ethereum blockchain accounts and new

Ethereum accounts without any prior history and, in so doing, committed money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Indictment ¶ 15.

Chastain now moves, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, to dismiss the Indictment on the ground that it "fails to allege the essential elements of the crimes charged."  ECF No. 19 ("Def.'s Mem."), at 6 (cleaned up).[1]  More specifically, Chastain makes three different arguments.  First, he contends, with the support of the New York Council of Defense Lawyers ("NYCDL"), as *amicus curiae*, that Count I, the wire fraud count, must be dismissed because the information that he allegedly misappropriated is not "property" within the meaning of the statute.  Def.'s Mem. 11-19; *see also* ECF No. 20 ("Amicus Mem."), at 3-14.  Second, Chastain argues that Count II, the money laundering count, must be dismissed because the Government fails to allege sufficiently two elements of the crime (namely, the concealment and financial transaction elements) and seeks impermissibly to criminalize the mere movement of money.  Def.'s Mem. 20-25.[2]  Finally, Chastain asserts that Count I, the wire fraud count, must be dismissed because an "'insider trading' wire fraud charge" requires "the existence of trading in securities or commodities."  *Id.* at 6-11 (capitalization altered).

It is well established that "[a] defendant faces a high standard in seeking to dismiss an indictment."  *United States v. White*, No. 17-CR-611 (RWS), 2018 WL 4103490, at *2 (S.D.N.Y. Aug. 28, 2018) (internal quotation marks omitted).  That is because "an indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must

---

[1]     In the alternative, he seeks an order, pursuant to Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure, requiring the Government to disclose its instructions to the grand jury. *See* Def.'s Mem. 25.

[2]     Chastain also argues that the money laundering count "cannot stand in the absence of the wire fraud count" because the Government must prove that the property at issue represented proceeds of "specified unlawful activity."  *See* Def.'s Mem. 20.

meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (cleaned up). Indeed, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (cleaned up). Thus, except in the rare case in which "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . , the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998). To that end, at the Rule 12(b) stage, a court "do[es] not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) (internal quotation marks omitted). At most, "[t]hat is something [courts] do *after* trial" on a complete record. *Id.* (emphasis added).

Measured against this standard, Chastain's motion to dismiss the Indictment must be rejected. Chastain's first two arguments have some force. For example, the Government may not be able to prove beyond a reasonable doubt that the information at issue with respect to Count I — namely, what NFTs would be featured and when on the OpenSea website — constituted "confidential business information" and, thus, "property" within the meaning of the statute. *See Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("Confidential information *acquired or compiled* by a corporation in the course and conduct of its business is a species of property." (emphasis added) (internal quotation marks omitted)); *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012) (noting that the viability of the Government's wire fraud theory required proof that the victim businesses "had exclusive use of the . . . information, considered that information to be confidential, and . . . treated it as such"). Additionally, given that the

3

Ethereum blockchain is public, the Government may have trouble proving beyond a reasonable doubt that the transactions at issue were "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds."  18 U.S.C. § 1956(a)(1)(B)(i); *see, e.g.*, *Regaldo Cuellar v. United States*, 553 U.S. 550, 567-68 (2008) (reversing a money laundering conviction on the ground that there was insufficient evidence of the defendant's intent to conceal).  At bottom, however, these arguments are arguments about the sufficiency of the evidence, not the adequacy of the Indictment, which properly tracks the relevant statutory language and provides Chastain with the basics of each charge.  Thus, they are arguments that Chastain must make to a jury in the first instance and, if convicted, to the Court on a full record; they are not arguments the Court may entertain now.[3]

Chastain makes only one argument that is ripe for decision now (an argument that *amicus* NYCDL conspicuously does not join): that the Government's "misappropriation theory" of wire fraud requires trading in securities or commodities transactions.  Def.'s Mem. 6-11.  That argument, however, is wholly without merit.  Chastain seizes on two references in the Indictment and statements made by the Government (in a press release and at the initial conference in this case) to assert that he is charged with "insider trading."  *Id.* at 1 & n.1, 11 n.9.  But he is not charged with insider trading, at least in the classic sense of the term, which is a means of engaging in securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R, § 240.10b-5.  Instead, he is charged with wire fraud in violation of Section 1343.  *See* Indictment ¶ 13.  And in contrast to Section 10(b), which is limited to fraud "in connection with the purchase or sale of

---

[3]     Chastain's argument to the contrary is belied by the fact that the vast majority of cases — and every wire fraud and money laundering case — on which he relies was decided following conviction — after trials or, in a couple cases, after guilty pleas.

4

any security," Section 1343 makes no reference to securities or commodities.  To accept

Chastain's argument would be to read an additional element into the wire fraud statute, which the

Court may not do.  *See Bates v. United States*, 522 U.S. 23, 29 (1997) ("[The Court] ordinarily

resist[s] reading words or elements into a statute that do not appear on its face."); *Liparota v.*

*United States*, 471 U.S. 419, 423 (1985) ("The definition of the elements of a criminal offense is

entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures

of statute."); *see also, e.g.*, *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d

Cir. 2021) ("When interpreting a statute, [a court must] begin with the text. . . .  Where the plain

meaning of the text is clear, [the] inquiry generally ends there." (cleaned up)).

Contrary to Chastain's assertions, *see* Def.'s Mem. 5, the fact that the Government's

theory rests on the Supreme Court's decision in *Carpenter* is of no moment.  Indeed, if anything,

*Carpenter* actually dooms Chastain's argument.  In *Carpenter*, a columnist for the *Wall Street*

*Journal* entered into a scheme in which he shared information "as to the timing and contents" of

the column with traders so that they could trade on the information and share the profits.  *See*

484 U.S. at 23.  The columnist and traders were charged with, and convicted of, both securities

fraud and mail and wire fraud.  On appeal, they argued for reversal of the securities fraud

convictions on the ground that the fraud was not "in connection with" the purchase or sale of a

security and for reversal of the wire and mail fraud convictions on the ground that the

information at issue was not "property."  *See id.* at 24.  The Supreme Court evenly divided on the

first issue, *see id.*, yet *unanimously* affirmed the defendant's wire fraud convictions, holding that

"the publication schedule and contents" of the newspaper column constituted property within the

meaning of the wire fraud statute, *id.* at 25.  In the wake of Carpenter, many courts have upheld

convictions for wire fraud based on a misappropriation theory.  *See, e.g.*, *United States v. Hager*,

879 F.3d 550, 554 (5th Cir. 2018) (affirming the wire fraud conviction of a defendant who

misappropriated his employer's confidential information regarding its clients and pricing

calculations); *Belt v. United States*, 868 F.2d 1208, 1213 (11th Cir. 1989) (affirming the wire

fraud conviction of a defendant who released employer's confidential information regarding

subcontractor bids for a construction project); *see also, e.g.*, *United States v. Regensberg*, 604 F.

Supp. 2d 625, 634 (S.D.N.Y. 2009) (rejecting an argument that securities fraud charges and wire

fraud charges were multiplicitous, noting that "[s]ecurities fraud requires a showing of fraud in

connection with the purchase or sale of any security — an element not required to prove wire

fraud" (citing cases)).  No court has suggested, let alone held, that conviction in such a case

requires trading in securities or commodities.[4]

      In short, to the extent that Chastain's arguments have potential merit, they are premature;

to the extent that they are not premature, they are without merit.[5]  Accordingly, and for the

reasons discussed above, Chastain's motion to dismiss the Indictment is DENIED.

      The Clerk of Court is directed to terminate ECF No. 17.

      SO ORDERED.

Dated: October 21, 2022
     New York, New York

_____
JESSE M. FURMAN
United States District Judge

---

[4]    At most, Chastain's argument suggests that the phrase "insider trading" may be
misleading.  If so, however, the appropriate remedy would presumably be to strike that phrase
from the Indictment (and preclude the Government from using it at trial), not dismissal of the
Indictment.  Chastain has separately moved for that relief, *see* ECF No. 30, but the motion is not
yet fully submitted so the Court reserves judgment on the issue here.

[5]    As noted, Chastain moves, in the alternative, for an order requiring the Government to
disclose its instructions to the grand jury.  Def.'s Mem. 25.  Because, for the reasons discussed
above, Chastain makes no "concrete allegations of Government misconduct" to justify his
request, *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994), that request is denied.

# SPA-7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                    :

UNITED STATES OF AMERICA,         :
                                      :
                                      :           22-CR-305 (JMF)
          -v-                  :
                                      :          OPINION AND ORDER
NATHANIEL CHASTAIN,           :
                                      :
                     Defendant.      :
                                      :
--------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      Defendant Nathaniel Chastain is charged with wire fraud and money laundering relating

to his purchase and sale of Non-Fungible Tokens or "NFTs" on OpenSea, an online NFT

marketplace.  ECF No. 1 ("Indictment"), ¶¶ 1, 3.  According to the Indictment, Chastain used

confidential information he obtained by virtue of his position as a product manager at OpenSea

to purchase NFTs shortly before they (or other NFTs made by the same creator) were featured on

OpenSea's homepage and, shortly after they were so featured, sold them for a hefty profit.  *Id.*

¶¶ 4, 8, 10, 12, 13.  More specifically, the Government alleges that, in making these trades,

Chastain "misappropriated OpenSea's confidential business information" — namely, the

knowledge of which NFTs were going to be featured when on OpenSea's homepage — and, in

so doing, committed wire fraud in violation of 18 U.S.C. § 1343.  Indictment ¶ 13.  The

Government further alleges that, to conceal his involvement in buying and selling the featured

NFTs, Chastain transferred funds through anonymous Ethereum blockchain accounts and new

Ethereum accounts without any prior history and, in so doing, committed money laundering in

violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Indictment ¶ 15.

      Trial is scheduled to begin on April 24, 2023.  Earlier this month, each side filed a motion

seeking to preclude some or all of the other side's expert testimony.  In particular, Chastain

moves to preclude the testimony of the Government's expert, Professor Daniel Taylor, *see* ECF No. 57, and the Government moves to preclude the testimony of Chastain's two experts, Professor Douglas Skinner and Dr. Matthew Edman, *see* ECF No. 61 ("Gov't Mem.").  At the heart of these motions is a dispute that first emerged in Chastain's motion to dismiss the Indictment: whether the Government is required to prove that "confidential business information" had "inherent economic value" to its owner (here, OpenSea) in order to establish that it is "property" for purpose of Section 1343, the wire-fraud statute.  Although the Court did not need to resolve that dispute to rule on Chastain's motion to dismiss, *see United States v. Chastain*, No. 22-CR-305 (JMF), 2022 WL 13833637 (S.D.N.Y. Oct. 21, 2022), it is ripe for resolution now.  For the reasons that follow, the Court concludes that the Government is not *required* to prove that the featured NFT information had inherent value to OpenSea but that such evidence can be considered by the jury in (among other things) evaluating whether the information was "confidential business information" and, thus, OpenSea's property.  In light of that ruling, and for other reasons discussed below, Chastain's motion to preclude Professor Taylor's testimony is largely denied, and the Government's motions to preclude are granted in part and denied in part.

## CONFIDENTIAL BUSINESS INFORMATION AS PROPERTY

The Court will begin with the parties' dispute over what the Government must prove to establish that the information about which NFT would be featured and when qualified as OpenSea's property.  Section 1343, the federal wire-fraud statute, criminalizes the use of certain interstate communications for a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  It is well established that "[a] scheme to deceive, however dishonest the methods employed, is not a scheme to defraud" within the meaning of Section 1343 "in the absence of a

property right to interfere with." *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). It is

equally well established that "[c]onfidential business information" qualifies as "property"

protected by Section 1343 even though it is "intangible." *Carpenter v. United States*, 484 U.S.

19, 25-26 (1987). The question presented here is whether, to qualify as property, confidential

business information must have some "inherent economic value" to its owner. Chastain,

reprising arguments that he made in support of his motion to dismiss, argues that it must. ECF

No. 58 ("Def.'s Mem."), at 9-13; ECF No. 63 ("Def.'s Opp'n"), at 3-7; *see also* ECF No. 19, at

12-19. The Government, reprising is arguments in opposition to Chastain's earlier motion,

argues that it need not. Gov't Mem. 20 fn.3; ECF No. 62 ("Gov't Opp'n."), at 7-10; *see also*

ECF No. 23, at 16-19. The Government has the better of the argument.

The Court begins with the Supreme Court's decision in *Carpenter*, which is the primary

precedent upon which the Government here relies. In *Carpenter*, a columnist for the *Wall Street

Journal* entered into a scheme in which he shared information "as to the timing and contents" of

his market-moving column with traders so that they, in turn, could trade on the information and

share the profits. 484 U.S. at 23. On appeal, the Supreme Court unanimously affirmed the

defendant's wire-fraud convictions, holding that "the *Journal*'s interest in the confidentiality of

the contents and timing of the . . . column" qualified "as a property right" within the meaning of

Section 1343. *Id.* at 25. "Confidential information acquired or compiled by a corporation in the

course and conduct of its business," the Court stated, "is a species of property to which the

corporation has the exclusive right and benefit, and which a court of equity will protect through

the injunctive process or other appropriate remedy." *Id.* at 26 (internal quotation marks omitted).

Quoting *International News Service v. Associated Press*, 248 U.S. 215, 236 (1918), for the

proposition that "news matter . . . is stock in trade, to be gathered at the cost of enterprise,

organization, skill, labor, and money, and to be distributed and sold to those who will pay money

for it, as for any other merchandise," the Court concluded that "[t]he *Journal* had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the . . . column." 484 U.S. at 26.

Perhaps most significant for present purposes, the Supreme Court deemed it irrelevant that the defendants "did not interfere with the *Journal*'s use of the information" and "did not publicize it and deprive the *Journal* of the first public use of it." *Id.* "The confidential information was generated from the business," the Court reasoned, "and the business had a right to decide how to use it prior to disclosing it to the public." *Id.* More to the point, the defendants could not contend "that a scheme to defraud requires a monetary loss, such as giving the information to a competitor; it [was] sufficient that the *Journal* . . . [was] deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id.* at 26-27. In other words, it was enough for the Government to prove (1) that the information at issue was kept confidential by the *Journal* and (2) that it was "acquired or compiled . . . in the course and conduct of its business"; the Government did not have to prove more, let alone that the *Journal* had suffered any "monetary loss." *Id.* at 26-27; *cf. United States v. O'Hagan*, 521 U.S. 642, 654 (1997) (relying on *Carpenter* to affirm a conviction for securities fraud where the defendant, a lawyer at a law firm, misappropriated information concerning a firm client, explaining that the information "qualifie[d] as property to which the company ha[d] a right of exclusive use").

Assuming for the sake of argument that *Carpenter* left the door ajar for an "inherent value" requirement, two later Second Circuit decisions all but slammed that door shut. The first, *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), involved a law firm associate who was convicted of mail fraud based on his misappropriation of confidential information pertaining to one of the firm's clients. On appeal, the defendant relied on *Carpenter*'s quotation from

*Associated Press* to argue that his firm "had no 'property interest' in the [client's] confidential information because [the firm] (1) could not use the information for its commercial value or have the exclusive right to exploit it; and (2) did not gather the information through its own enterprise, organization, skill, labor and money."  843 F.2d at 86.  The Second Circuit rejected this argument as "specious."  *Id.*  "In context," the court explained, *Carpenter*'s language "merely *describe*[d] the confidential information in that case; it [did] not require that *all* confidential information must be of the same nature to be considered 'property.'  *Carpenter* actually holds generally that, even though 'confidential business information' is intangible, it 'has long been recognized as property.'"  *Id.* (citation omitted).  With that, the court concluded that the law firm client's confidential information "*clearly* [fell] within the definition of property under *Carpenter*."  *Id.* (emphasis added).  Moreover, that was true even though the law firm itself "could not commercially exploit the information by trading on it . . . .  As several partners of the firm testified, maintaining the confidentiality of the information was of commercial value because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients."  *Id.*

In the second case, *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012), the defendants, traders at several brokerage firms, disclosed confidential communications about client orders — transmitted over devices known as "squawk boxes" — to a day trader, who "then placed trades in the squawked securities before the brokerage firms executed the squawked customer orders."  *Id.* at 120.  On appeal, the Second Circuit vacated the defendants' convictions based on a failure to disclose exculpatory evidence.  More relevant for present purposes, however, the court rejected the defendants' challenge to the district court's jury instructions on the meaning of "confidential business information."  The defendants had requested a charge, based on case law concerning civil trade secret claims, that would have instructed the jury to consider, among other

things, "the value of the information to the business and its competitors" and "the amount of

effort or money expended by the business in developing the information." *Id.* at 134.  The

district court declined the defendants' request and instead instructed the jury that "[c]onfidential

information acquired by a company in the operation of its business is a form of property, to

which the company has the exclusive right and benefit." *Id.*  In a supplemental charge, the

district court added that "confidential business information" qualified as property "[e]ven if it

lacks commercial value to the company . . . .  What is key is that the company treat the

information as confidential and with knowledge of that fact, its employee nonetheless knowingly

discloses that information for an improper use." *Id.* at 135.

The Second Circuit held that the district court did not err in rejecting the defendants'

request because it "did not accurately reflect the law in every respect." *Id.*  In particular, the

requested "charge would have instructed the jury to consider factors, borrowed from case law

discussing trade secrets, that do not necessarily bear on the confidentiality of the squawked

information, including the value of the information to the business and business's investment in

developing the information.  Information may qualify as confidential under *Carpenter* even if it

does not constitute a trade secret." *Id.*  At the same time, the court explicitly "caution[ed] the

district court that, if there is another trial, its instruction regarding confidential business

information should provide more fulsome guidance to assist the jury in determining whether the

squawked information was confidential." *Id.*  "*Carpenter*," the court continued, "requires proof

that the information was both considered *and* treated by an employer in a way that maintained

the employer's exclusive right to the information. . . .  If employers 'consider' information to be

confidential but do not really take affirmative steps to treat it as such and maintain exclusivity,

*Carpenter* is not satisfied." *Id.* at 135 n.14 (emphasis added).  "The pertinent factors" to be

considered by a jury "will, of course, vary from case to case, but may include written company

policies, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business, and the ways in which other employees may access and use the information." *Id.*

Taken together, these decisions make plain that the Government is not required to prove that "confidential business information" had "inherent value" to an employer for it to qualify as the employer's property for purposes of Section 1343. Indeed, at bottom, Chastain's argument to the contrary is no different from the arguments rejected by the Second Circuit in *Grossman* and *Mahaffy*. Like the defendant in *Grossman*, Chastain seizes on *Carpenter*'s quotation from *Associated Press* to argue that confidential business information qualifies as property only when it is "a company's 'stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and *to be distributed and sold to those who would pay money for it*." Def.'s Opp'n 5 (cleaned up) (emphasis in original). But that argument "distorts *Carpenter*." *Grossman*, 843 F.2d at 86. And like the defendants in *Mahaffy*, Chastain argues that confidentiality requires evidence that information has "value" to its owner. Def.'s Mem. 9-10. But such evidence "do[es] not necessarily bear on . . . confidentiality." *Mahaffy*, 693 F.3d at 135. Instead, *Carpenter* and its progeny require only that the information be "acquired or compiled by [an employer] in the course and conduct of its business," *Carpenter*, 484 U.S. at 26, and that "the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information," *Mahaffy*, 693 F.3d at 135 n.14. They do not leave the door open to adding an additional "inherent value" requirement.

In arguing for such a requirement, Chastain relies less on *Carpenter*, *Grossman*, and *Mahaffy* than he does on *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), in which the Second Circuit reversed a wire-fraud conviction for misappropriation of confidential information from the Centers for Medicare and Medicaid Services on the ground that the information did not

qualify as "property."  Def.'s Mem. 10-11; Def.'s Opp'n 4-6.  In doing so, the *Blaszczak* court

did indeed invoke the "stock in trade" quote from *Carpenter*, describe the lack of "impact on the

government's fisc," and refer to "inherently valuable" government information.  *Id.* at 243-44.

But that language was merely part of the court's explanation for why the information in that case

was "regulatory in character" rather than "money or property," *id.* at 244, a critical distinction

following the Supreme Court's decision in *Kelly v. United States*, 140 S. Ct. 1565 (2020), the

infamous "Bridgegate" case.  Chastain distorts *Blaszczak* in arguing that its language establishes

a requirement for confidential information to have inherent value in order to qualify as property

— let alone that it does so outside of the public corruption context in which the Supreme Court

has been careful to construe the wire and mail fraud statutes strictly so as to avoid "a sweeping

expansion of federal criminal jurisdiction" to police state and local governmental decisions.

*Kelly*, 140 S. Ct. at 1574.  Indeed, *Blaszczak* did not involve confidential *business* information at

all.  Nor did it purport to overrule *Grossman* and *Mahaffy*.  Thus, *Blaszczak* does not support the

weight that Chastain puts on it.[1]

In sum, under *Carpenter* and its progeny, the Government is not required to prove that

the information at issue in this case had "inherent value" to OpenSea in order to establish that it

was confidential business information within the meaning of Section 1343.  Significantly,

---

[1]    Nor does the Solicitor General's letter brief in *Blaszczak*, which Chastain cites for the proposition that confidential business information must have "inherent market value to [its] owners."  Def.'s Mem. 10.  The full context for the phrase is "[u]nlike confidential news material or stock-trading statistics, which have inherent market value to their owners" — citing *Carpenter* and another case as examples — the "the draft reimbursement rates at issue here have value to the government *only* as a regulator, not 'as [a] property holder.'"  United States Supplemental Letter Brief at 7, *United States v. Blaszczak*, Nos. 18-2811 et al. (2d Cir. June 4, 2021) (ECF No. 497) (citing *Kelly*, 140 S. Ct. at 1572).  If anything, therefore, the Solicitor General's letter brief demonstrates that *Kelly* and *Blaszczak* are inapposite because they apply only to officials exercising regulatory power.  Moreover, observing that confidential news material and stock-trading statistics have inherent market value is not the same as conceding that inherent value is a *requirement* for information qualify as property.

however, it does not follow that evidence and argument that the information did have "value" to OpenSea is irrelevant, let alone inadmissible. The fact that information has "value" to an employer may well be relevant in evaluating whether the information is property. For instance, it may be relevant to understanding why the employer would "acquire[] or compile[]" the information "in the course and conduct of its business," *Carpenter*, 484 U.S. at 26, or to understanding why the employer would consider and treat the information "in a way that maintained the employer's exclusive right to the information," *Mahaffy*, 693 F.3d at 135 n.14. To say that the Government *may* prove that the information at issue had inherent value to OpenSea is not, however, to say that it is *required* to do so. For the reasons discussed above, the Government is not required to do so.

### THE PARTIES' *DAUBERT* MOTIONS

Having resolved the parties' "inherent value" debate, the Court turns to the actual relief that the parties are seeking in their motions: preclusion of one another's experts. The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the

task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case."). "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (explaining that because "there are many different kinds of experts, and many different kinds of expertise," a court must be granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

The focus of the Court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Ultimately, "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (cleaned up). The Court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Nor should an expert be permitted to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), or be permitted to merely "construct[] a factual narrative based upon record evidence," *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018). Relatedly, expert testimony regarding "an ultimate determination that [is] exclusively within [the jury's] province," including witness credibility, must be precluded, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), as must an expert's testimony "on

issues of law," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Moreover, "[a]lthough a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule." *In re Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted); *see also Nimely*, 414 F.3d at 395 ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . .").

**A.  Chastain's Motion to Preclude the Testimony of Professor Taylor**

The Court begins with Chastain's motion to preclude the testimony of Professor Taylor of the Wharton School. *See* ECF No. 59-1 ("Taylor Notice"), at 1. According to Taylor's report, he intends to provide an expert opinion related to economic theories about the use and value of the information about upcoming featured digital art. *Id.* In particular, he would opine that information about upcoming featured art was valuable because it provided profitable information about future demand; that companies often keep valuable information confidential for business reasons; and that maintaining the confidentiality of certain information promotes trust, which is especially important to the functioning of a marketplace. *Id.* Chastain moves to exclude the report and testimony of Taylor on a several grounds, namely, that (1) "Taylor impermissibly opines on ultimate legal issues in this case"; (2) Taylor's testimony is "irrelevant to key issues . . . and . . . rel[ies] on easily-understood economic concepts" not "beyond the ken of an average juror"; (3) "portions of Taylor's proposed testimony are based exclusively on irrelevant and unhelpful analogies"; (4) Taylor's opinion about trust "is not only irrelevant, but illogical"; and

(5) "Taylor's proposed testimony is unreliable because it fails to consider critical exculpatory evidence." Def.'s Mem. 1-2. The Court will address each argument in turn.

Chastain's first argument has force in one respect that is not even disputed by the Government: Taylor may not "opine that information about upcoming featured NFTs was 'confidential business information' or try to offer a definition of that term." Gov't Opp'n 5-6; *accord id.* at 11.[2] Any such testimony would impermissibly intrude on the province of the Court to define the law, *see, e.g.*, *Bilzerian*, 926 F.2d at 1294; the jury to draw legal conclusions, *see e.g., Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992); or both. That one limitation aside, Chastain's first argument rests in part on the false premise that the Government may not offer evidence of the information's economic value if, as is the case, it is not required to prove "inherent value." That is, although the Government is not required to prove inherent economic value, it may nevertheless offer Taylor's testimony about the rise in prices due to heightened demand that occurs after an NFT is featured to help the jury understand the economic factors at play, including the incentives for Chastain to misappropriate the information at issue and the reasons why OpenSea may have had a business interest in safeguarding the exclusivity of the information. *See* Gov't Opp'n 11-12.

Chastain's second argument — his only other argument for exclusion of Taylor's first opinion about the economic value of the information at issue — is that "the law of supply and demand" is a "simple and easy to understand" concept that is not beyond the ken of the average juror. Def.'s Mem. 15-16 (internal quotation marks omitted). The argument is without merit.

---

[2] The Government represents that Taylor "will not" offer such opinions, but his report is not quite as circumspect. *See, e.g.*, Taylor Notice at 1 ("Confidential business information about upcoming featured digital art was valuable because it provided information about expected future demand."); *id.* at 3 ("Chastain engaged in this sort of trading dozens of times, often re-selling the digital art he purchased using confidential business information for multiples of the purchase price.").

**SPA-19**

For starters, it is doubtful that all jurors have a solid grasp of basic economics, let alone could apply it to the facts of this case.  But more fundamentally, the argument overlooks (or mischaracterizes) the import of Taylor's testimony.  As the Government explains, Taylor merely "*begins* with the principle that, when supply is restricted and demand increases, price tends to rise.  He then goes further to explain how, because of this principle, *information about anticipated demand* can [itself] have value."  Gov't Opp'n 16 (initial emphasis added).  "This more subtle point — that, from an economic perspective, *information itself can have value* — is not something that jurors can be counted on to know," *id.* (emphasis added), and, for the reasons discussed above, is plainly relevant to the issues in this case.

Next, Chastain takes issue with a series of analogies Taylor makes — for example, about Coca-Cola's efforts to maintain the secrecy of its formula and the efforts of publicly traded companies to maintain the secrecy of pricing information in publicly disclosed contracts.  Def.'s Mem. 17-19.  Chastain's arguments for why the circumstances of these examples differ from the circumstances in this case are well taken, but they ultimately miss the point.  As the Court understands it, Taylor does not claim, or intend to claim, that information about OpenSea's upcoming featured NFTs is similar to Coca-Cola's secret formula or to public companies' pricing information.  (To the extent that he does so testify, Chastain may renew his objection at trial.)  Instead, the analogies are offered merely to help the jury understand a more basic point: that there are circumstances in which companies have an economic interest in controlling information — that is, keeping information confidential — rather than selling or licensing it, even when the information *could* be sold for a substantial sum.  Gov't Opp'n 18-20; Taylor Notice 3-4.  Chastain is obviously free to argue that Taylor's analogies are inapt — and in service of that argument, to explore (within reasonable limits) the differences between the analogies and this case through "[v]igorous cross-examination," if not "presentation of contrary

evidence." *Daubert*, 509 U.S. at 596.  But the differences are not a basis to preclude the relevant portion of Taylor's testimony.

Chastain's fourth argument attacks Taylor's opinions about the importance of trust to OpenSea's business — namely, that OpenSea had a business interest in controlling access to the information at issue because misuse risked undermining trust in its marketplace.  Def.'s Mem. 20-21.  In particular, Chastain contends that the opinion is irrelevant to the value of the information to OpenSea *ex ante*.  *See id.* at 20.  That is debatable, but ultimately irrelevant because it proceeds from the mistaken premise that the Government is required to prove that the information had inherent economic value to OpenSea.  As discussed above, the Government is not.  More broadly, Chastain's argument is based on an overly cramped understanding of "value" in this context.  As *Grossman* and *Mahaffy* make plain, information can have "value" to an employer even if the employer does not — or cannot — commercially exploit the information by selling it or trading on it.  *See Grossman*, 843 F.2d at 86; *Mahaffy*, 693 F.3d at 135.  "[B]y maintaining confidentiality," for example, a firm may be able to "protect or enhance [its] reputation, with the result that it would not lose its clients and perhaps would gain more clients." *Grossman*, 843 F.2d at 86; *see Mahaffy*, 693 F.3d at 135 ("Even if it lacks commercial value to the company, company policy may be to treat the information as confidential to protect the reputation of the company and its customers." (quoting the district court's jury instructions)).[3]

---

[3]      The Court's understanding is that Taylor's testimony about trust is focused on explaining economic principles and how they apply to OpenSea, not on demonstrating that Chastain's conduct caused an erosion of trust.  (The Government suggests that Taylor may offer limited testimony about the effects of Chastain's conduct "to corroborate his opinion that the economic literature related to trust applies to OpenSea."  Gov't Opp'n 22.  The Court is not entirely sure what that means, but it can and will consider objections to such testimony if it is offered at trial. Moreover, if the Government offers such testimony, it may, as discussed below, open the door to evidence that Chastain's conduct did not have the effects that Taylor suggests.)  Given that, Chastain's criticism that Taylor did not "conduct[] an event study or empirical analysis," Def.'s Mem. 21, misses the mark.

**SPA-21**

Finally, Chastain argues that "Taylor utterly fails to account for OpenSea's statements" that "specifically conclud[e] that the relevant information had no . . . value." Def.'s Mem. 22. For example, Chastain points to a statement by a "senior officer" that "OpenSea did not think there was inherent value in the confidentiality of the featured NFT artist selection, as OpenSea would still get a cut of the sales and would have made the identity of it public regardless." *Id.* at 6. Whether these statements accurately reflect what the evidence will be at trial is disputed. *See* Gov't Opp'n 24-25. But whatever the case may be, Chastain's criticism is misplaced. Taylor will not — indeed, could not — testify about what OpenSea employees did, or did not, "think." *See, e.g.*, *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011 (JMF), 2023 WL 2307179, at *29 (S.D.N.Y. Mar. 1, 2023). Instead, his testimony will be limited to economic principles and how they apply to OpenSea generally. In preparing for that testimony, Taylor did review "documents describing the company's business model." Gov't Opp'n 23-24. But he did not review any notes from interviews with witnesses, favorable or unfavorable. *Id.* at 24. Thus, he cannot be accused of cherry-picking favorable evidence, as in the principal case on which Chastain relies, *In re Rezulin Products Liability Litigation*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005). *See* Def.'s Mem. 22. To the extent that Chastain wishes to challenge Taylor's testimony on the ground that he did not consider relevant facts, he may, of course, cross-examine on those points.

In sum, Chastain's motion is GRANTED (effectively on consent) to the extent that it seeks to preclude Taylor from opining that the information at issue in this case was "confidential business information" or from offering a definition of that legal term. Otherwise, the motion is DENIED.

**B. The Government's Motion to Preclude Professor Skinner**

Next, the Government moves to preclude the testimony of Professor Skinner, a professor

at the University of Chicago, Booth School of Business.  *See* ECF No. 61-5 ("Skinner Notice"),

at 1.  Chastain seeks to call Skinner to rebut the testimony of Taylor on several points.  *See id.* at

2; Def.'s Opp'n 7.  Among other things, Skinner proposes:

- to "offer background testimony regarding the economics of two-sided platforms based on the relevant academic literature," and specifically, "OpenSea's business model in the economic context of two-sided platforms," Skinner Notice 2-3;

- to explain "how 'fundamental information' related to the value of an asset is understood by economists as information pertaining to the asset's ability to generate cash flows and riskiness of those cash flows," and to "opine that the information that Mr. Chastain allegedly possessed differs from fundamental information as economists understand it," *id.* at 3;

- to "explain" the meaning of "confidential (or more precisely, proprietary) business information . . . in the academic literature" and "to opine that this type of proprietary business information is distinct from what Prof. Taylor characterizes as confidential information about upcoming NFT features on OpenSea's homepage," *id.*;

- to "address the concept of 'informed traders'" and to "explain that the private information deemed valuable and used by 'informed traders' to generate trading profits is often distinct from . . . proprietary or confidential business information," *id.*

- relatedly, to "explain that, as a result, information that may have value to traders may not have value to the platforms on which they trade" and to "opine that the information Mr. Chastain allegedly possessed about upcoming NFT features on OpenSea's homepage has not been shown by Prof. Taylor to have value to OpenSea," *id.*; and

- to "address Prof. Taylor's assertions with respect to trust," by opining "that Prof. Taylor has not demonstrated that the literature on trust is applicable to either the context of Mr. Chastain's alleged activities or any purported effects on OpenSea" and opining, "[b]ased on data and analysis of the activity on and involving OpenSea in the period following the public revelation of the news of Mr. Chastain's conduct," that there is "no reliable empirical evidence that OpenSea suffered harm from the alleged conduct, including through any purported 'erosion of trust,'" *id.* at 4.

The Government argues that some or all of Skinner's testimony should be precluded on the

grounds that it is irrelevant, unreliable, and usurps the role of the Court and the jury.  Gov't

Mem. 13-25.

It is not entirely clear whether the Government seeks to preclude Skinner from testifying

altogether, *see* Gov't Mem. 24 (conceding that Skinner's proffered testimony on two-sided

markets and OpenSea's business model is "not necessarily impermissible"), but to the extent that it does, the motion is denied. As discussed above, the Government is not *required* to prove that the information at issue had inherent value, but it may do so — and, through Taylor, it apparently intends to do so. To the extent that it does, Chastain is plainly permitted to call his own expert to rebut that testimony and to offer an opinion, with appropriate reference to economic concepts and evidence in this case (including, but not limited to the concept of two-sided markets and OpenSea's business model), that "the information Mr. Chastain allegedly possessed about upcoming NFT features on OpenSea's homepage has not been shown by Prof. Taylor to have value to OpenSea." Skinner Notice 3. Similarly, Chastain is entitled to call Skinner to rebut any testimony that Taylor gives regarding the issue of trust. Thus, to the extent that Taylor testifies that the economic literature regarding trust applies to OpenSea and the information at issue, Skinner may testify to the contrary. So too, to the extent that the Government elicits testimony from Taylor about the effects of Chastain's conduct (purportedly "to corroborate his opinion that the economic literature related to trust applies to OpenSea," Gov't Opp'n 22), Skinner may testify that he has seen "no reliable empirical evidence" of those effects. Skinner Notice 4.[4]

That said, the Court agrees with the Government that much of Skinner's proposed testimony is inadmissible. First, just as Taylor may not opine on the meaning of "confidential business information" and whether the information at issue here meets the definition, Skinner may not testify about how "confidential (or more precisely, proprietary) business information" is understood "in the academic literature" or whether the information at issue here qualifies.

---

[4]     Even if Taylor does not testify about the effects of Chastain's conduct, Skinner may be able to testify to the lack of effects as a means of rebutting Taylor's opinion that the literature of trust applies to OpenSea. In any event, to the extent *either* party introduces evidence regarding the effects of Chastain's conduct, the Court will give a curative instruction to the jury explaining that the Government is not required to prove that OpenSea was actually harmed to convict Chastain of wire fraud. *See, e.g.*, *United States v. Jabar*, 19 F.4th 66, 81 (2d Cir. 2021).

Skinner Notice 3.[5]  Second, the Court agrees with the Government that Skinner's proposed

testimony about the academic definitions of "fundamental information" and "informed trading"

and a comparison between these definitions and the information in this case is largely, if not

entirely, inadmissible.  Whatever "fundamental information" and "informed trading" may be,

they have limited or no bearing on the issues in this case; and to the extent that they have any

probative value, it is substantially outweighed by the dangers of confusing or misleading the

jury.  *See* Fed. R. Evid. 401-403.  Moreover, to the extent that any of this testimony touches on

whether the information at issue in this case is confidential business information, it too would

invade the province of the jury.  *See, e.g.*, *Hygh*, 961 F.2d at 363.  Subject to rulings on

objections at trial, the Court will permit a *limited* amount of testimony about the meaning of

"fundamental information" and "informed trading" *if* they are necessary to explain Skinner's

admissible opinions — but beyond that, Skinner may not testify on these subjects.

In short, the Government's motion to preclude Skinner's testimony is GRANTED in part

and DENIED in part.  Specifically, to the extent that Taylor testifies that the information at issue

had value and that the concept of trust is important to OpenSea, Skinner may testify to the

contrary, with appropriate reference to economic principles.  But Skinner may not otherwise

testify about the meaning of "confidential business information," "fundamental information,"

"informed trading," and whether the information at issue here meets any of these definitions.

**C.  The Government's Motion to Preclude Dr. Edman**

Finally, the Government moves to preclude the testimony of Dr. Edman, "Partner & Co-

Founder of NAXO, a cybersecurity and investigations firm . . . specializing in cryptocurrency,

---

[5]      Skinner's testimony on that score not only intrudes on the role of the Court and jury, but also suffers from a relevance problem.  Put simply, how "confidential business information" is understood in the academic literature is utterly irrelevant.  "Confidential business information" is a legal term of art and will be defined by the Court in its instructions to the jury.

cybersecurity, and digital forensic investigations." ECF No. 61-4 ("Edman Notice"), at 1. According to his expert disclosure, Edman intends to opine that "Defendant did not attempt to obfuscate his identity or conceal his OpenSea activity by using a VPN or other anonymizing technology," "Defendant did not attempt to obfuscate his OpenSea activity by laundering cryptocurrency funds through the use of mixers, non-KYC exchanges, or other techniques often associated with illicit activity," and that "[i]t is common for sophisticated cryptocurrency users to use multiple wallets and wallet addresses to store and transact with their cryptocurrency." *Id.* at 3-4. The Government argues that this testimony should be precluded because it "is tantamount to opinion testimony about Chastain's intentions and mental state" and because Edman's "opinions that certain behaviors are 'common' for 'sophisticated cryptocurrency users' and thus not indicative of intent to conceal one's online activity [are] not scientifically based and [are] unhelpful to the finder of fact." Gov't Mem. 7. Ultimately, the Government contends that "Edman's testimony should be excluded, or in the alternative, severely curtailed to avoid confusion of the issues and misleading the jury." *Id.*

The Court agrees that Dr. Edman's testimony must be curtailed, but there is no basis to preclude it altogether. First, on the impermissible side of the ledger, the Government is correct that Edman may not opine on whether Chastain attempted "to obfuscate his identity or conceal his OpenSea activity" as such testimony would invade the province of the jury and violate the principle that experts may not testify "regarding the intent or motive of parties, or a party's state of mind." *Accent Delight Int'l Ltd.*, 2023 WL 2307179, at *28. More broadly, Edman may not offer "opinions about whether the defendant's conduct constitutes money laundering activity." *United States v. Nektalov*, No. 03-CR-828 (PKL), 2004 WL 1469487, at *4 (S.D.N.Y. June 30, 2004). But the technologies and some of the conduct at issue in this case are plainly "esoteric or otherwise beyond the understanding of the average juror," and therefore an appropriate subject

19

matter for generalized expert testimony. *Id.* at *2-3 (citing cases); *see also Munoz v. United States*, No. 07-CV-2080 (ILG), 2008 WL 2942861, at *44-45 (E.D.N.Y. July 28, 2008) (citing cases). Thus, for example, Edman may provide *general* testimony about the technologies and steps that Chastain used (and did not use) in the transactions at issue; whether or to what extent these technologies and steps do (or do not) conceal one's identity and conduct; and common practices with respect to such technologies (such as the use of multiple cryptocurrency "wallets" and "wallet addresses"). To the extent that the Government takes issue with any of this testimony, it may object to specific questions at trial, challenge Edman on cross-examination, or present contrary evidence. *See Daubert*, 509 U.S. at 596.

In sum, the Government's motion to preclude Edman's testimony is also GRANTED in part and DENIED in part. More specifically, Edman may not opine on whether Chastain engaged in money laundering, including but not limited to whether he attempted to conceal his identity or conduct, but he may provide general testimony regarding the techniques and technologies that Chastain did and did not use in connection with the conduct at issue.

## CONCLUSION

In sum, the Court rules as follows:

- The Government is not required to prove that the information at issue had "inherent economic value" to OpenSea to establish that it was "confidential business information" and, thus, "property" for purposes of Section 1343;

- Nevertheless, evidence regarding the value of the information (or lack thereof) is relevant and admissible, as it may bear on whether the information qualifies as "confidential business information" and on Chastain's motive to misappropriate it;

- Chastain's motion to preclude the testimony of Professor Taylor is GRANTED to the extent that he proposes to opine on the meaning of "confidential business information" and whether the information at issue qualifies, but otherwise DENIED;

- The Government's motion to preclude the testimony of Professor Skinner is DENIED to the extent that Skinner properly rebuts testimony given by Taylor and otherwise GRANTED; and

# SPA-27

- The Government's motion to preclude the testimony of Dr. Edman is GRANTED to the extent that Edman proposes to opine on whether Chastain engaged in money laundering or attempted to conceal his identity and conduct but DENIED to the extent that he would testify generally about the technologies and techniques that Chastain did and did not use in connection with the transactions at issue.

In light of the Court's analysis and ruling regarding "confidential business information" in this Opinion and Order, the parties shall, no later than **noon** on **April 21, 2023**, file revised versions of their proposed jury instructions — along with a redline showing all differences between the revised version and the version the party filed on April 13, 2023.  *See* ECF Nos. 77, 83.

The Clerk of Court is directed to terminate ECF Nos. 57 and 61.

SO ORDERED.

Dated: April 17, 2023
     New York, New York

                                           JESSE M. FURMAN
                                          United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
UNITED STATES OF AMERICA                                          :
                                                                  :
          -v-                                                     :          22-CR-305 (JMF)
                                                                  :
NATHANIEL CHASTAIN,                                               :          MEMORANDUM OPINION
                                                                  :              AND ORDER
                              Defendant.                          :
                                                                  :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

     Defendant Nathaniel Chastain is charged with wire fraud and money laundering relating

to his purchase and sale of Non-Fungible Tokens or "NFTs" on OpenSea, an online NFT

marketplace.  *See* ECF No. 1 ("Indictment").  Trial is scheduled to begin April 24, 2023.  On

April 13, 2023, each party filed multiple motions *in limine*.  *See* ECF Nos. 64, 67, 69, 70, 73, 75,

80.[1]  The parties should be prepared to address Chastain's motion to exclude evidence relating to

the Larva Labs project (ECF No. 64) at the final pretrial conference on April 20, 2023.  The

Court rules on the other motions as follows:

- **Chastain's Motion to Exclude Evidence and Argument Regarding Compensation
  (ECF No. 67):** The motion is denied substantially for the reasons stated by the
  Government in its opposition to the motion.  *See* ECF No. 85 ("Gov't Opp'n"), at 9-11.
  The limited evidence is plainly relevant to Chastain's motivation, and "[e]vidence of
  financial motivation is frequently admitted in fraud cases and is further considered more
  probative than prejudicial."  *United States v. Moses*, 565 F. Supp. 3d 394, 398 (W.D.N.Y.
  2021) (citing cases); *see also United States v. Avenatti*, 19-CR-374, ECF No. 288, at 46-
  47 (S.D.N.Y. Jan. 13, 2022).

- **Chastain's Motion Regarding Summary Charts (ECF No. 69):** The motion is denied
  substantially for the reasons set forth in the Government's opposition.  *See* Gov't Opp'n
  19-26.  First, the Court agrees with the Government that the use of the term "anonymous"
  (and wallet icons with silhouettes) is consistent with the evidence (including Chastain's
  own use of the term) and that there is no need or basis under Rule 403 to use a different
  term.  *See id.* at 20-21.  Second, to the extent there is a distinction between a "wallet" and

---

[1]      Earlier today, the Government filed an additional motion *in limine*.  See ECF No. 89.
Chastain shall file any opposition by tomorrow.

"wallet address," and Chastain's motion has not been mooted by the Government's revisions, *see id.* at 23, it is not meaningful enough to exclude (or require modifications to) any of the summary charts. Third, Chastain's arguments about use of the term "insider trading" are moot. *See id.* Fourth, assuming the Government lays a proper foundation at trial, there is nothing improper about the conversion of Ethereum to U.S. dollars given the evidence (and the need to make the evidence intelligible to the jury). Chastain's reliance on U.S.S.G. § 2B1.4 and suggestion that he never realized any gain because he never converted his Ethereum to U.S. dollars are frivolous and, in any event, not a basis to exclude (or require modifications to) the summary charts. Finally, in light of the Court's ruling above, there is no basis to exclude the summary charts referencing Chastain's compensation.

- **Chastain's Motion to Exclude Terms Such as "Level Playing Field" (ECF No. 73):** The motion is denied substantially for the reasons set forth in the Government's opposition. *See* Gov't Opp'n 6-9. Yes, the gravamen of the crime charged is that Chastain schemed to deprive *OpenSea* of its property, not that he cheated the *purchasers* of the NFTs at issue. But the Government is plainly entitled to argue that Chastain committed the crime in order to obtain an advantage over purchasers who were not privy to the allegedly confidential business information. Any risk of prejudice or confusion can and will be addressed through the Court's instructions to the jury.

- **Chastain's Motion to Exclude Evidence and Argument Concerning the Value of Information to Third-Party Purchasers (ECF No. 75):** The motion is denied substantially for the reasons set forth in the Government's opposition. *See* Gov't Opp'n 15-19. Evidence regarding the value of the information at issue to prospective purchasers of NFTs is plainly necessary for the jury to understand the context and basic issues of the case. It is also probative of Chastain's motive, OpenSea's business decisions, and the value of the information. *See United States v. Chastain*, No. 22-CR-305 (JMF), 2023 WL 2966643, at *10 (S.D.N.Y. Apr. 17, 2023) (ECF No. 88) ("[E]vidence regarding the value of the information (or lack thereof) is relevant and admissible, as it may bear on whether the information qualifies as 'confidential business information' and on Chastain's motive to misappropriate it . . . ."). Again, any risk of prejudice or confusion can and will be addressed through the Court's instructions to the jury.

- **Chastain's Motion to Exclude Terms Such as "Insider Trading" (ECF No. 80):** The motion is denied substantially for the reasons set forth in the Government's opposition. *See* Gov't Opp'n 3-6. As the Court observed at the October 27, 2021 pretrial conference, "[i]ts classic meaning notwithstanding," the term "insider trading" is "not an inapt description of the facts of this case." ECF No. 46 ("Oct. 27, 2022 Tr."), at 3. After all, "Chastain is accused of improperly using confidential, non-public (or 'inside') information about an asset to buy and then sell (or 'trade') that asset on a public market." Gov't Opp'n 4. Jurors are unlikely to be familiar with the technical legal meaning of the term. And regardless, "any concerns about either negative pretrial publicity or potential confusion at trial can and [will] be addressed through a combination of appropriate voir dire and jury instructions." Oct. 27, 2022 Tr. 3.

- **The Government's Motion to Exclude Evidence of OpenSea's Policy Changes on and After September 15, 2021 (ECF No. 70 ("Gov't Mem."), at 2-9):** The motion is

denied substantially for the reasons stated in Chastain's opposition.  *See* ECF No. 87 ("Def.'s Opp'n"), at 3-10.  The Government is certainly free to introduce evidence and argue that OpenSea considered and treated the information at issue as "confidential" even before it changed its policies on September 15, 2021, and November 5, 2021.  But consistent with the Court's observations during the October 27, 2022 pretrial conference, Chastain is entitled to argue that the changes "shed light on the content and meaning of the policies that were in place at the time of his conduct," which is "relevant," in turn, "to whether the information constituted property."  Oct. 27, 2022 Tr. 9; *cf. Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991) (holding, in a civil case, that "actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident").  Moreover, there is no merit to the Government's argument under Rule 407 of the Federal Rule of Evidence.  First, it is not clear that the Rule even applies to the conduct of a third party.  *See, e.g.*, *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, No. 08-CV11315 (WHP), 2011 WL 855876, at *7 (S.D.N.Y. Feb. 28, 2011) ("[C]ourts have unanimously held that Rule 407 does not bar evidence of subsequent remedial measures by non-defendants." (citing cases)).  Second, even if it does, the evidence at issue here is not offered for one of the purposes prohibited by the Rule, but for "another purpose[]."  Fed. R. Evid. 407.

- **The Government's Motion to Preclude Witnesses' Opinions About Whether Chastain's Conduct Constituted "Insider Trading" (Gov't Mem. at 9-12):** The motion is granted substantially for the reasons stated in the Government's memorandum of law.  *See* Gov't Mem. 9-11.  Whether OpenSea's CEO (or any other witness) believed that Chastain's conduct constituted "insider trading" is irrelevant and improper opinion testimony under Rules 701 and 702 of the Federal Rules of Evidence.  Moreover, any probative value of such evidence is substantially outweighed by the risk of confusion, as the opinions appear to be rooted in an understanding of the classic or traditional meaning of "insider trading," which, as discussed, is not relevant here.  For similar reasons, the fact that the Government may use the term "insider trading" at trial does not "open the door" to the evidence at issue.  *See also, e.g.*, *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993) ("To be admissible under [the 'opening-the-door'] doctrine, the evidence that allegedly 'opened the door' must in fact have been inadmissible.  Properly admitted evidence does not open the door to inadmissible evidence.").

- **The Government's Motion to Preclude Questioning of OpenSea Employees Regarding Their Beliefs About the Company's Rules (Gov't Mem. at 12-14):** To the extent that the Government asks "one or both of OpenSea's co-founders what they intended the confidentiality agreement to cover and whether the information Chastain utilized in conducting his [alleged] frontrunning was confidential," Gov't Mem. 13, Chastain may be entitled to cross-examine these witnesses about the clarity of the agreement (or lack thereof); the Court can and will rule on specific objections to any such questions at trial.  Beyond that, the motion is granted to the extent it seeks to preclude Chastain from questioning other OpenSea employees, including Jessica Phan, about their opinions on whether OpenSea's confidentiality rules were adequate or clear, substantially for the reasons stated in the Government's memorandum of law.  *See* Gov't Mem. 12-14.  Chastain's reliance on the Second Circuit's footnote in *United States v. Mahaffy*, 693 F.3d 113, 138 n.14 (2d Cir. 2012), *see* Def.'s Opp'n 15-17, is misplaced.  Chastain is free to question OpenSea employees, including Phan, about the existence (or non-existence)

of relevant policies and trainings.  In addition, Chastain is free to make arguments at trial based on the language of such policies and trainings or to testify about *his* interpretations and understanding of these matters.  But how *other* employees interpreted or understood the rules is irrelevant and improper opinion testimony.

- **The Government's Motion to Preclude Questioning Regarding Privileged Communications (Gov't Mem. at 14-17):** The motion is denied as moot in light of Chastain's representation that he has "no intention" to question OpenSea witnesses about privileged communications.  Def.'s Opp'n 18.  Chastain shall promptly advise the Court and the Government at trial if he believes that the Government has "open[ed] the door" to such questioning or if he wishes to question Dan Viau about the in-person conversation on September 15, 2021.  *See id.*  Relatedly, the parties should be prepared to address at the final pretrial conference how to address any privilege issues at trial insofar as OpenSea is not a party to the case.

- **The Government's Motion to Preclude Evidence and Argument that OpenSea Did Not Suffer Actual Harm (Gov't Mem. at 17):** With two caveats, the motion is granted substantially for the reasons stated in the Government's memorandum of law.  *See* Gov't Mem. 17.  First, as discussed in the Court's Opinion and Order entered April 17, 2023, testimony from the Government's expert may open the door to evidence about the effects (or lack thereof) of Chastain's conduct on OpenSea.  *See Chastain*, 2023 WL 2966643, at *7-8 & nn.3-4.  Second, if Chastain elects to testify, he may be allowed to testify about his beliefs regarding the effects of his conduct on OpenSea on the theory that such testimony would be probative of willfulness and intent.

- **The Government's Motion to Preclude Argument that this Case is Novel or Unprecedented (Gov't Mem. at 17-18):** The motion is granted substantially for the reasons stated in the Government's memorandum of law.  *See* Gov't Mem. 17-18.  Put simply, the sole question before the jury is whether Chastain committed the crimes with which he is charged; the motivations of the prosecutors, and whether or to what extent the charges are novel, are irrelevant and unduly prejudicial.  Moreover, the novel context of NFTs aside, it is debatable whether this case is even "novel" or "unprecedented," as the Government's theory of prosecution is identical to that in *Carpenter v. United States*, 484 U.S. 19 (1987).  If Chastain were permitted to argue that this case is novel or unprecedented, therefore, the Court would have to allow the Government to argue the contrary or explain the facts and holding of *Carpenter* to the jury.  That would obviously run afoul of Rule 403.

The Clerk of Court is directed to terminate ECF Nos. 64, 67, 69, 70, 73, 75, and 80.

SO ORDERED.

Dated: April 18, 2023
New York, New York

_____
JESSE M. FURMAN
United States District Judge

4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case      (form modified within District on Sept. 30, 2019)
                       Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
| NATHANIEL CHASTAIN | ) | Case Number:  1:22-CR-305-1 (JMF) |
| | ) | USM Number:  03740-510 |
| | ) | David I Miller and Daniel Post Filor |
| | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   1 and 2 of the Indictment.
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC § 1343 | FRAUD BY WIRE, RADIO, OR TELEVISION | 6/1/2022 | 1 |
| 18 USC § 1956 | MONEY LAUNDERING - FRAUD, OTHER | 6/1/2022 | 2 |

    The defendant is sentenced as provided in pages 2 through ___7___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____  ☐ is  ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

8/22/2023
_____
Date of Imposition of Judgment

_____
Signature of Judge

Hon. Jesse M. Furman U.S.D.J.
_____
Name and Title of Judge

8/22/2023
_____
Date

## SPA-33

AO 245B (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page    2    of    7

DEFENDANT:   NATHANIEL CHASTAIN
CASE NUMBER:   1:22-CR-305-1 (JMF)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
3 months.

☑ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that the defendant be designated to the camp at FCI Otisville and, if that is not available, to a facility in or near New York City to facilitate the maintenance of ties to his family and friends.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

     ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

     ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☑ before 2 p.m. on    11/2/2023 _____ .

     ☐ as notified by the United States Marshal.

     ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

# SPA-34

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page    3    of    7

DEFENDANT:  NATHANIEL CHASTAIN
CASE NUMBER:  1:22-CR-305-1 (JMF)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years with a special condition of 3 months' home detention.

## MANDATORY CONDITIONS

1.     You must not commit another federal, state or local crime.
2.     You must not unlawfully possess a controlled substance.
3.     You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
         ☐ The above drug testing condition is suspended, based on the court's determination that you
            pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3A — Supervised Release

———————————————————————————————————————————————————————————————
                                             Judgment—Page    4    of    7
DEFENDANT:  NATHANIEL CHASTAIN
CASE NUMBER:  1:22-CR-305-1 (JMF)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____        Date  _____

**SPA-36**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3B — Supervised Release

Judgment—Page ___5___ of ___7___

DEFENDANT:  NATHANIEL CHASTAIN
CASE NUMBER:  1:22-CR-305-1 (JMF)

## ADDITIONAL SUPERVISED RELEASE TERMS

1. You shall serve home detention for a period of three months, enforced by location monitoring at the discretion of the probation officer. You must abide by all technology requirements. You must pay all or part of the costs of participation in the location monitoring program as directed by the court and the probation officer based on your ability to pay. Home detention means you are restricted to your residence at all times except for employment; education; religious services; medical, substance use disorder, or mental health treatment; attorney visits; Court appearances; Court-ordered obligations; or other activities as pre-approved by the officer.

2. You must perform 200 hours of community service to be approved by the Probation Officer.

3. You must provide the probation officer with access to any requested financial information.

4. You shall be supervised in the district of your residence

# SPA-37

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 5 — Criminal Monetary Penalties

Judgment — Page    6    of    7

DEFENDANT: NATHANIEL CHASTAIN
CASE NUMBER: 1:22-CR-305-1 (JMF)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 200.00 | $ | $ 50,000.00 | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# SPA-38

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __7__ of __7__

DEFENDANT:  NATHANIEL CHASTAIN
CASE NUMBER:  1:22-CR-305-1 (JMF)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ __200.00__ due immediately, balance due

    ☐  not later than _____ , or
    ☑  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☑  Special instructions regarding the payment of criminal monetary penalties:
    fine in the amount of $50,000, payable within the first six months of supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

Case Number
Defendant and Co-Defendant Names
*(including defendant number)*    Total Amount    Joint and Several Amount    Corresponding Payee, if appropriate

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    15.98 ETH - in accordance with the terms of an Order to be submitted by the parties within one week

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**Significant Rules of Law**

**18 U.S.C.A. § 1341.** Frauds and swindles
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**18 U.S.C.A. § 1343.** Fraud by wire, radio, or television
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**Federal Rule of Evidence Rule 401.** Test for Relevant Evidence
Evidence is relevant if:
(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action.

# SPA-40

**Federal Rule of Evidence Rule 403.** Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

**Federal Rule of Evidence Rule 701.** Opinion Testimony by Lay Witnesses

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.