# 23-7038

*To Be Argued By*:
NICOLAS ROOS

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-7038

———◆◆◆———

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NATHANIEL CHASTAIN, AKA Sealed Defendant 1,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

THOMAS S. BURNETT,
ALLISON C. NICHOLS,
NICOLAS ROOS,
DANIELLE R. SASSOON,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The Government's Case . . . . . . . . . . . . . . . 2

    B.  The Verdict and Sentencing. . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT I—The District Court's Wire Fraud
Instructions Were Correct . . . . . . . . . . . . . . . . 9

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . 9

        1.  Jury Instructions . . . . . . . . . . . . . . . . . . 9

        2.  Wire Fraud . . . . . . . . . . . . . . . . . . . . . . 11

    B.  The District Court's Property
Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  Relevant Facts . . . . . . . . . . . . . . . . . . . 12

        2.  The District Court Properly Instructed
the Jury on the Meaning of
Property . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.  Chastain Cannot Demonstrate Plain
Error . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        4.  Any Error Was Harmless Under Any
Standard of Review . . . . . . . . . . . . . . . 25

ii

PAGE

C. The District Court's Instruction on the Definition of Fraud . . . . . . . . . . . . . . . . . . . 28

    1. Relevant Facts . . . . . . . . . . . . . . . . . . . 28

    2. The District Court Properly Defined Fraud . . . . . . . . . . . . . . . . . . . . . . . . . 29

D. The District Court Did Not Err in Omitting a Materiality Instruction . . . . . . . . . . . . . 31

POINT II—Chastain's Convictions Were Supported By Sufficient Evidence . . . . . . . . . . . . . . . . . . . 33

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 34

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 35

    1. There was Sufficient Evidence That Chastain Defrauded OpenSea of Property . . . . . . . . . . . . . . . . . . . . . . . . 35

    2. There Was Sufficient Evidence of Chastain's Intent To Defraud . . . . . . . 40

POINT III—The District Court's Evidentiary Rulings Were Correct . . . . . . . . . . . . . . . . . . . . . . . . . . 41

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . 41

B. The District Court Properly Excluded Questioning of Lower-Level OpenSea Employees About the Clarity of OpenSea's Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

iii

PAGE

      1.   Relevant Facts . . . . . . . . . . . . . . . . . . .   42

      2.   Discussion. . . . . . . . . . . . . . . . . . . . . . .   43

  C.  The District Court Properly Excluded a
      Redline Comparison Created by Defense
      Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

  D.  The District Court Properly Excluded
      Irrelevant Cross-Examination of OpenSea's
      Co-Founder . . . . . . . . . . . . . . . . . . . . . . . .   49

  E.  The Cumulative Error Doctrine Does Not
      Warrant Reversal . . . . . . . . . . . . . . . . . . . .   51

POINT IV—The District Court Properly Responded to
    the Jury's Note About Confidential
    Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52

  A.  Relevant Facts . . . . . . . . . . . . . . . . . . . . . .   52

  B.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .   53

  C.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .   54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

## TABLE OF AUTHORITIES

*Cases*:

*Applebaum v. American Export Isbandtsen Lines*,
    472 F.2d 56 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . 58

iv

PAGE

*Belt v. United States*,
 868 F.2d 1208 (11th Cir. 1989) . . . . . . . . . . . 26, 27

*Carpenter v. United States*,
 484 U.S. 19 (1987). . . . . . . . . . . . . . . . . . . . *passim*

*Cleveland v. United States*,
 531 U.S. 12 (2000). . . . . . . . . . . . . .   11, 12, 20, 57

*Colon v. Mitchell*,
 No. 93 Civ. 4951 (MBM), 1995 WL 758776
 (S.D.N.Y. Dec. 26, 1995) . . . . . . . . . . . . . . . . . . . 58

*Crowe v. Bolduc*,
 334 F.3d 124 (1st Cir. 2003). . . . . . . . . . . . . . . . 45

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
 902 F.3d 132 (2d Cir. 2018) . . . . . . . . . . . . . . . . 29

*FMC Corp. v. Boesky*,
 852 F.2d 981 (7th Cir. 1988) . . . . . . . . . . . . . . . 38

*Grin v. Shine*,
 187 U.S. 181 (1902). . . . . . . . . . . . . . . . . . . . . . . 32

*International News Service v. Associated Press*,
 248 U.S. 215 (1918). . . . . . . . . . . . . . . . . . . . 15, 32

*Kelly v. United States*,
 140 S. Ct. 1565 (2020). . . . . . . . . . . . . .   11, 20, 21

*Marx & Co. v. Diners' Club Inc.*,
 550 F.2d 505 (2d Cir. 1977) . . . . . . . . . . . . . . . . 45

*Neder v. United States*,
 527 U.S. 1 (1999). . . . . . . . . . . . . . . . . . . . . *passim*

v

PAGE

*Pasquantino v. United States,*
544 U.S. 349 (2005). . . . . . . . . . . . . . . . . . . . . . . 11

*Phillips v. Washington Legal Found.,*
524 U.S. 156 (1998). . . . . . . . . . . . . . . . . . . . . . . 22

*Red Rock Commodities, Ltd. v. Standard Chartered Bank,*
140 F.3d 420 (2d Cir. 1998) . . . . . . . . . . . . . . . . 45

*Skilling v. United States,*
561 U.S. 358 (2010). . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Aina-Marshall,*
336 F.3d 167 (2d Cir. 2003) . . . . . . . . . . . . . . . . 30

*United States v. Altman,*
48 F.3d 96 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 30

*United States v. Atilla,*
966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 34

*United States v. Avenatti,*
81 F.4th 171 (2d Cir. 2023) . . . . . . . . . . . . . . . . 34

*United States v. Baker,*
899 F.3d 123 (2d Cir. 2018) . . . . . . . . . . . . . . . . 34

*United States v. Blaszczak,*
56 F.4th 230 (2d Cir. 2022) . . . . . . . . . . 20, 21, 24

*United States v. Capers,*
20 F.4th 105 (2d Cir. 2021) . . . . . . . . . . . . . . . . 34

*United States v. Chapman,*
209 F. App'x 253 (4th Cir. 2006) . . . . . . . . . . . . 45

vi

PAGE

*United States v. Cherif,*
    943 F.2d 692 (7th Cir. 1991) . . . . . . . . . . . . . 20, 37

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012) . . . . . . . . . . . . . . . . . 37

*United States v. Crawford,*
    239 F.3d 1086 (9th Cir. 2001) . . . . . . . . . . . . . . . 45

*United States v. Delva,*
    858 F.3d 135 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 41

*United States v. Desinor,*
    525 F.3d 193 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 54

*United States v. Facen,*
    812 F.3d 280 (2d Cir. 2016) . . . . . . . . . . . . . . 35, 37

*United States v. Frady,*
    456 U.S. 152 (1982). . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Gabinskaya,*
    829 F.3d 127 (2d Cir. 2016) . . . . . . . . . . . . . . . . . 51

*United States v. Ganim,*
    510 F.3d 134 (2d Cir. 2007) . . . . . . . . . . . . . 10, 24

*United States v. Gansman,*
    657 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 11

*United States v. Gatto,*
    986 F.3d 104 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 29

*United States v. Gengo,*
    808 F.2d 1 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . 54

*United States v. Gilbertson,*
    970 F.3d 939 (8th Cir. 2020) . . . . . . . . . . . . . . . . 29

vii

PAGE

*United States v. Girard,*
601 F.2d 69 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . 24

*United States v. Goldblatt,*
813 F.2d 619 (3d Cir. 1987) . . . . . . . . . . . . . . . . . 29

*United States v. Grossman,*
843 F.2d 78 (2d Cir. 1988) . . . . . . . . 15, 16, 17, 26

*United States v. Guadagna,*
183 F.3d 122 (2d Cir. 1999) . . . . . . . . . . . . . . . . 40

*United States v. Hager,*
879 F.3d 550 (5th Cir. 2018) . . . . . . . . . . . . . . . 26

*United States v. Hedaithy,*
392 F.3d 580 (3d Cir. 2004) . . . . . . . . . . . . . . . . 19

*United States v. Hunt,*
82 F.4th 129 (2d Cir. 2023) . . . . . . . . . . . . . . . . 24

*United States v. James,*
712 F.3d 79 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 51

*United States v. Khalupsky,*
5 F.4th 279 (2d Cir. 2021) . . . . . . . . . . . . . . . . . 22

*United States v. Kopstein,*
759 F.3d 168 (2d Cir. 2014) . . . . . . . . . . . . . . . . 58

*United States v. Litvak,*
808 F.3d 160 (2d Cir. 2015) . . . . . . . . . . . . . . . . 44

*United States v. Mahaffy,*
693 F.3d 113 (2d Cir. 2012) . . . . . . . . . . . . . *passim*

*United States v. Males,*
459 F.3d 154 (2d Cir. 2006) . . . . . . . . . . . . . . . . 40

viii

PAGE

*United States v. Marcus,*
560 U.S. 258 (2010). . . . . . . . . . . . . . . . 10, 25, 33

*United States v. Matthews,*
31 F. App'x 838 (5th Cir. 2002) . . . . . . . . . . . . . 29

*United States v. Moran,*
312 F.3d 480 (1st Cir. 2002). . . . . . . . . . . . . . . 29

*United States v. Naiman,*
211 F.3d 40 (2d Cir. 2000) . . . . . . . . . . . 9, 10, 25

*United States v. Nektalov,*
461 F.3d 309 (2d Cir. 2006) . . . . . . . . . . . . . . . 10

*United States v. Newman,*
664 F.2d 12 (2d Cir. 1981) . . . . . . . . . . . . . . . . 22

*United States v. Norton,*
108 F.3d 133 (7th Cir. 1997) . . . . . . . . . . . . . . . 29

*United States v. O'Hagan,*
521 U.S. 642 (1997). . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Parker,*
903 F.2d 91 (2d Cir. 1990) . . . . . . . . . . . . . . . . 54

*United States v. Paulino,*
445 F.3d 211 (2d Cir. 2006) . . . . . . . . . . . . . . . 42

*United States v. Perholtz,*
842 F.2d 343 (D.C. Cir. 1988). . . . . . . . . . . . . . 22

*United States v. Persico,*
645 F.3d 85 (2d Cir. 2011) . . . . . . . . . . . . . . 34, 35

*United States v. Poirier,*
321 F.3d 1024 (11th Cir. 2003) . . . . . . . . . . . . . 26

ix

PAGE

*United States v. Ragosta,*
970 F.2d 1085 (2d Cir. 1992) . . . . . . . . . . . . . . . 29

*United States v. Rahman,*
189 F.3d 88 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 51

*United States v. Raniere,*
55 F.4th 354 (2d Cir. 2022) . . . . . . . . . . . . . . 34, 40

*United States v. Rathburn,*
771 F. App'x 614 (6th Cir. 2019) . . . . . . . . . . . . 29

*United States v. Riley,*
621 F.3d 312 (3d Cir. 2010) . . . . . . . . . . . . . . . . 29

*United States v. Rodrigues,*
237 F. App'x 178 (9th Cir. 2007) . . . . . . . . . . . . 29

*United States v. Rommy,*
506 F.3d 108 (2d Cir. 2007) . . . . . . . . . . . . . . . . 53

*United States v. Roy,*
783 F.3d 418 (2d Cir. 2015) . . . . . . . . . . . . . . 9, 55

*United States v. Rutigliano,*
790 F.3d 389 (2d Cir. 2015) . . . . . . . . . . . . . . . . 35

*United States v. Siddiqui,*
699 F.3d 690 (2d Cir. 2012) . . . . . . . . . . . . . . . . 41

*United States v. Taylor,*
832 F.2d 1187 (10th Cir. 1987) . . . . . . . . . . . . . 29

*United States v. Thorpe,*
166 F.3d 1216 (6th Cir. 1998) . . . . . . . . . . . . . . 22

*United States v. Torres,*
901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . . . 10

x

PAGE

*United States v. Trapilo,*
    130 F.3d 547 (2d Cir. 1997) . . . . . . . . . . . . . . . . . 29

*United States v. Triumph Capital Group, Inc.,*
    544 F.3d 149 (2d Cir. 2008) . . . . . . . . . . . . . . . . 35

*United States v. Twentieth Century Fox Film Corp.,*
    882 F.2d 656 (2d Cir.1989) . . . . . . . . . . . . . . . . . 56

*United States v. Ulbricht,*
    858 F.3d 71 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 52

*United States v. Vasquez,*
    267 F.3d 79 (2d Cir. 2001) . . . . . . . . . . . . . . . 10, 24

*United States v. Von Barta,*
    635 F.2d 999 (2d Cir. 1980) . . . . . . . . . . . . . . . . 29

*United States v. Walters,*
    910 F.3d 11 (2d Cir. 2018) . . . . . . . . . . . . . . . . . 22

*United States v. Weaver,*
    860 F.3d 90 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 32

*United States v. Weintraub,*
    273 F.3d 139 (2d Cir. 2001) . . . . . . . . . . . . . . . . 24

*United States v. Whab,*
    355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . . . . 33

*United States v. Wilkerson,*
    361 F.3d 717 (2d Cir. 2004) . . . . . . . . . . . . . . . . 54

*Universal Health Servs., Inc. v. United States,*
    579 U.S. 176 (2016) . . . . . . . . . . . . . . . . . . . . . . 32

xi

PAGE

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Crim. P. 52(a). . . . . . . . . . . . . . . . . . . . . . . . 11

Restatement (Second) of Torts § 222A (Am. L. Inst.
1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Restatement (Second) of Torts § 911 cmt. e (Am. L.
Inst. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 23-7038

———————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

NATHANIEL CHASTAIN, also known as Sealed
Defendant 1,

*Defendant-Appellant.*

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————————

### Preliminary Statement

Nathaniel Chastain appeals from a judgment of conviction entered on August 22, 2023, in the United States District Court for the Southern District of New York, following a jury trial before the Honorable Jesse M. Furman, United States District Judge.

Indictment 22 Cr. 305 (the "Indictment") was filed on May 31, 2022, charging Chastain in two counts. Count One charged Chastain with wire fraud, in violation of 18 U.S.C. § 1343. Count Two charged Chastain with money laundering, in violation of 18 U.S.C. § 1956.

2

Trial commenced on April 23, 2023, and ended on May 3, 2023, when Chastain was convicted on both counts.

On August 22, 2023, Judge Furman sentenced Chastain principally to 3 months' imprisonment, to be followed by 3 months in home detention as part of a three-year term of supervised release.

Chastain has served the incarceratory portion of his sentence.

## Statement of Facts

### A. The Government's Case

The evidence at trial established that Chastain used confidential information he obtained by virtue of his position as a product manager at OpenSea, an online marketplace for non-fungible tokens ("NFTs"), to purchase NFTs shortly before they were featured on the company's homepage and sold them for a profit shortly after they were featured. The Government's evidence at trial included the testimony of 8 witnesses, including both of OpenSea's co-founders, three other OpenSea employees, and a law enforcement witness who testified about Chastain's NFT trading activity. In addition, the Government introduced numerous e-mails, Slack messages, and text messages, including ones in which Chastain acknowledged that it was wrong to purchase and sell OpenSea's featured NFTs. The Government's evidence also included NFT transaction records, IP records demonstrating that it was Chastain who engaged in the illegal trading, and a

3

confidentiality agreement that applied to Chastain's conduct.

OpenSea is an online marketplace for buying and selling NFTs. (A. 166, 175, Tr. 91:18-19).[1] An NFT is a digital asset with a unique identifier, stored on a public ledger called a blockchain, and often represented by a digital object, such as digital artwork. (A. 167-68, 173, 176). NFTs can trade for mere pennies but are also bought and sold for millions of dollars. (Tr. 90:10-24). During the relevant time period, when NFTs traded on OpenSea, the company collected a 2.5% transaction fee, which was the company's primary source of revenue. (A. 178, 229, 304-05). The company's earnings were therefore driven by the volume of NFT sales on the site. (A. 270). OpenSea took a transaction fee, rather than participate in buying and selling NFTs, because being a "trust[ed]," "neutral party" was a "necessary condition" to driving customers to the marketplace. (A. 178-79; Tr. 170:4-14).

---

[1]  "Tr." refers to the trial transcript; "Sent. Tr." refers to the transcript from Chastain's sentencing on August 22, 2023; "Dkt." refers to the District Court's docket in this case; "Br." refers to Chastain's brief on appeal; "A." and "SPA" refer to the appendix and special appendix, respectively, filed with Chastain's brief; and "Amicus Br." refers to the brief submitted by amicus curiae New York Council of Defense Lawyers. Unless otherwise noted, case quotations omit internal quotation marks, citations, and previous alterations.

4

In 2021, OpenSea began featuring NFTs on the front page of its website. (A. 174, 303-04). Once or twice a week, OpenSea published a "featured work," which was an NFT by an artist selected by the company to be promoted on the company's website and Twitter account. (A. 220, 226-27; Tr. 110:10-17, 111:1-4, 258:1-25). While the company did not profit directly by featuring any particular NFT on its website, featuring "new and not stale" NFTs "provided an incentive for people to visit the site." (A. 183, 206-07, Tr. 300). As Chastain wrote to one of his colleagues, the featured work section of the website was "clearly an incredibly important promotional area that anyone would pay for access to." (Tr. 361; GX-201).

OpenSea hired Chastain in January 2021 as the head of product. (A. 186; Tr. 163:16-19). In that role, Chastain was responsible for setting product direction, making changes to the company's website, and organizing engineers to work on new product features. (A. 186, 277). When he started at OpenSea, Chastain was required to sign a "Confidential Information and Invention Assignment Agreement." (A. 192-93, 198, 282, 524). The confidentiality agreement required employees "to hold in strictest confidence and not to use, except for the benefit of the company . . . any confidential information that [the employee] obtain[s], access[es] or create[s] during the term of the relationship." (A. 201-02, 282, 334-35, 524-33; Tr. 199-200). The agreement was intended to be an "umbrella agreement," creating a presumption that things learned and created at OpenSea were private unless discussed otherwise, and prohibiting use that would be detrimental to the company. (A. 200-01). OpenSea required its

5

employees to sign the confidentiality agreement be-
cause it was important to the business "to control the
dissemination of information" so that it could "decide
when to announce something or when the public
should know about something." (A. 194).

Chastain, together with other OpenSea employees,
was involved in creating the featured NFT portion of
the OpenSea website in May 2021. (A. 208, 283, 286-
87; Tr. 206-07). From then on, one of Chastain's work
responsibilities was selecting the NFT that would be
featured on the OpenSea front page. (A. 209). While
Chastain was ultimately responsible for selecting and
posting the featured NFTs, other OpenSea employees
contributed ideas through a Slack channel, and cus-
tomers were able to make suggestions through the
website. (A. 209-17, 337, 543-72). The particular NFT
that the company planned to feature, however, was
kept confidential and not identified publicly until it
was published to OpenSea's website. (A. 220-22, 287,
337, 341). Typically the value of the featured NFT, as
well as other NFTs by the featured artist, increased
substantially after the NFT was featured. (A. 228, 287;
Tr. 355-57; GX-908).

Over a period of several months, between approxi-
mately July and September 2021, with the benefit of
the confidential information about what NFT would be
featured, Chastain engaged in a scheme to purchase
featured NFTs at low prices and then, after they were
featured on OpenSea's front page and their prices
went up, sell them for profit. (Tr. 375-98; GX-910, 916-
925). On each occasion, Chastain created a new anon-
ymous account and funded it with cryptocurrency;

6

then he purchased one or more copies of the NFT that was going to be featured; then the NFT was featured; he then sold the NFTs at a profit; and finally he transferred the profits back to his main account. (Tr. 375-98; GX-910, 916-925). Chastain deliberately used anonymous cryptocurrency accounts, created new accounts for each instance he purchased a featured NFT, and transferred funds through multiple anonymous nominee accounts to conceal the fact that he was doing the purchasing. (Tr. 398-401; GX-926, 933). Chastain earned a profit after selling the featured NFTs. (A. 165, 266-67; Tr. 404; GX-930).

The evidence at trial established that Chastain knew what he was doing was wrong. He kept his purchasing activity secret from his co-workers. (A. 232, 287-88, 342; Tr. 525). At the same time, he told co-workers that OpenSea's users would "take us to task if we feature something we own" because it would be a "conflict of interest." (A. 358-63, 505-06). On one occasion, when Chastain accidentally used his public account to purchase a featured NFT, and then was caught by a Twitter user, he lied and said he "just wanted to secure one of these before they all disappeared." (A. 314-15, 593). At the same time he purchased the featured NFT with his public account, Chastain purchased additional copies of the featured NFT through an anonymous account, which he did not address in his response to the Twitter user, and thereafter, he only used anonymous accounts to purchase featured NFTs. (Tr. 376-81; GX-916).

On September 14, 2021, a Twitter user accused Chastain of secretly purchasing featured NFTs before

they were featured, and then selling them after they were featured for a profit. (A. 233-34, 594). When Chastain was confronted by OpenSea employees about the allegation, he lied, falsely suggesting that the Twitter user was "mistaken" and "had seen him buy right after" the featuring. (A. 236, 343-45). The next day, OpenSea asked Chastain to resign. (A. 237, 288-90). He later admitted to a friend, "I did buy NFTs ahead of them being featured on the homepage though knowing full well that the increased exposure would increase their price." (A. 364-66, 585-88).

Both of OpenSea's founders, Devin Finzer and Alex Atallah, considered the information about the company's planned featured work confidential, and believed that the confidentiality agreement prohibited Chastain's conduct. (A. 221, 230, 242, 290). After Chastain's resignation, OpenSea immediately announced additional policies to reinforce the prohibition on trading in NFTs using confidential company information. (A. 239-42, 291-94, 582-83). The company also published an additional policy that made clear that it considered "OpenSea's plans to feature or promote an NFT, collection or creator on the OpenSea home page or on its social media" as "confidential information." (A. 257).

## B. The Verdict and Sentencing

The defense called a single witness who testified about cryptocurrency wallets. Through cross-examination and closing argument, Chastain argued that the information about featured NFTs was not confidential, that he did not know what he was doing was wrong,

8

and that he had not attempted to conceal his transactions.

The jury began deliberating on May 1, 2023. (A. 432). During its deliberations, the jury sent several notes with questions about the evidence and the legal instructions. (A. 448, 487-488, 500). On May 3, 2023, the jury convicted Chastain on both counts of the Indictment.

On August 22, 2023, Judge Furman sentenced Chastain to 3 months' imprisonment, to be followed by three years' supervised release, the first three months of which would be home detention, ordered the forfeiture of a quantity of cryptocurrency, and imposed a $50,000 fine and $200 special assessment. (A. 636-37, SPA 32-38). At the sentencing, Judge Furman explained that, in his view, "the only explanation for Mr. Chastain's conduct is both greed and that he knew exactly what he was doing," and while "there were some ambiguities at OpenSea at the time . . . Mr. Chastain's own conduct, his use of more than two dozen anonymous . . . wallets, his reaction to the Tweets that called him out, his reaction when first confronted by [coworkers] . . . makes abundantly clear that he knew exactly what he was doing and he took advantage of an opportunity." (Sent. Tr. 48). Judge Furman noted that "the jury's verdict was totally defensible" that "this was confidential business information," and that Chastain "made it quite clear that he treated it as confidential and took substantial steps to conceal what he was doing from his employer and from the public." (Sent. Tr. 36).

9

**A R G U M E N T**

**POINT I**

**The District Court's Wire Fraud Instructions Were Correct**

Chastain argues that the District Court erred by not instructing the jury that "confidential business information" must have "commercial value to its owner" to satisfy the "property" element of wire fraud. (Br. 22). The District Court did not err. Under the Supreme Court's and this Court's precedent, confidential information in the hands of a business need not have commercial value to the business to constitute property. In addition, Chastain failed to properly preserve this claim, and any alleged error was not plain, and did not prejudice Chastain under any standard of review.

Chastain's remaining challenges to the District Court's wire fraud instructions are similarly meritless.

**A. Applicable Law**

**1. Jury Instructions**

This Court reviews *de novo* a defendant's claim of error in instructions to the jury. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015). An "'instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law.'" *Id.* (quoting *United States v. Naiman*, 211 F.3d 40, 51 (2d Cir. 2000)). Where the defendant's claim is that the district court misled the jury by omitting an instruction that he requested, the defendant must demonstrate both that (1) he requested a charge that

10

"accurately represented the law in every respect" and (2) the charge delivered, when viewed as a whole, was erroneous and prejudicial. *Id.*; *see also*, *e.g.*, *United States v. Nektalov*, 461 F.3d 309, 313-14 (2d Cir. 2006).

"Where an appellant 'stat[es] distinctly,' under Rule 30, the grounds for objecting the charge below, but urges a different ground on appeal, the objection is not properly preserved on appeal" and this Court reviews the alleged failure for plain error. *United States v. Vasquez*, 267 F.3d 79, 87 (2d Cir. 2001) (quoting *United States v. Torres*, 901 F.2d 205, 227-28 (2d Cir. 1990)); *see also United States v. Ganim*, 510 F.3d 134, 151 (2d Cir. 2007) (plain error review appropriate where defendant failed to object to particular language on appeal, and instead raised a different objection to the instruction at trial). To establish plain error, the defendant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; [and] (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Where those elements are met, this Court may exercise its discretion to correct the error if "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* Reversal for plain error should "be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982).

Where a defendant has properly preserved an objection to the jury instructions, reversal will not be

11

warranted if the alleged error was harmless. Fed. R. Crim. P. 52(a); *see United States v. Gansman*, 657 F.3d 85, 91-92 (2d Cir. 2011). Thus, a conviction should be affirmed despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

### 2. Wire Fraud

In relevant part, 18 U.S.C. § 1343 criminalizes "devis[ing] or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." The wire-fraud statute requires the government to show that a fraudulent scheme was designed to obtain "money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (citing *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). In interpreting the phrase "money or property," the Supreme Court has relied on the "ordinary or natural meaning" of those terms. *Pasquantino*, 544 U.S. at 356. That ordinary meaning "extend[s] to every species of valuable right and interest." *Id.* (quoting Black's Law Dictionary 1382 (4th ed. 1951)). Thus, while the phrase does not include the right to an employee's "honest services," *Skilling v. United States*, 561 U.S. 358, 399-402 (2010), or "purely regulatory" government decision making, *Cleveland v. United States*, 531 U.S. 12, 22 (2000), it encompasses "property rights" both "tangible" and "intangible," *Carpenter v. United States*, 484 U.S. 19, 25 (1987). Thus, as the Supreme Court has reaffirmed repeatedly, "confidential business information has long been recognized as property."

12

*Carpenter*, 484 U.S. at 26; *see also, e.g., Cleveland*, 531 U.S. at 19; *United States v. O'Hagan*, 521 U.S. 642, 654 (1997).

## B. The District Court's Property Instruction

### 1. Relevant Facts

In advance of trial, both parties submitted proposed requests to charge to the District Court, including a proposed charge on the property requirement of wire fraud. (A. 40-44, 73-74, Dkt. 96 at 7). Among other things, Chastain proposed that the District Court instruct the jury that "[u]nder the wire fraud statute, information is 'property' only if it is, among other things, confidential business information (which must be treated as such) and has inherent value to the purported victim." (A. 40). On April 17, 2023, the District Court held that "the Government is not *required* to prove that the featured NFT information had inherent value to OpenSea but that such evidence can be considered by the jury in (among other things) evaluating whether the information was 'confidential business information' and, thus, OpenSea's property." (SPA 7-15). In light of the District Court's ruling, Chastain proposed a revised instruction that defined confidentiality and enumerated factors that may be considered in evaluating whether information was treated as confidential. (A. 73-74). The District Court largely adopted this proposal in its draft jury charge circulated in advance of the charge conference. (Dkt. 122 at 17). At the charge conference, Chastain's counsel reiterated that "inherent value should be a test under whether or not something is property." (A. 386-87). At no point in any

13

of Chastain's pretrial briefing, in his original or revised request to charge, or at the charge conference did he specifically request that the District Court instruct the jury that confidential information must have *commercial* value to the business.

Judge Furman's final jury instructions tracked the language in the draft jury charge. (A. 412-13). As relevant here, he instructed the jury in part:

> A company's confidential business information is a type of property. Information is confidential business information if it was acquired or created by a business for a business purpose, and the business both considered and treated that information in a way that maintained the company's exclusive right to that information. The company must both consider the information to be confidential and take affirmative steps to treat the information as confidential and maintain exclusivity.

(A. 412-13). Judge Furman also delineated "some of the factors [the jury] may consider in determining whether OpenSea treated the information at issue as confidential," including "whether the information had economic value to the employer." (A. 412-13).

14

### 2. The District Court Properly Instructed the Jury on the Meaning of Property

The District Court properly instructed the jury on the property element of wire fraud. Chastain claims that the District Court erred by failing to instruct the jury that confidential business information must have "commercial value" to its owner to constitute property. (Br. 38-39). But under long-established precedent, there is no such requirement. As Chastain acknowledges, the Supreme Court in *Carpenter* reaffirmed that "[c]onfidential business information has long been recognized as property." (Br. 24 (quoting *Carpenter*, 484 U.S. at 26)). And Chastain does not dispute that the District Court—incorporating his proposal below —properly defined "confidential business information" as information a company creates or acquires for a business purpose (the "business" part) that the company considers and treats as confidential (the "confidential" part). *See Carpenter*, 484 U.S. at 26. Chastain claims, however, that *Carpenter* was limited to confidential business information that has "commercial value to its owner." (Br. 22-24). This misstates the holding in *Carpenter* and cannot be squared with the cases in this Circuit that have applied *Carpenter* without imposing an additional "commercial value" requirement.

The District Court's jury instructions were wholly consistent with *Carpenter*, which affirmed the wire fraud conviction of a newspaper columnist who shared information "as to the timing and contents" of his market-moving column with traders so that they, in turn, could trade on the information and share the profits.

15

*Carpenter* explained that "the [newspaper]'s interest in the confidentiality of the contents and timing of the . . . column" qualified "as a property right," even though the newspaper suffered no readily monetizable loss as a result of the scheme. *Carpenter*, 484 U.S. at 25. "Confidential information acquired or compiled by a corporation in the course and conduct of its business," the Supreme Court held, "is a species of property to which the corporation has the exclusive right and benefit." *Id.* at 26. The Supreme Court described the newspaper's "property right" as "keeping confidential and making exclusive use, prior to publication, of the schedule and contents of the . . . column." *Id.* In reaching that conclusion, the Supreme Court rejected the argument that some additional element was required to render confidential information "property," instead holding that it was "sufficient that the [newspaper] . . . [was] deprived of its right to exclusive use of the information." *Id.* at 26-27.

Despite *Carpenter*'s repeated and unqualified embrace of confidential business information as property, Chastain seizes on *Carpenter*'s quotation of *International News Service v. Associated Press*, 248 U.S. 215, 236 (1918), for the proposition that "news matter . . . is stock in trade, to be gathered at the cost of enterprise, organization, skill, labor, and money, and to be distributed and sold to those who will pay money for it, as any other merchandise." (Br. 22). Chastain claims this demonstrates that only confidential business information of commercial value to its owner is property. But this Court rejected precisely that argument in *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988). There, this Court affirmed a law firm associate's

16

conviction for mail fraud based on his funneling of confidential information pertaining to the recapitalization of a firm client to his friends and relatives, who profited from the information. Relying on *Carpenter*'s quotation of *International News Service* (as Chastain does here), the defendant argued that the confidential information was not property in the hands of the law firm, because the firm "could not use the information for its commercial value or have the exclusive right to exploit it." *Grossman*, 843 F.2d at 86. This Court rejected that argument as "specious," concluded that it "distorts *Carpenter*," and explained that "[i]n context, the language [quoted from *International News Service*] merely *describes* the confidential information in that case; it does not require that *all* confidential information must be of the same nature to be considered 'property.'" *Id.* (emphasis in *Grossman*). Instead, *Carpenter* "actually holds generally that, even though 'confidential business information' is intangible, it 'has long been recognized as property.'" *Id.*[2]

-----------

[2] *Carpenter* also cited Fletcher's treatise *Cyclopedia of the Law of Corporations* in describing "[c]onfidential information acquired or compiled by a corporation in the course and conduct of its business" as a "species of property to which the corporation has the exclusive right and benefit." 484 U.S. at 26 (quoting 3 W. Fletcher, *Cyclopedia of Law of Private Corporations* § 857.1, p. 260 (rev. ed. 1986)). Chastain relies on an entirely different excerpt of Fletcher's treatise, which specifies that one of the "factors" that can be considered in determining whether information is

17

Chastain tries to distinguish *Grossman*, claiming that *Grossman* "involved commercially valuable information." (Br. 28). But fatal to Chastain's claim on appeal, the information in *Grossman* was not commercially monetizable by the *victim*—the law firm—which "could not commercially exploit the information by trading on it." *Grossman*, 843 F.2d at 86. Nonetheless, this Court concluded that the law firm client's confidential information "clearly [fell] within the definition of property under *Carpenter*." *Id*.

Chastain's argument is also contrary to *Mahaffy*, 693 F.3d at 134-35, which rejected the suggestion that "confidential business information" must include a commercial value component. There, the defendants, traders at several brokerage firms, disclosed confidential communications about client orders to a day trader, who then traded on the information before the

---

confidential is whether it "provides a demonstrable competitive advantage." (Br. 23). Not only was this portion of Fletcher's treatise not quoted or relied upon in *Carpenter*, but also this language (attributed to a civil state case) says nothing about commercial value, and certainly does not imply that it is a key or dispositive factor in determining whether information is property. Equally misplaced is the inference that Chastain draws from *Carpenter*'s reference to state trade secrets law. (Br. 24). This Court has already made clear that "[i]nformation may qualify as confidential under *Carpenter* even if it does not constitute a trade secret." *United States v. Mahaffy*, 693 F.3d 113, 135 (2d Cir. 2012).

18

brokerage firms executed the client orders. *Id.* at 120-22. On appeal, while vacating the defendants' convictions on unrelated grounds, this Court also "provide[d] guidance" to the district court in the event of further proceedings. *Id.* at 134. Specifically, this Court explained that the defendants' challenge to the jury instructions on the meaning of "confidential business information" was meritless. *Id.* at 135. The district court had declined the defendants' request to instruct the jury that when evaluating whether information was "confidential" to consider, among other things, "the value of the information to the business and its competitors" and "the amount of effort or money expended by the business in developing the information." *Id.* at 134. Instead, among other things, the district court had instructed the jury that "confidential business information" qualified as property "[e]ven if it lacks commercial value to the company." *Id.* at 135. This Court agreed that the defendant's proposed instruction was legally erroneous because it listed factors "that do not necessarily bear on . . . confidentiality . . ., including the value of the information to the business and the business's investment in developing the information." *Id.*

*Mahaffy* emphasized that all *Carpenter* requires is "proof that the information was both considered and treated by an employer in a way that maintained the employer's exclusive right to the information," and that the jury instructions should focus on whether the

19

employer "treat[s] information as confidential." *Id.* at
135 & n.14.[3]

Chastain characterizes *Mahaffy*'s analysis as
"dicta," and claims that *Mahaffy* was defining confi-
dentiality, not the meaning of property. (Br. 29-30).
But *Mahaffy* addressed the meaning of "confidential
business information" in defining the property ele-
ment of fraud, *Mahaffy*, 693 F.3d at 134-35, and for the
specific purpose of guiding the district court's jury in-
structions on remand. Chastain conceded as much be-
low when he argued that *Mahaffy* "should be relied on"
in defining the property element of wire fraud.
(Tr. 752).

*Carpenter*, *Grossman*, and *Mahaffy* leave no doubt
that the Government is not required to prove that
"confidential business information" had "commercial
value" to a business for it to qualify as the business's
"property" under the wire fraud statute. Chastain's ar-
gument to the contrary is no different from the argu-
ments already rejected by this Court and by other
courts of appeal to have considered the question. *See,
e.g.*, *United States v. Hedaithy*, 392 F.3d 580, 598 (3d
Cir. 2004) ("we rejected the general proposition that
the mail fraud statute is not implicated if the property
defrauded has no value in the hands of the victim");

---

[3]   *Mahaffy* enumerated several "pertinent factors"
to be considered by the jury in assessing confidential-
ity, which were included in Judge Furman's instruc-
tions here at Chastain's request. *Id.* at 135 & n.14;
(A. 73-74; Dkt. 122 at 17).

20

*United States v. Cherif*, 943 F.2d 692, 697 (7th Cir. 1991) (rejecting the argument that bank's information about deals was not "property" because the information was "not the bank's stock in trade" and "had no value to the bank or its customers").

Chastain's emphasis on *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), is misplaced. *Blaszczak* did not involve confidential business information or purport to overturn *Grossman* or *Mahaffy*. Instead, *Blaszczak* reversed a wire-fraud conviction for misappropriation of *regulatory* information from the Centers for Medicare and Medicaid Services on the ground that the information did not qualify as "property." That decision followed from the principle, not relevant here, that fraud related to "an exercise of regulatory power" does not meet the wire fraud statute's "property requirement." *Kelly*, 140 S. Ct. at 1568-69; *see also Cleveland*, 531 U.S. 12. Governments, unlike private businesses like OpenSea, often act through their "sovereign power to regulate," rather than in their capacity as market participants. *Kelly*, 140 S. Ct. at 1572. Relying on *Kelly* and *Cleveland*, *Blaszczak* held that information about an upcoming regulatory decision was not property because it was "regulatory in character." *Blaszczak*, 56 F.4th at 244.[4] If anything, *Blaszczak*

―――――――

[4]    While, as Chastain notes (Br. 27-28), *Blaszczak* invoked the "stock in trade" language from *Carpenter*, that language was merely part of this Court's explanation for why the information in that case was "regulatory in character" rather than "money or property," *id.* at 244; as the Court noted, the Centers for Medicare

21

underscores that Chastain's proposed "commercial
value" requirement is not only incorrect, but also in-
scrutable in the context of confidential business infor-
mation. In a case involving government information, a
court can helpfully look at whether the value of infor-
mation to the government is primarily regulatory or
economic. But businesses do not act as regulators, and
it is not apparent that there is a discrete category of
information that a business acquires or creates, uses
for a business purpose, and maintains in confidence,
that nonetheless has no "commercial value" to the
business.

_____

and Medicaid Services was "not a commercial entity,"
*Blaszczak*, 56 F.4th at 243-44. The Government's let-
ter brief in *Blaszczak*, which Chastain cites for the
proposition that confidential business information
must have "inherent market value" to its owners, pro-
vides no support for his position: it addressed whether
"confidential *government* information" in a particular
case constituted "property," not the contours of when
confidential *business* information is property. *See*
United States Supplemental Letter Brief at 7, *United
States v. Blaszczak*, Nos. 18-2811 et al. (2d Cir. June
4, 2021) (ECF No. 497) (arguing that "[u]nlike confi-
dential news material or stock-trading statistics,
which have inherent market value to their owners"—
citing *Carpenter* and another case as examples—"the
draft reimbursement rates at issue here have value to
the government *only* as a regulator, not 'as [a] property
holder'") (citing *Kelly*, 140 S. Ct. at 1572).

22

Chastain's position also finds no support in the common law (Br. 25-26), which recognizes that property interests are not limited to things that can be monetized or sold. *See Phillips v. Washington Legal Found.*, 524 U.S. 156, 170 (1998) ("While the interest income at issue here may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property."); Restatement (Second) of Torts §§ 222A, 911 cmt. e (Am. L. Inst. 1979) (noting that for purposes of liability and damages for conversion, "[s]ome things may have no exchange value but may be valuable to the owner"). Far from drawing on settled understandings of property law, Chastain's proposed limitations on "property" would dramatically narrow the wire fraud statute. For instance, nonpublic information about a merger or acquisition, which is regularly viewed as confidential business information in insider trading prosecutions, *see, e.g.*, *United States v. Newman*, 664 F.2d 12, 15 (2d Cir. 1981), would no longer be "property" under the wire fraud statute because information about the fact of a merger is not commercially sold. The same would be true for confidential information about bidding on a project (*see, e.g.*, *United States v. Thorpe*, 166 F.3d 1216 (6th Cir. 1998), and *United States v. Perholtz*, 842 F.2d 343, 366 (D.C. Cir. 1988)), a company's planned earning announcement (*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018)), or pre-publication press releases (*United States v. Khalupsky*, 5 F.4th 279, 285 (2d Cir. 2021)).[5]

---

[5] The New York Council of Defense Lawyers, appearing as an amicus on behalf of criminal defense

23

*Carpenter* and its progeny do not support, much less require, such a result.

### 3. Chastain Cannot Demonstrate Plain Error

Chastain's claim also fails because he failed to preserve his objection below, and cannot demonstrate error, let alone plain error. Chastain claims that he "requested a jury instruction that 'property' must have commercial value." (Br. 38). No so. At almost every stage of the proceedings in the District Court, Chastain argued that confidential information must have "inherent value to the purported victim," or on at least one occasion "inherent economic value," to qualify as property. (A. 40, 73-74, 386-87). At no point in his motions, in his proposed jury instructions, or at trial did Chastain ever propose information must be *commercially* valuable to its owner. The distinction is not merely semantic: as *Blaszczak* acknowledged in the context of government information, information can

––––––––––

attorneys, offers several hypothetical that it claims prove the District Court's interpretation of property to be "breathtaking." (Amicus Br. at 4, 21-25). But the hypotheticals illuminate nothing of legal significance. It is not apparent that the supposed examples of "confidential business information" actually involve information created or acquired by a company for a business purpose, and even so, whether the hypotheticals would satisfy all the elements of "wire fraud" beyond the definition of "property," including whether the defendant misappropriated the property and acted with specific intent to defraud.

24

have "inherent value" to the victim, even if it is not commercial in nature. 56 F.4th at 244 (discussing *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979)). In other words, a jury could conclude that something has "inherent value" to a business (the instruction urged in the District Court), while concluding that it does not have "commercial value" because it was not or could not be commercially exploited by the business. Because Chastain has changed tack on appeal, his claim is reviewable only for plain error. *See, e.g.*, *Vasquez*, 267 F.3d at 87 (plain error review applied where defendant's objection to interstate commerce element below was "ambiguous" and "different" from his objection to the same element on appeal); *Ganim*, 510 F.3d at 151 (plain error review applied where defendant had raised a "different objection" to the same jury instruction below and objected for the first time on appeal to a particular word in the instruction).

Chastain cannot meet his burden. He has not identified a single case that interprets *Carpenter* to impose a commercial value requirement, and *Grossman* and *Mahaffy* establish the opposite. *See supra* Point I.B.2. Chastain therefore cannot establish a "clear or obvious" error in Judge Furman's instructions. *See United States v. Hunt*, 82 F.4th 129, 139 (2d Cir. 2023) (error not plain where appellant "cites no binding precedent supporting his proposed jury instruction"); *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001) ("Without a prior decision from this court or the Supreme Court mandating the jury instruction that [appellant], for the first time on appeal, says should have been given, we could not find any such error to be plain, if error it was.").

25

### 4. Any Error Was Harmless Under Any Standard of Review

Even if Judge Furman erred—which he did not— any error was harmless. On plain error review, Chastain cannot show that he was prejudiced by any error. *See Marcus*, 560 U.S. at 262. And even had the objection been preserved, it is clear beyond a reasonable doubt that any purported error did not affect the verdict. *See Neder*, 527 U.S. at 15.

As a threshold matter, Chastain cannot show that "the charge delivered, when viewed as a whole, was erroneous and prejudicial." *Naiman*, 211 F.3d at 51. Although Judge Furman did not instruct the jury that the information at issue must have "commercial value to its owner," the definition of "confidential business information" as confidential information gathered or acquired by the company and used for a business purpose, necessarily implies that the information is derived from and used for a fundamentally commercial pursuit. Chastain fails to explain how the jury could find that the information was "confidential business information" as defined here, while at the same time finding that the information had no commercial value.

Moreover, even if such a distinction could be drawn in the abstract, here the evidence overwhelmingly showed that confidential information in question had commercial value to OpenSea. Chastain argues that OpenSea never tried to profit from the confidential information. (Br. 30-31). That argument misses the mark. Even if proving commercial value were required, commercial value is not so narrowly defined, as Chastain himself concedes by acknowledging that

26

*Grossman* "involved commercially valuable information." (Br. 28). As here, in *Grossman* the law firm did not and could not profit directly from the confidential information. *Grossman*, 843 F.2d at 86. But this Court reasoned that "the fact that [the law firm] could not commercially exploit the information by trading on it does not mean the confidentiality of the information had no commercial value to the firm." *Id.* Instead, "[a]s several partners of the firm testified, maintaining the confidentiality of the information was of commercial value because by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients." *Id.*; *see also Belt v. United States*, 868 F.2d 1208, 1213-14 (11th Cir. 1989) (fact that defendant's actions "materially affected [the business's] reputation and ability to gain new business" proved "the information was commercially valuable to [the business]"); *United States v. Poirier*, 321 F.3d 1024, 1030 (11th Cir. 2003) (maintaining confidentiality of bids had commercial value because otherwise "the bidding process could become corrupted"); *United States v. Hager*, 879 F.3d 550, 554 (5th Cir. 2018) (using confidential information about employer's supply needs, clients, and pricing to profit by selling to employer was wire fraud).

As in *Grossman*, the evidence at trial proved that maintaining the confidentiality of the featured NFT was necessary to protect OpenSea's reputation, which was in turn essential for the success of the business. As Alex Atallah, one of OpenSea's co-founders, testified, trading by an OpenSea employee based on confidential information "could compromise OpenSea's

27

brand and stance as a neutral and fair marketplace" because "the public would probably lose trust in . . . the company as a whole." (A. 230-31). Chastain's own statements that OpenSea's users would "take us to task if we feature something we own" was powerful proof that guarding against such exploitation was valuable to OpenSea's reputation and business. (A. 358-63, 505-06).

Moreover, the information about featured NFTs was a commercially valuable part of OpenSea's business. Chastain stated, for instance, that the featured work section of the website was "clearly an incredibly important promotional area that anyone would pay for access to." (Tr. 361, GX-201). Atallah testified that OpenSea could have theoretically charged people money to be featured on the home page, and theoretically could have bought the featured NFT itself. (A. 228). It did not because it would have compromised OpenSea's brand neutrality. (A. 229). Such evidence, coupled with the undisputed fact that Chastain was able to profit from the information when he did use it unlawfully, proves that the information in question had commercial value. *See Belt*, 868 F.2d at 1213 ("the value of the confidential information [was] evidenced by the companies' willingness to pay significant funds for the information"). And OpenSea's reaction after Chastain's criminal activity became public demonstrates that it viewed its reputation as a neutral broker of NFT transactions as essential to its business.

For all these reasons, Chastain's challenge to Judge Furman's jury instructions on the meaning of "property" should be rejected.

28

### C. The District Court's Instruction on the Definition of Fraud

#### 1. Relevant Facts

With respect to the first element of wire fraud, the District Court provided the following preliminary definition to the jury:

> Fraud is a general term that includes all efforts and means that an individual may devise to deprive another of money or property by trick, deception, swindle, or overreaching. In order to establish a scheme to defraud, the government need not show that the defendant made a misrepresentation. You may find the existence of a scheme to defraud if you find that the conduct of the defendant was deceptive or if you find that the defendant conducted himself in a manner that departed from traditional notions of fundamental honesty and fair play in the general and business life of society.

(A. 411). Chastain objected to the last sentence of that instruction, but on a different ground than he now raises, arguing that it ran afoul of *Cleveland* and *Kelly* because the fraud statutes only "protect traditional property rights," not a "view of integrity." (A. 133, 385). The District Court declined to revise its proposed charge, noting that "*Kelly* and *Cleveland* . . . are addressing different issues in a different context," and that "[t]his language comes from the Second Circuit's decisions." (A. 385).

29

## 2. The District Court Properly Defined Fraud

The District Court's instruction on the meaning of fraud was not erroneous. Chastain claims that the "jury instructions defined fraud far too broadly, inviting conviction for conduct that is not fraudulent" by referencing traditional notions of fundamental honesty and fair play, which he claims is a concept of fraud that has been "relegated to the dustbin." (Br. 49-50). But even since Justice Scalia's concurrence in *Skilling* —the main opinion on which Chastain relies (Br. 50) —this Court has repeatedly defined fraud to involve "a departure from fundamental honesty, moral uprightness, or fair play." *United States v. Gatto*, 986 F.3d 104, 130 (2d Cir. 2021); *see also, e.g.*, *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018); *United States v. Trapilo*, 130 F.3d 547, 550 (2d Cir. 1997); *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992); *United States v. Von Barta*, 635 F.2d 999, 1005 n.12 (2d Cir. 1980). That definition is likewise used by nearly every other circuit. *See, e.g.*, *United States v. Moran*, 312 F.3d 480, 489 (1st Cir. 2002); *United States v. Riley*, 621 F.3d 312, 327 (3d Cir. 2010) (citing *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987)); *United States v. Matthews*, 31 F. App'x 838 (5th Cir. 2002); *United States v. Rathburn*, 771 F. App'x 614, 621 (6th Cir. 2019); *United States v. Norton*, 108 F.3d 133, 135 (7th Cir. 1997); *United States v. Gilbertson*, 970 F.3d 939, 947 (8th Cir. 2020); *United States v. Rodrigues*, 237 F. App'x 178, 180 (9th Cir. 2007); *United States v. Taylor*, 832 F.2d 1187, 1199 (10th Cir. 1987). Chastain therefore cannot show error, much less plain error.

30

Chastain likewise cannot show that the District Court plainly erred by instructing the jury, without objection from Chastain, that "the Government need not show that the defendant made a misrepresentation." (Br. 52 (quoting A. 411)). This instruction was consistent with settled law that embezzlement by a fiduciary effectuates a scheme to defraud. In *Carpenter*, the Supreme Court held that the "concept of 'fraud' includes the act of embezzlement," 484 U.S. at 27, and in *United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995), this Court made clear that embezzling property with which a defendant was "entrusted as a fiduciary" effectuates a scheme to defraud. Similarly here, Chastain misappropriated confidential information from his employer. Chastain emphasizes that embezzlement by a fiduciary includes the failure to disclose the misappropriation of property. (Br. 52 (citing cases)). But that is consistent with the District Court's instruction that the Government must prove that the "conduct of the defendant was deceptive" or that his conduct "departed from traditional notions of fundamental honesty and fair play." (A. 411). Even if the District Court had also been required to instruct the jury about "an omission in the face of a duty to disclose" (Br. 52) —and Chastain cites no case to that effect—Chastain cannot demonstrate any adverse effect on the trial, where it was undisputed that Chastain not only failed to disclose his use of confidential information about NFTs, but that he also lied about it.

Moreover, "viewing the charge as a whole, there was no prejudicial error." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). It was not possible for the jury to convict simply on the basis of

31

"generally unethical" conduct or a violation of OpenSea's rules (Br. 51), because the District Court instructed the jury that the scheme to defraud had to be for the purpose of obtaining property (A. 411-12), and that it was not enough for the defendant to violate professional duties or policies (A. 413). Additionally, notwithstanding the general definition of fraud, the District Court instructed the jury that in this case "the alleged scheme to defraud is fraudulently embezzling or fraudulent misappropriating property belonging to another," further diminishing the risk of any prejudice. (A. 411-12). The dispute between the parties was whether Chastain fraudulently misappropriated confidential business information, which is plainly a form of property fraud, and by convicting Chastain the jury necessarily concluded that he did. *See Neder*, 527 U.S. at 15.

### D. The District Court Did Not Err in Omitting a Materiality Instruction

Chastain claims that it was plain error for the District Court to omit a materiality instruction in its wire fraud instruction. (Br. 53). As he concedes, he raises this argument for the first time on appeal. (Br. 53). He cannot show error, plain or otherwise.

Chastain argues that the omission of a materiality instruction was plain error under *Neder*. (Br. 53). But *Neder* recognized that "none of the fraud statutes define the phrase 'scheme or artifce to fraud,' or even mentions materiality." *Neder*, 527 U.S. at 21. *Neder* nonetheless held that with respect to a fraudulent scheme involving falsehoods, "materiality *of falsehood*

32

is an element of the . . . wire fraud . . . statute[ ]." *Id.* at 25 (emphasis added). Chastain is similarly incorrect that *United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017), stands for the general proposition that materiality is a "separate element necessary to 'assure that the defendant's conduct was calculated to deceive.'" (Br. 52). As in *Neder*, *Weaver* concerned the materiality of misrepresentations, and held that with respect to false representations, "[i]n order to prove the existence of a scheme to defraud, the government must also prove that the misrepresentations were material." *Weaver*, 860 F.3d at 95. Where, as here, the fraudulent scheme instead involves misappropriation—and not affirmative misrepresentations—it is not apparent that materiality is an independent element of the crime, and Chastain cites no case to that effect. *See Int'l News Serv.*, 248 U.S. at 242 (characterizing misappropriation as a "fraud upon complainant's rights" that "substitutes misappropriation in the place of misrepresentation"). As explained in *Weaver*, "under any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Weaver*, 860 F.3d at 84 (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016)). That rationale, however, does not readily apply to an embezzlement scheme, which is *per se* fraudulent. *See Grin v. Shine*, 187 U.S. 181, 189 (1902) ("[I]t is impossible for a person to embezzle the money of another without committing a fraud upon him.").

Chastain suggests that the Government was required to prove that "Chastain's undisclosed use of the information was a material misrepresentation or

omission." (Br. 54). Because Chastain cites "no binding precedent" that supports this argument, Chastain cannot establish that any purported error by the District Court was plain. *United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004). In any event, the requirement that the jury find that Chastain misappropriated "confidential business information"—meaning information "acquired or created by a business for a business purpose" and that "the business both considered and treated . . . in a way that maintained the company's exclusive right to that information" (A. 412)—necessarily required the jury to find that Chastain's undisclosed use of the information was material to OpenSea. And there was extensive evidence at trial that the misappropriation of OpenSea's confidential information was material to OpenSea. Among other things, as soon as OpenSea learned of Chastain's conduct, it terminated his employment and adopted additional measures to protect its confidential information. (A. 239-42, 291-94, 582-83). Therefore, even if Chastain could establish an error that was plain—which he cannot—he still cannot show that any purported error affected the verdict. *See Marcus*, 560 U.S. at 262.

## POINT II

### Chastain's Convictions Were Supported By Sufficient Evidence

Chastain argues that the evidence Chastain defrauded OpenSea of "property" was insufficient, as was the evidence of intent to defraud. (Br. 19-37). This argument is meritless, and the evidence amply supported the jury's verdict.

34

### A. Applicable Law

Although this Court will "review sufficiency of evidence challenges *de novo* . . . defendants face a heavy burden, as the standard of review is exceedingly deferential" to the jury's verdict. *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (emphasis in original). A court "may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021).

In considering the sufficiency of the evidence supporting a guilty verdict, the evidence must be viewed in the light most favorable to the Government. *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020). The Court "must analyze the pieces of evidence in conjunction, not in isolation," *Persico*, 645 F.3d at 104, and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023). The Court must also "credit every inference that the jury might have drawn in favor of the government, because the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court." *United States v. Raniere*, 55 F.4th 354, 364 (2d Cir. 2022). "These standards apply whether the evidence

35

being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

"In order to avoid usurping the role of the jury, courts must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony when reviewing the sufficiency of the evidence." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 158-59 (2d Cir. 2008). "A jury's verdict may be based entirely on circumstantial evidence." *United States v. Rutigliano*, 790 F.3d 389, 402 (2d Cir. 2015). Because the jury is entitled to choose which inferences to draw, "the government's case need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016).

## B. Discussion

### 1. There was Sufficient Evidence That Chastain Defrauded OpenSea of Property

Chastain argues that the evidence was insufficient to satisfy the "property" element of wire fraud because the information he exploited about OpenSea's forthcoming featured NFT was neither of commercial value to the business, nor was it confidential. (Br. 19). There was ample evidence for the jury to conclude otherwise. As explained above, the Government was not required to prove that the information was of commercial value to OpenSea. But even if such proof were required, it was not only sufficient, but also overwhelming. *See supra* Point I.B.4.

Similarly, there was considerable evidence for a jury to conclude that the information in question was

36

confidential, as Judge Furman properly instructed the jury that it was required to find. While "pertinent factors" for determining whether information was treated as confidential will "vary from case to case," *Mahaffy* identified factors a jury may consider in evaluating confidentially, *Mahaffy*, 693 F.3d at 135 n.14, which Judge Furman (at Chastain's request, *see* A. 73-74) enumerated for the jury:

> Factors you may consider in determining whether OpenSea treated the information at issue as confidential include, but are not limited to: Written company policies and agreements, employee training, measures the employer has taken to guard the information's secrecy, the extent to which the information is known outside the employer's place of business, and the ways in which other employees may access and use the information.

(A. 412-13). By this measure, particularly viewing the evidence in the light most favorable to the Government, there was more than sufficient evidence for the jury to conclude that OpenSea considered and treated the information as confidential.

For one, OpenSea had written agreements that rendered the information confidential. Specifically, OpenSea had a confidentiality agreement that applied to every OpenSea employee and defined confidential to include "information . . . not generally known or available outside the Company." (A. 524-33). While the agreement did not enumerate every item of confidential information, Atallah testified that it was an

37

"umbrella agreement" that required employees to treat business information confidential by default. (A. 200-01). Atallah also testified that information about upcoming featured NFTs was not known outside of OpenSea before the NFTs were featured, and he believed and considered the information to be confidential under the agreement. (A. 221). OpenSea's other co-founder, Devin Finzer, testified that while he had not thought "explicitly" about whether an employee purchasing featured NFTs in advance of their featuring would violate the agreement, the information about the featured NFT fell under the agreement because it "was privy and specific to the company." (A. 290). Chastain calls this testimony "equivocal," but Atallah use of the word "believe" and "considered" simply expressed his understanding, not hesitation. This is hardly the facts of *United States v. Coplan*, 703 F.3d 46, 74-76 (2d Cir. 2012), cited by Chastain (Br. 33), where the key witness testified "no" to a question on direct and then "yes" on cross. To the extent there is any question about how Atallah's word choices bore on his credibility, all inferences must be drawn in favor of the jury's verdict. *See Facen*, 812 F.3d at 286.

The fact that OpenSea put in place a confidentiality agreement, which it viewed as "standard practice" for protecting information (A. 279), and which according to the company applied to Chastain, is sufficient evidence alone to give the lie to Chastain's claim that OpenSea took no "affirmative steps" to protect the confidentiality of the featured NFTs. (Br. 32-37). *See Cherif*, 943 F.2d at 694 (company "treated . . . information as confidential, and went to some lengths to keep the information confidential" by, for example, requiring

38

"all its employees to sign an 'integrity policy' by which employees agreed not to disclose confidential information to unauthorized people"); *FMC Corp. v. Boesky*, 852 F.2d 981, 990-91 (7th Cir. 1988) (company "intended to keep . . . information confidential" where "[u]nder the parties' written letter agreement, Goldman agreed to keep confidential . . . all information disclosed by FMC"). That is especially apparent here, where the jury convicted Chastain after Judge Furman expressly instructed that "[i]f an employer considers information to be confidential but does not take affirmative steps to treat it as such and maintain exclusivity, it does not qualify as property." (A. 412-13).

Chastain dismisses the evidentiary significance of the confidentiality agreement by labeling it a "Clerky template"—a reference to the legal service that provided the template for the agreement—and noting that it does not say "NFT" in it. (Br. 32-33). Chastain made these very same arguments to the jury, and they were rejected. OpenSea's founders used an agreement from an outside legal service because they were a startup company without an in-house legal department. That OpenSea nonetheless sought out a confidentiality agreement is evidence of "measures the employer has taken to guard the information's secrecy," *Mahaffy*, 693 F.3d at 135 n.14, not the opposite. The jury was likewise free to conclude that the absence of the word "NFT" from the agreement was insignificant; after all, OpenSea is an NFT company, so the agreement plainly applied to NFTs. The fact that OpenSea immediately asked Chastain to resign and issued guidance to employees to reinforce the prohibition on trading in NFTs using confidential company information further

39

demonstrated that the company viewed Chastain's conduct as a breach of its confidentiality policies. (A. 239-42, 291-94, 582-83).

The evidence also showed that information about what NFTs would be featured on OpenSea was not "known outside the employer's place of business" and was not freely accessible to "other employees." *Mahaffy*, 693 F.3d at 135 n.14. OpenSea treated the information as confidential both inside and outside the company. While Chastain solicited suggestions from co-workers and the public (Br. 36-37), the identity of the featured NFT once selected was never disclosed to the public or even internally at OpenSea prior to its publication. (A. 220-22, 287, 337, 341). Chastain's words and actions also demonstrated that he understood OpenSea's business information to be confidential. There was substantial evidence that Chastain knew what he was doing was wrong, including that he concealed what he was doing from co-workers, lied when he was first caught by a Twitter user, and used anonymous accounts to purchase featured NFTs. (A. 232, 287-88, 314-15, 342, 593; Tr. 376-81, 525). Similarly, when Chastain was accused of trading featured NFTs in September 2021, he twice lied, including by claiming that someone "had seen him buy right after." (A. 236, 343-45). The false statements are evidence that Chastain knew he was not permitted to use the information because it was confidential.

That evidence, taken together, was sufficient for any rational trier of fact to find that the business information in question was confidential.

40

### 2. There Was Sufficient Evidence of Chastain's Intent To Defraud

Chastain also argues in passing that there was insufficient evidence that Chastain contemplated or intended some harm to the property rights of OpenSea. (Br. 38). This argument is easily dispensed with. To convict a defendant of wire fraud, the Government must prove as part of the element of intent to defraud that the defendant "contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). "[I]t is sufficient that a defendant's scheme was intended to deprive another of property rights, even if the defendant did not physically 'obtain' any money or property by taking it from the victim." *United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006). Where the property right is confidential business information, "it is sufficient that the [business] has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." *Carpenter*, 484 U.S. at 26-27. Here, there was ample evidence that Chastain intentionally traded on OpenSea's confidential information, which likewise established that Chastain intended to deprive OpenSea of the exclusive use of that information. *See Raniere*, 55 F.4th at 364 (this Court must "credit every inference that the jury might have drawn in favor of the government"). That is sufficient to prove the element of intent to defraud.

41

## POINT III

### The District Court's Evidentiary Rulings Were Correct

Chastain raises a number of challenges to the District Court's evidentiary rulings. Chastain can neither demonstrate that the District Court abused its discretion nor establish that he was prejudiced by the purported errors.

### A. Applicable Law

A district court's evidentiary rulings are reviewed for abuse of discretion and will be reversed "only when the court acted arbitrarily or irrationally." *Nektalov*, 461 at 318. In particular, when assessing claims of relevance and undue prejudice under Federal Rules of Evidence 401 and 403, this Court's review "is highly deferential in recognition of the district court's superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice." *Id.* When reviewing a Rule 403 ruling, this Court reviews the evidence "maximizing its probative value and minimizing its prejudicial effect." *Id.*

Under this "deferential" standard, an evidentiary ruling may be disturbed "only where the decision to admit or exclude evidence was manifestly erroneous." *United States v. Delva*, 858 F.3d 135, 156 (2d Cir. 2017). Even when a district court's evidentiary ruling is "manifestly erroneous," the defendant is not entitled to a new trial if the error was harmless. *United States v. Siddiqui*, 699 F.3d 690, 702 (2d Cir. 2012). An evidentiary error is harmless if this Court determines

42

with "fair assurance that the jury's judgment was not substantially swayed by error." *United States v. Paulino*, 445 F.3d 211, 219 (2d Cir. 2006).

## B. The District Court Properly Excluded Questioning of Lower-Level OpenSea Employees About the Clarity of OpenSea's Rules

Chastain argues that the District Court erroneously excluded evidence that "precluded Chastain from questioning other OpenSea employees about how they 'interpreted or understood [OpenSea's] rules.'" (Br. 54 (quoting SPA 31)). It was well within the District Court's discretion to exclude this evidence as irrelevant.

### 1. Relevant Facts

Prior to trial, the Government moved to preclude questioning of OpenSea employees regarding their beliefs about OpenSea's rules. Judge Furman ruled that Chastain was permitted to cross-examine OpenSea's founders "about the clarity of the [confidentiality] agreement (or lack thereof)" in the event the Government asked them about what the agreement was intended to cover. (SPA 30). Judge Furman precluded Chastain "from questioning other OpenSea employees . . . about their opinions on whether OpenSea's confidentiality rules were adequate or clear" because "how *other* employees interpreted or understood the rules is irrelevant and improper opinion testimony." (SPA 30-31(emphasis in original)). Judge Furman noted that Chastain was "free to question OpenSea employees . . . about the existence (or non-existence) of relevant

43

policies and trainings" and "to make arguments at
trial based on the language of such policies and train-
ings or to testify about *his* interpretations and under-
standings of these matters." (SPA 30-31 (emphasis in
original)).

### 2. Discussion

Judge Furman did not abuse his discretion by pre-
cluding irrelevant cross examination about whether
employees other than OpenSea's co-founders believed
OpenSea's confidentiality rules were adequate or
clear. Such testimony was neither evidence of
OpenSea's efforts to safeguard its confidential infor-
mation, nor was it probative of Chastain's knowledge
and intent. Chastain claims that such testimony could
have rebutted the argument that Chastain knew his
actions violated OpenSea's confidentiality policy. But
Judge Furman expressly permitted Chastain to testify
about "*his* interpretations and understandings of these
matters." (SPA 30-31). The District Court rightly de-
termined, however, that Chastain could not use other
employees' opinions about the clarity of the rules as a
substitute for his own mental state. Chastain claims
that evidence about employee beliefs was relevant to
whether OpenSea took steps to keep its information
confidential. (Br. 55). But Judge Furman's ruling only
precluded questioning of low-level OpenSea employees
about whether they found the agreement clear. Chas-
tain was still permitted to ask employees about
whether they believed OpenSea treated the infor-
mation confidentially and to question the co-founders
about the "clarity (or lack thereof)" of the agreement
and any other measures they took, or failed to take, to

44

preserve confidentiality. (SPA 30; *see also* A. 464 (Judge Furman explaining that the defense was permitted to ask employees "was the information treated as confidential"); A. 474-75 (Judge Furman explaining that with respect to lower-level employees, he had "preclude[d] inquiry into essentially the meaning of the contract and whether the rules and the contract were clear," but that questions about "how was this information thought about or treated within the company" were permitted)).

This case is unlike *United States v. Litvak*, 808 F.3d 160, 188-90 (2d Cir. 2015), on which Chastain relies. There, the district court improperly excluded evidence of the *conduct* of other employees that was approved by Litvak's supervisors, that tended to show that Litvak's similar conduct was likewise approved, supporting a good faith defense. That is different from the facts here, where there was no evidence that OpenSea's co-founders were aware of, much less approved of, Chastain or other employees trading on the company's confidential information, or that Chastain or the co-founders were informed that any employee considered the confidentiality rules unclear. The disputed evidence therefore had no bearing on Chastain's supposed good faith, and permitting questions on this subject would therefore have confused and misled the jury into believing that another employees' beliefs about or understanding of the rules could be imputed to Chastain.

The District Court also properly precluded the questioning as soliciting improper lay opinion testimony under Federal Rule of Evidence 701. Under Rule

45

701, a "lay witness may not . . . testify as to a legal con-
clusion, such as the correct interpretation of a con-
tract." *United States v. Crawford*, 239 F.3d 1086, 1090
(9th Cir. 2001); *see also Crowe v. Bolduc*, 334 F.3d 124,
131 (1st Cir. 2003) (noting that "interpretation of a
contract . . . was not a subject commonly addressed by
lay witnesses"). Indeed, courts preclude experts from
opining on the meaning and ambiguity of contracts, so
it is certainly inappropriate to permit a lay witness to
similarly opine. *See, e.g.*, *Marx & Co. v. Diners' Club
Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("legal opin-
ions as to the meaning of . . . contract terms" is not per-
missible because "[i]t is not for witnesses to instruct
the jury as to applicable principles of law"); *Red Rock
Commodities, Ltd. v. Standard Chartered Bank*, 140
F.3d 420, 423-24 (2d Cir. 1998) (holding question of
whether contract is ambiguous is not for expert testi-
mony).[6]

Even if Judge Furman erred—which he did not—
any error was harmless. Chastain was able to cross

---

[6] The circumstances here are unlike those in
*United States v. Chapman*, 209 F. App'x 253, 264 (4th
Cir. 2006), an out-of-Circuit case cited by Chastain.
(Br. 57). There, a *victim* of the defendant's investment
advisory fraud properly testified about his personal
understanding of the obligations imposed by a contract
with his company, which was relevant to whether the
defendant breached his defined duties. Similarly here,
Chastain was permitted to testify about his personal
understanding of the confidentiality agreement, which
was relevant to his mental state.

46

examine OpenSea's co-founders about the confidentiality agreement and the clarity of its terms, and to cross examine the other OpenSea employee who testified about whether the information at issue was kept confidential. (A. 341-42, 349, Tr. 571; A. 475 (Judge Furman noting that OpenSea employee was questioned about "whether this information was shared outside the company . . . and so on and so forth")). At most, Chastain points to a single text message from an employee that "[OpenSea] didn't have policies" relating to NFTs (Br. 54 (citing GX 605)), but the lack of any written policy expressly about NFTs was elicited at trial from one of OpenSea's co-founders (A. 302), and Judge Furman's ruling expressly permitted Chastain "to question OpenSea employees . . . about the existence (or non-existence) of relevant policies." (SPA 30-31). Chastain argued to the jury that the confidentiality agreement was unclear, but the jury was simply unpersuaded in light of the powerful evidence that the agreement forbade Chastain's conduct and that Chastain knew what he was doing was wrong. *See supra* Point II.

## C. The District Court Properly Excluded a Redline Comparison Created by Defense Counsel

Chastain argues that the District Court erred by excluding a redline comparison created by Chastain's counsel between the OpenSea confidentiality form, which was in evidence, and the template OpenSea had used to create the form from a legal service called Clerky. (Br. 57-61). Judge Furman properly concluded that the proposed exhibit had "minimal, if any,

47

relevance," any relevant facts had already been elicited through witnesses, and "introducing the redline can only cause confusion and undue prejudice." (A. 375-76).

Chastain argues that the redline "was relevant because it demonstrated that OpenSea's co-founders took no steps . . . to define employees' confidentiality obligations." (Br. 59). The origins of the confidentiality agreement, however, had limited relevance to the question of confidentiality. Chastain's argument was based on the questionable premise that using a template betrays a lack of care for confidentiality, rather than reliance on the expertise of an online legal service. The agreement's origins also did not shed light on whether the company took affirmative steps to maintain the confidentiality of featured NFT information because OpenSea did not decide to feature NFTs on its website until after the agreement was adopted. (A. 249). There was no evidence that Chastain knew about the origins of the agreement (which was adopted before he joined the company) so it was irrelevant to his mental state. Notably, while this Court has identified "written company policies" as a "pertinent factor[]," in assessing whether "employers treat information as confidential," *Mahaffy*, 693 F.3d at 135 n.14, it has never stated that *how* the company came to write its policies is relevant. The words of a confidentiality agreement or policy are evidence of how a company treated its confidential information. The process for creating an agreement, on the other hand, has no such probative value.

48

Chastain is also incorrect that the redline was relevant to impeach the credibility of OpenSea's co-founder, Atallah. (Br. 59). Atallah acknowledged that OpenSea used Clerky boilerplate with minimal edits. (A. 246-49). The redline did not contradict his testimony. Atallah was not wrong that OpenSea made some modifications "to customize the template." (A. 246). As Chastain's redline showed, among other things, the template was modified to customize it to OpenSea.

Given the exhibit's minimal probative value, it was well within Judge Furman's discretion to conclude that any relevance was outweighed by the risk of unfair prejudice, confusion, and wasting time under Rule 403. The exhibit risked unfairly suggesting to the jury that failure to alter the template showed a lack of concern for confidentiality. And it would have invited a distracting and time-wasting minitrial on the quality and reliability of Clerky's templates.

Finally, any alleged error was harmless. Even assuming that the "specificity with which an employer crafts a written confidentiality policy" were relevant (Br. 59), there was ample undisputed evidence admitted at trial that the confidentiality agreement was based on a Clerky template that was not meaningfully modified. Atallah testified that the "agreement was based on a template that was generated by a website called Clerky," a legal service that creates legal documents from templates, and that OpenSea "made modifications on Clerky's website to customize the template that they had, and then generated the form from the site." (A. 246; *see also* 193-94, 300). Atallah agreed

49

that he did not need to edit the agreement's terms and that "the Clerky form was basically boilerplate language." (A. 249). OpenSea's other co-founder gave similar testimony. (A. 300). Chastain argued to the jury that this showed that OpenSea did not consider or treat the featured NFTs as confidential. (Tr. 838, 844-50). Therefore, to the extent the redline evidence had any relevance, it was cumulative of evidence admitted at trial, and the testimony in the record demonstrates that its exclusion did not affect the outcome of the trial.

### D. The District Court Properly Excluded Irrelevant Cross-Examination of OpenSea's Co-Founder

Chastain argues that he should have been permitted to question OpenSea co-founder Devin Finzer about Finzer's trading in a cryptocurrency token, MATIC, after OpenSea had decided to integrate the blockchain associated with MATIC into OpenSea's platform, but before that integration was publicly announced. (Br. 61). The District Court properly excluded this line of cross examination under Rules 401 and 403 as irrelevant, confusing, misleading, and a waste of time. (A. 330-31).

Chastain claims that the prospect that Finzer traded on OpenSea's inside information "bore on Finzer's credibility" and undermined the Government's allegation that the confidentiality agreement prohibited Chastain from using confidential company information for his own personal gain. (Br. 62-63). But as the District Court rightly found, the evidence "doesn't

50

speak to the issues in this case" and "would be a f[r]olic and detour." (A. 331). As Chastain conceded below, there was no evidence that Chastain knew of Finzer's trading of MATIC, and therefore Finzer's conduct was irrelevant to Chastain's knowledge, good faith, or intent with respect to what constituted confidential information or its misuse. (A. 331). Moreover, as the District Court repeatedly observed, OpenSea and its founders were not on trial. (A. 331). Because the evidence did not relate to whether information about featured NFTs was considered confidential by OpenSea, Judge Furman rightly determined that the evidence would "just smear" Finzer and "make him look bad" in an "unfair and prejudicial" way. (A. 331).

Chastain argues that the evidence would show that Finzer "didn't believe company policy precluded . . . using similar company information for personal benefit." (Br. 63). But whether or not Finzer treated *other* information confidentially was not relevant to whether he considered and treated OpenSea's plans about featured NFTs to be confidential. That line of inquiry would also have opened the floodgates to evidence about MATIC and its associated blockchain, whether OpenSea treated this information as confidential, whether Finzer's trading activity was based on confidential information, and whether his trading in fact violated OpenSea's rules and was wrongful. Judge Furman rightly deemed this a needless frolic and detour that would distract from Chastain's conduct and the "issues in this case." (A. 331).

Finally, even if Judge Furman erred—which he did not—it is apparent that any error did not affect the

verdict. Chastain's counsel was permitted to cross-examine Finzer about other examples of OpenSea arguably not treating its plans confidentially (*see* A. 332), and Chastain was given considerable latitude to attack OpenSea's adherence to confidentiality rules (*see, e.g.*, A. 300-03). Had Chastain established that OpenSea did not treat information about MATIC confidentially, that would not have resolved whether information about featured NFTs was confidential. Alternatively, had Chastain demonstrated that Finzer engaged in wrongful insider trading based on confidential information, that would not have excused Chastain's own wrongful use of OpenSea's confidential information, which the evidence overwhelming proved.

## E. The Cumulative Error Doctrine Does Not Warrant Reversal

Chastain groups his meritless claims into a catchall claim of cumulative error. (Br. 66). It is true that the effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal." *United States v. Rahman*, 189 F.3d 88, 145 (2d Cir. 1999). However, "[a] cumulative-error analysis aggregates only actual errors to determine their cumulative effect." *United States v. Gabinskaya*, 829 F.3d 127, 135 (2d Cir. 2016). Because Chastain's individual claims of error are meritless, the cumulative error claim must be rejected. *See United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013). Moreover, even if any of the challenged rulings were erroneous, their aggregate effect does not cast doubt on the fairness of the trial, particularly in light of the overwhelming

52

evidence of Chastain's guilt. *See United States v. Ulbricht*, 858 F.3d 71, 123 (2d Cir. 2017).

## POINT IV

### The District Court Properly Responded to the Jury's Note About Confidential Information

Chastain objects to an instruction the District Court gave in response to a jury note concerning what evidence to evaluate in determining whether OpenSea considered information confidential. (A. 40-49). But the District Court reasonably interpreted the jury note and gave a proper instruction, rather than Chastain's legally inaccurate proposal.

### A. Relevant Facts

In the course of its deliberations, the jury submitted a note asking the following: "Re Count One, Element 1, if the defendant viewed the information as confidential but Devin Finzer, the other signatory to the confidentiality agreement, did not, is that enough to consider it confidential?" (A. 448). Chastain repeatedly submitted that the answer should be "no" without additional elaboration. (A. 457, 466). Judge Furman disagreed, noting that while "Mr. Finzer's opinion is certainly significant," it was not "dispositive," which was a "fatal flaw" in Chastain's proposal. (A. 458-59). The District Court received written submissions, proposed three alternative supplemental instructions, and heard from the parties. (A. 462-84). Ultimately, the District Court repeated its instructions on "confidential business information" and again enumerated the factors the jury may consider in determining

53

whether OpenSea treated the information at issue as confidential. The District Court further explained:

> As these instructions suggest, the focus of the inquiry with respect to whether the information at issue was "confidential business information" is on the company, namely, OpenSea. Of course, a company can act only through its officers, employees, and corporate materials, such as policies and agreements. Thus, in evaluating how OpenSea considered and treated the information at issue, you may consider the conduct and testimony of Mr. Finzer, as an officer of the company, as well as any other evidence that relates to the issue, including how employees at OpenSea treated the information within the scope of their employment and any other evidence relevant to the factors referenced above. What weight, if any, you give any such evidence is, of course, for you to decide.

(A. 485-86). The jury resumed its deliberations and ultimately returned its guilty verdict without any further inquiries on this issue.

## B.  Applicable Law

A district court "enjoys considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry." *United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007). Specifically, "[t]he trial judge is in the best position to sense

54

whether the jury is able to proceed properly with its
deliberations, and he has considerable discretion in de-
termining how to respond to communications indicat-
ing that the jury is experiencing confusion." *United
States v. Parker*, 903 F.2d 91, 101 (2d Cir. 1990). A dis-
trict court has discretion to reply to a jury note with a
supplemental instruction, *id.* at 102, the legal suffi-
ciency of which "must be assessed in the context of the
instructions as a whole," *United States v. Gengo*, 808
F.2d 1, 4 (2d Cir. 1986).

"A jury instruction is erroneous if it misleads the
jury as to the correct legal standard or does not ade-
quately inform the jury on the law." *United States v.
Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). A trial
court's refusal to issue a defendant's requested jury in-
struction will not require a new trial "unless the re-
quested instruction was legally correct, represented a
theory of defense with a basis in the record that would
lead to acquittal, and the charge actually given was
prejudicial." *United States v. Desinor*, 525 F.3d 193,
198 (2d Cir. 2008). A conviction should be affirmed de-
spite instructional error if it "appears beyond a reason-
able doubt that the error complained of did not contrib-
ute to the verdict obtained." *Neder*, 527 U.S. at 15.

## C.  Discussion

The District Court's response to the jury's note was
both legally correct and an appropriate exercise of its
considerable discretion.

Chastain asserts on appeal, as he did below, that
the District Court simply should have said "no" when
the jury asked if it could find the information

55

confidential if Finzer did not. (Br. 44, 46). A simple "no" would not only have been incomplete, but also misleading. As Judge Furman reasoned, it was not "legally accurate to say that if Mr. Finzer didn't view it as confidential, the answer is it's not property," because while his "opinion is certainly significant," it is not "dispositive." (A. 458-59). Judge Furman's reasoning adhered to *Mahaffy*, where this Court explained that the "pertinent factors" for whether an employer treated information as confidential will "vary from case to case," meaning that no one factor is dispositive. Instead, a jury should consider a variety of factors, among them "measures the employer has taken to guard the information's secrecy," as well as "written company policies, employee training, . . . and the ways in which other employees may access and use the information." 693 F.3d at 135 n.14. Because the District Court rightly concluded that the answer "no" would not be legally correct "in every respect," and had the potential to "mislead the jury," *Roy*, 783 F.3d at 420, Judge Furman properly declined to give Chastain's proposed answer.

On the other hand, the District Court's supplemental instruction was consistent with *Mahaffy*'s explanation of the factors a jury may consider in evaluating whether employers treat information as confidential. The District Court's response did not, as Chastain asserts, "incorrectly suggest[ ] Chastain's subjective views could trump the jury's apparent conclusion that Finzer did not view the information as confidential." (Br. 44). Judge Furman specifically instructed the jury that "in evaluating how OpenSea considered and treated the information at issue, you may consider

56

the conduct and testimony of Mr. Finzer, as an officer of the company, as well as any other evidence that relates to the issue." (A. 485-86). The District Court also did not tell the jury to evaluate Chastain's subjective beliefs in a particular way. Instead, the District Court stated that the jury could consider "how employees at OpenSea treated the information within the scope of their employment." (A. 486). That was proper under *Mahaffy*, which lists "the ways in which . . . employees may access and use the information" as an appropriate consideration in assessing whether an employer considers and treats information as confidential. *Mahaffy*, 693 F.3d at 135 n.14. Indeed, *Mahaffy* vacated the defendants' convictions because of undisclosed evidence of "the conduct of other employees who possessed block order information." *Id.* at 130-31. That is because how an employee of a business treats information in the course of their employment is probative of how the employer treats the information.

Chastain posits that the District Court's instruction is inconsistent with principles of agency law. (Br. 44). Not so. The law is clear that a corporation acts through its employees and agents. *See, e.g.*, *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 660 (2d Cir.1989). None of the cases cited by Chastain indicates that only the CEO or founder of a company can define how confidential information is treated. Chastain contends that the problem is that he was a "disloyal agent" who acted "ultra vires." (Br. 44-45). But the instruction was not particular to Chastain and was instead limited to how employees "treated the information *within the scope of their employment*." (A. 486 (emphasis added)).

57

Chastain also asserts that it was improper for the District Court to instruct the jury to consider "how employees at OpenSea treated the information within the scope of their employment" because the District Court had previously precluded evidence about how other employees interpreted or understood the rules. (Br. 47). As discussed *supra* Point III.B, that misrepresents the record. Although Judge Furman precluded questions about whether employees other than the co-founders and Chastain considered the confidentiality rules "adequate or clear" (SPA 30-31), Chastain was never prevented from asking employees questions about how the featured NFT information was treated within OpenSea, which he in fact did during trial. (A. 478 (Judge Furman explaining that none of his rulings precluded asking employees about whether the information was treated as confidential); A. 476 (Judge Furman summarizing employee testimony on cross examination about whether the business information was confidential)). Chastain argues that a defendant's views are not relevant to whether something constitutes property. (Br. 46 (citing *Cleveland*, 531 U.S. at 15)). But the defendant in *Cleveland* was not employed by the victim. Here, under *Mahaffy*, the jury was permitted to consider whether Chastain's understanding as an employee of OpenSea had any bearing on whether OpenSea, his employer, considered the relevant information confidential.

Finally, any error in the supplemental instruction was harmless. Taken together, the District Court's instructions correctly informed the jury of the relevant factors it could assess in determining whether OpenSea considered and threated the information as

58

confidential. Nothing in the supplemental instruction directed the jury to disregard Finzer's testimony or to rely exclusively or even principally on Chastain's views. The case is entirely unlike *United States v. Kopstein*, 759 F.3d 168 (2d Cir. 2014), an outlier case upon which Chastain relies. (Br. 48-49). There, the district court mistakenly instructed the jury that it could convict even if an entrapment defense was successful, gave inconsistent instructions as to what must be "induced" to show entrapment, and then suggested that the government had to both "prove" and "disprove" entrapment, all to the jury's "bewilderment." *Kopstein*, 759 F.3d at 170-82. Nothing about the District Court's instruction here confused the essential elements of the crime, shifted the burden of proof, or directed the jury to convict in the face of a successful defense. Chastain places substantial weight on the subsequent jury notes and verdict. (Br. 64-65). But as courts have cautioned, "one jury note or series of notes" are not a "meaningful reflection of the jury's decisionmaking process." *Colon v. Mitchell*, No. 93 Civ. 4951 (MBM), 1995 WL 758776, at *4 (S.D.N.Y. Dec. 26, 1995), *aff'd*, 108 F.3d 1369 (2d Cir. 1997) (citing cases); *Applebaum v. American Export Isbandtsen Lines*, 472 F.2d 56, 63 (2d Cir. 1972) ("we are loath to speculate on what might be concluded from the successive jury notes").

59

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:     New York, New York
           April 16, 2024

                    Respectfully submitted,

                    DAMIAN WILLIAMS,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States*
                         *of America.*

NICOLAS ROOS,
THOMAS S. BURNETT,
ALLISON C. NICHOLS,
DANIELLE R. SASSOON,
     *Assistant United States Attorneys,*
               *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,974 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: DANIELLE R. SASSOON,
*Assistant United States Attorney*